

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MEG:LKG/AS
F#: 2015R01691

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 26, 2018

<u>By Hand and ECF</u>

The Honorable Steven M. Gold
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    United States v. Scott Brettschneider, et al.
                Criminal Docket No. 18-123 (CBA)

Dear Judge Gold:

        The government respectfully requests that for the reasons provided below the Court order defendants Scott Brettschneider, Charles Gallman, Richard Marshall, and Reginald Shabazz-Muhammad detained pending trial unless they propose and perfect a combination of significant securities backed by real property and financially responsible sureties with sufficient moral suasion to assure their appearance at trial and, in the case of Marshall and Gallman, to assure the safety of the community.

        A criminal defense attorney (Brettschneider), his client (Marshall, a federal inmate) and two other convicted felons (Gallman and Shabazz-Muhammad) submitted a false letter to the Bureau of Prisons ("BOP"). Their scheme to mislead the BOP was captured over Gallman's cell phone, which was subject to court-authorized interception by state authorities. In addition to this scheme, conversations over Gallman's cell phone revealed Gallman's efforts to bribe witnesses and work with attorneys (including Brettschneider) to financially benefit from false recantations. For some of this conduct, Gallman has been charged by the Queens County District Attorney's Office ("QCDA's Office") and has been released on a significant bond. The federal case—and the virtual certainty of conviction that accompanies it—adds another incentive for Gallman to flee and continue tampering with witnesses. A separate package should therefore be required to secure Gallman's federal bond.

I.  Background

The defendants are charged in a two-count indictment for submitting a false letter to the BOP in an effort for Marshall to gain entry into the Residential Drug Abuse Program ("RDAP").  RDAP is a treatment program sponsored by the BOP and is available to sentenced inmates who have a verifiable diagnosis of a substance use disorder within the year preceding their arrest.[1]  An inmate who successfully completes the RDAP program is potentially eligible for early release, receiving as much as a year off his sentence.

As set forth below, in an effort to shave a year off of his sentence, Marshall—with the help of his attorney and two convicted felons—submitted a fraudulent letter to cheat the system.  Unbeknownst to them, the QCDA's Office was monitoring the telephone calls of one of the defendants pursuant to a court-authorized wiretap, and their scheme was exposed.[2]

A.  Brettschneider's Representation of Marshall in *Wright*

Brettschneider, a practicing attorney of 30 years, represented Marshall in United States v. Wright et al., 12-CR-014 (N.D.N.Y) (FJS), a 16-defendant drug conspiracy case.  In Wright, Marshall was charged and pled guilty to distributing at least 280 grams of crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).  The government also filed a prior felony information, under 21 U.S.C. § 851, indicating that Marshall had a prior drug conviction, thus doubling his mandatory minimum sentence.  Court documents in Wright indicate that Marshall supplied significant amounts of powder cocaine—approximately four kilograms total—to the lead defendant, who in turn converted it to crack cocaine and redistributed it in Albany and Troy.

Despite his drug dealing, Marshall did not have a recent history of substance or alcohol abuse.[3]  In his sentencing submission in Wright, Brettschneider asked that Marshall be sentenced to home or community confinement, which could include an alcohol

---

[1] The BOP uses the one-year demarcation point because, according to the DSM-V, an individual is in remission for substance use disorder if they go a year without abusing such substances.

[2] All the recorded conversations quoted in this letter are prepared in draft form only.  The government will prepare a finalized version of the transcripts in advance of trial.  The government also hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case.  In order to preserve the integrity and confidentiality of the government's investigation, notice to some of the defendants of the wiretap interceptions prior to their arrests was not feasible.  This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

[3] In advance of sentencing in Wright, the Probation Department in the Northern District of New York interviewed Marshall on the phone (with Brettschneider also on the line), and prepared a Presentence Investigation Report (the "PSR").  The government intends to seek permission from the Northern District to unseal relevant portions of the PSR.

or drug rehabilitation center.  Id.  Docket Entry No. 336 at 6.  The request was based on the non-violent conduct for which Marshall had been convicted and his criminal history, rather than any history of substance abuse.  Brettschneider also submitted a report (publicly-available) from a psychologist who evaluated Marshall.  The report stated that after recovering from depression earlier in his life, Marshall had been "clean and sober for over 20 years."  Id.  Docket Entry No. 338 at 6.  At sentencing, Brettschneider told the court that he had known Marshall for 20 years and represented that in that time, Marshall had led a "clean life," free of crimes save for a 2007 marijuana arrest.

Marshall was sentenced in August 2014 to 36 months' imprisonment.[4]

B.      False Statements in a Letter to the BOP

Shortly after Marshall began his term of incarceration, the defendants submitted a fraudulent letter to the BOP stating that Marshall had an active drug dependence on alcohol and marijuana.  As Gallman would explain to a person he identified as Marshall's brother, a letter like that would "knock a year off his sentence," but would cost $300.

In October 2014, Marshall and Gallman exchanged a series of calls—intercepted over Gallman's cell phone pursuant to a wiretap order—in which the two men discussed obtaining a letter for Marshall.  The calls were always initiated by Marshall on his "burner" phone, which had been smuggled into prison.  On one call with Gallman, Marshall referred to the phone as one of those "funny joints" that he could use only sparingly because "shit be too hot."  In an October 16, 2014 call, Marshall asked Gallman whether he had spoken to Brettschneider (or "Mighty Whitey" as they would occasionally call him) about a certain letter.  Marshall and Gallman then sketched out the details of this letter, which, at that time, "Michael Jackson" was supposed to author.  Gallman said he would write that Marshall had an "alcohol and heroin problem, that's what I put in.  Well that's what I told him to put in."  In the end, Gallman reassured Marshall: "Mike knows how to hook them things up."

About a week later, on October 24, 2014, Gallman reported having issues securing a letter because the BOP was apparently getting better at detecting fraud and potential authors were weary:  "he is saying he don't know if the dude can do it because they cracking down."  But Gallman claimed he had another person in mind, someone who had to be paid right away: "I'm going to end up having to get this chump the paper (money) he is asking for man."

The two men then added Brettschneider to the call.  Marshall explained to Brettschneider that he needed a letter from a "drug program," to which Brettschneider responded, "alright, alright, we'll work on that Monday.  Ok I know who to talk to."  Marshall also reminded Brettschneider how difficult it was to call from his smuggled cell

---

[4] Marshall escaped the statutory mandatory minimum penalty because he was eligible for and received "safety valve" treatment pursuant to (l)-(5) of subsection (a) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases).

3

phone in prison: "It's hard to get on this phone, right?" Brettschneider acknowledged the hardships associated with using a burner phone in prison: "right I know." Later in the conversation, Marshall also clarified to Brettschneider why he had not discussed this letter on the jail phones (conversations on which are recorded): "I didn't want to talk about this on a regular phone." "You got it," Brettschneider responded.

As he did with Gallman, Marshall outlined to Brettschneider what he wanted from the letter: it had to be on the letterhead to "look real official [be]cause they don't want no bullshit over here. Well listen, it can't be . . . for the last year, it's got to be a year before, you know, before I got locked up, within that year so." Brettschneider knew the year, "2011," he confirmed. Continuing his instructions, Marshall noted that the letter should state that he has been "drinking forever," even before the arrest, and that he was "relapsing and stuff." He implored Brettschneider to get the letter quickly so that it would get him out of prison earlier, "next year," he believed. Gallman reassured him that "we'll get it to you next week," a belief Brettschneider echoed ("alright, we'll get it" and, later, "I am on it, I am on it, I'll take care of it for Tuesday").

A week later, on November 1, 2014, the three men spoke again. Marshall called Gallman and asked about the status of the letter. Gallman had good news, "I just got someone to put the letter together," but there was a wrinkle: "It's coming from Virginia though." Gallman reported that the letter will cost "$350 or 400," a price Marshall hoped Brettschneider would "maybe . . . put that shit up." The two men discussed whether the Virginia origin would set off red flags, because Marshall was from New York. Gallman was not worried: "I doubt they going to be scrutinizing it that much," because Gallman reassured them it was coming from someone who owned his own facility. At the end of the call, Gallman said, "that's the chance we got to take right now." Gallman noted that the letter stated, just as Marshall wished, that he had been an outpatient since 2011 and had relapsed: "that's what you told me, tell him say 2011." "I got to tell him how to hook it up," Gallman explained later in the call. As Marshall began to quibble with the content of the letter, Gallman said, "let me call the dude so you can tell him exactly what you want." The letter should come from Brettschneider "through legal mail," Marshall and Gallman agreed, so that it would not be detected by the prison.

Gallman once again added Brettschneider to the call to discuss the letter. Gallman confirmed with Brettschneider, as Marshall was listening, that Brettschneider had someone prepared to write it: "I think I do," Brettschneider said, "I just have to ask the person." Marshall was not satisfied because, he explained, he could not use his smuggled phone freely—"I can't use these phones like that"—and needed the letter "ASAP." Brettschneider obliged, "I'll call the guy right now." Marshall told Brettschneider that the letter should discuss alcohol abuse and "you can put drugs too, whatever but definitely alcohol." "I'll take care of it when I get off the phone with you," Brettschneider promised, and said he thought that Gallman already had the letter taken care of with another person: "I thought T.A. (Gallman's alias) had someone, but that's ok we got somebody." Not caring about the source of the letter, Marshall demanded for it to come right away, or ASAP as he repeated.

4

Brettschneider delivered. About thirty minutes later, he told Marshall on another three-way call that a letter from a program would be written. "He's gonna do it," Brettschneider said, referring to the person he apparently had recruited on short notice. As it turned out, the person who would write about Marshall's prior drug treatment was Reginald Shabazz-Muhammad—one of Brettschneider's legal assistants. Brettschneider would later describe Shabazz-Muhammad as a dependable worker, willing to do hours of grunt work: "He's a guy that he'll stand there copy 500 pages for me and put together a loose leaf, you know, for trial." With Brettschneider temporarily off the phone, Marshall and Gallman discussed the logistics. Gallman said that Marshall had to get a copy of the letter before it was submitted so that he would know all about his purported substance abuse history, in case he was "questioned about what's in the letter. So this way you already know what's in the letter, and you'll be able to answer whatever is asked"; otherwise, Gallman explained, if Marshall gave answers different from the information conveyed in the letter, he would be "fucked." Marshall worried that the prison authorities would discover the letter and know it is "bullshit," but Gallman was not worried since they would send it through legal mail.

Upon rejoining the call, Brettschneider immediately asked Marshall's deadline for getting the letter. Marshall said he needed the letter "yesterday," so that he could get into the December drug program. Gallman then briefed Brettschneider on the updated plan: Brettschneider would be sending a copy of the letter through legal mail to Marshall so that Marshall knew about his prior treatment, if he was ever asked. Brettschneider approved: "ok, that works." Marshall asked Brettschneider who was writing the letter, to which Brettschneider responded, "it's Shabazz's program!"

Three days later, Gallman asked Brettschneider if "Shabazz ever g[a]ve up the letter." Brettschneider said he did but that Marshall wanted Shabazz to send the letter directly to Marshall rather than go through Brettschneider.

That same month, in November 2014, United States Penitentiary Lewisburg received a letter signed by "Reginald Shabazz-Muhammad, CASAC CLA, Director Of Program Services," detailing Marshall's purported treatment at the "Muhammad Mosque No. 7." The letter, dated November 6, 2014, was postmarked November 20, 2014, from Jamaica, Queens. It stated that Marshall was involved in an outpatient program described as a "community outreach program" run by Muhammad Mosque No. 7 from October 2003 through January 2010, and explained that Marshall was "suffering from active drug dependence, namely alcohol and marijuana." The letter stated that Marshall had been "making progress gradually reducing his active substance dependence."

About two weeks passed before Marshall called Gallman again, on December 5, 2014. Marshall explained that the BOP required progress reports[5] to accompany the letter. Gallman believed those could be fabricated too: "Ok she wants progress notes so we got to

---

[5] Progress reports, also referred to as session notes, are contemporaneous notes made by the treatment provider documenting that the service provider delivered certain diagnostic and/or treatment services to an individual.

5

find somebody to make them up"; he promised to follow up with "Scott's [Brettschneider] man." Marshall offered to send Gallman samples from a fellow inmate, to give a "general idea" of what the progress reports should look like. On the same day, Marshall called Gallman to add another complaint: the January 2010 date in the letter, describing when Marshall had received treatment, is "not gonna fly" because "it's gotta be a year within [when] I got arrested, so it has to be like 2011 in the summer time." Marshall continued "brainstorming" about creating progress reports and requested that he not just have a report about one session. Gallman agreed that they would "spread it out over a period of time."

The following day, Marshall told Gallman that he forwarded two samples "to show what a dude had to do while he was here" to get into the program, though the inmate recommended that they "put it in your own language." Brettschneider joined the call and immediately asked Marshall if he had gotten into the drug program. Marshall responded that he still needed to produce progress reports. Brettschneider sounded optimistic: "I'm sure he must have session notes." Marshall added that the treatment period in the letter should also be changed to end in 2011 because "it gotta be a year prior to my arrest." Brettschneider responded "let me talk to him, let me reach out to him on Tuesday."

Despite repeated attempts by Gallman, however, by this point Shabazz stopped returning his calls. Gallman and Brettschneider described how odd it was that the usually-dependable Shabazz had gone missing, though Brettschneider also recognized that what Marshall was "looking for . . . that's not really that easy to—."

  C. <u>Witness Intimidation and Bribery</u>

Since 2014, the QCDA's Office has been investigating Gallman in connection with witness bribery in Queens County criminal cases.[6] The investigation culminated with an indictment against Gallman for bribing witnesses, tampering with a witness and criminal solicitation (hereinafter, the "Queens Case"). Gallman was arraigned on the charges in Queens County Supreme Court in July 2015 and ultimately posted a $250,000 bond. The case remains pending.

Gallman, as the investigation in the Queens Case revealed, worked with multiple criminal defense lawyers—including Brettschneider—to thwart prosecution and obtain post-conviction relief. Gallman has a well-known reputation in New York City,

---

[6] This conduct may also constitute a violation of federal law, under 18 U.S.C. § 1952. In addition, the government is aware that at least one of the cases involving a potentially false recantation resulted in the dismissal of a violation of supervised release of a defendant in this district. Finally, the government anticipates offering it as evidence of the charged conspiracy against Gallman and Brettschneider, pursuant to Rule 404(b) of the Federal Rules of Evidence. See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (evidence regarding defendant's criminal conduct with coconspirators admissible to "inform jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationships between the participants in the crime developed" (internal quotation marks omitted)).

particularly in Queens, stemming in part from his criminal record.  As detailed below, Gallman has participated in murders and has been convicted of other serious felonies.  Gallman appeared to rely on this reputation when contacting witnesses.

1. Attorney-A

The genesis of the Queens Case were recorded jail calls that revealed a defendant charged by the QCDA's Office with weapons possession (the "State Defendant-1") discussing with his father the prospect of hiring Gallman to bribe the victim not to testify at trial.  Notably, the victim had been threatened at gunpoint in the underlying case.

In the first relevant jail call between State Defendant-1 and his father, State Defendant-1 said he wanted to hire Gallman for "something else," but did not think that he "should talk about it over the phone."  The father acknowledged that he "had an idea" of what State Defendant-1 had in mind and would talk to Gallman to see "how much they charge to make a couple of visits," referring to visits to the victim in the case.  In a subsequent call, State Defendant-1 told his father than he was ready to pay Gallman $300 and as much as a thousand dollars (a "rack") for the "whole situation," which likely included bribery costs.

Investigators working with the QCDA's Office interviewed the victim.  According to the victim, Gallman visited him and stated, in sum and substance, that "We are black.  We don't testify against one of our black brothers.  Come with me to *one of my lawyers* and put stuff in writing.  I'll pay you" (emphasis added on Gallman's reference to working with different lawyers).   In a recorded call with the victim, Gallman asked what the victim would say when called to testify.  During the call, Gallman alluded to his reputation, representing himself as a "motherfucking homie" who "had a life in jail" and now "works with a lot of lawyers."

Following this conversation, Gallman reported to the State Defendant-1's attorney ("Attorney-A") that the victim bribery was successful: "I got with the kid" and "he say it's not him."  Attorney-A and Gallman were confused, however, why the QCDA's Office was still not dismissing the case.  Gallman boasted that the prosecutor would have difficulty finding her star witness: "She gotta have a lot of balls to put that on the record you know because when it comes time for court I think she's gonna come back up with that shit about she's having problems locating the witness so whatever the situation may be."  Attorney-A responded, "I think the man needs his trial."

Attorney-A has since been convicted of participating in an unrelated bribery scheme and sentenced to six years' imprisonment.

7

2.      Attorney-B

After a Justice of the Queens County Supreme Court authorized the interception of Gallman's telephone from October 2014 to April 2015, and law enforcement began listening to Gallman's conversations, it became clear that Gallman worked with multiple attorneys to obtain statements from individuals purporting to be witnesses, dissuading witnesses (including victims) from testifying, and bribing or intimidating witnesses into offering recantations in sworn affidavits. Some examples of this conduct are detailed below.

One series of calls involved discussions of recruiting individuals who would act as witnesses to refute charges of assault on a police officer. In one call in October 2014, Gallman told another state defendant ("State Defendant-2") that Gallman had a witness who was "willing to do whatever it is I need him to do." Gallman added that he wanted "three, four people" to submit affidavits too—at least two, he explained, to "say yeah I was right there and umm you know the cop just wild out, he gave him license, registration and everything, and next thing I know, the cop was just going crazy on him, you know. . . . He was trying to protect himself, he didn't throw no punches. . . . You know so if we can get that, that would be great." Later in the call, Gallman stated that State Defendant-2 and he could visit these potential "witnesses" together, "and then we'll start grooming them on what they gotta say." It does not matter, Gallman said, if these individuals were old or young: "I don't give a fuck how old they are . . . let's get one old and one young." After previewing what Gallman wanted the witnesses to say, he then asked State Defendant-2 about his payment: "Yo, where the fuck is my lunch money?"

In a subsequent call, Gallman and State Defendant-2 continued discussing their ideal recruits. Gallman said they "might have to find somebody outside the projects," a statement with which State Defendant-2 agreed, noting that these people—who would not have any reason to have witnessed the event— could say they were "passing the car or something and they seen it." Gallman revealed that he intended to pay $100 to $200 for "one of these motherfuckers right over here to testify." Gallman referred to Attorney-B as representing State Defendant-2, and court documents corroborated that Attorney-B was counsel of record.

In a January 2015 call with Attorney-B about an unrelated case—in which another defendant ("State Defendant-3") was preparing for a murder trial—Gallman told Attorney-B that a former codefendant in the case (who had been convicted and sentenced to 62 years) was willing to testify however Attorney-B wanted him. In the call, Gallman stated he "just came off the visit . . . I think you're ok, anything we need, he is willing—whichever way you want to play, he is willing." Attorney-B responded, "ok" and "ok, you got it." Gallman added that he wrote down a number of demands this codefendant was making in exchange for the favorable testimony for State Defendant-3. Later in the call, Attorney-B asked Gallman about his collection efforts, presumably from clients; Gallman stated the sums that he had already obtained. In a separate call with another person, Gallman explained why the codefendant would perjure himself. He had been sentenced to 62 years,

8

Gallman said, and he "can't lose nothing. And nig** could get all the prestige in the world, [be]cause I'll spread the word throughout the (jail) system that this nig** here is great."

The codefendant ultimately testified at the murder trial on behalf of State Defendant-3, stating that he was the lone gunman in the murder. He added detail to this story by explaining away the ballistics evidence—how it was that the victim was shot with two different guns. The codefendant testified that he drove to the scene in State Defendant-3's car, approached the victim, who was sitting alone in another car, with a gun in each hand—a fully loaded .38 caliber revolver in one hand and a fully loaded .40 caliber in the other—because he thought it would be "fun" to use two guns. Despite this perjurious testimony, Defendant-3 was convicted.

3.   Attorney-C

In February 2015, the QCDA's Office captured a conversation between Gallman and Attorney-C about a knifepoint robbery case. In the call, the two discussed intercepting the victim on his way to a lineup identification procedure. Gallman asked Attorney-C to notify him when the lineup would occur so that he could "go over that way real quick." Gallman had spoken with the defendant's father, he explained, and the father told Gallman "You know what to do . . . Maybe you can talk to him [the identifying witness]." About an hour later Gallman called Attorney-C, reporting that the victim had not yet arrived; Attorney-C asked Gallman to "sit tight" and wait. Moments later Attorney-C said Gallman was free to leave because the lineup would not happen. During this conversation, Gallman told Attorney-C that he had helped with a prior arrest on this case ("they got this other young kid locked up") and that he was "helping his [i.e., the arrestee's] family" by getting "in touch with the dude [i.e., the witness]"; "I went and spoke to him and everything."

About 30 minutes later, Gallman talked to the defendant's father about bribing the victim. The father told Gallman that he "heard" Gallman had just left the precinct (where he was waiting for the lineup witness), and that the "dude ain't cooperating." Gallman confirmed, explaining that the victim wanted "nothing to do with no police." The father added, "on top of that, like 25 dollars . . . . I would have gave the nig** $1,000 tell him, go ahead home." Gallman said the victim "might . . . still ask for [$]500, [$]600." Gallman promised to find the victim at his job and talk to him again. The father was ready to pay: "If he asked for it and he not gonna fuck with my child, I'll give it to him." Gallman told the father that his daughter would still likely be charged but that he would give Attorney-C something "that's going to blow that out the water."

About an hour later, the two men spoke again, with Gallman informing the father that Gallman would pay the victim a visit. He promised that he would take no "short cut" in this case, and that as he tells "everyone," "If money can keep me out of jail, I ain't never going to jail." He promised the father that "I sure ain't gonna let your daughter go to jail for this dumb shit you know."

9

The following day, Attorney-C spoke with Gallman about the case, exclaiming that "these motherfuckers set $150,000 bail. . . . I'm dead-ass serious, this motherfucker talking bout, the complainant um, filed a photo array in September 2014, but you don't mention that you couldn't do a lineup last night because you don't have your complainant now?" Attorney-C recounted imploring the judge to reconsider but the motion was denied. Attorney-C remarked, about the judge, "Oh, you one of those bitches?" Attorney-C went on to describe the judge as a "devil ass bitch" and that "when there's a race war, I'm taking this bitch's head off personally. I can't wait." The two resolved not to waive time to indict because, Attorney-C said, "You ain't got him [the victim] now, you ain't going to have by Monday."

Moments later, Gallman talked to the father, who volunteered to "speak" with the victim himself. Gallman cautioned him to be "careful" because he could be "charged with tampering with a witness" and because "we don't know if the dude is down." The father was not persuaded, stating that "I ain't got no choice man . . . . So what am I gonna do? Throw the towel in?" The following day the father grew more desperate, asking Gallman for the victim's name so that they "could work from both angles." Gallman discouraged the father, saying that only Gallman knew how to "approach these people." Gallman told the father that his role was to open his pocketbook because this "chump may ask for five, six hundred dollars . . . and we'll give him a stack [i.e., a thousand dollars]." The father confirmed that paying this much for bribing the witness "is not a problem man." Gallman assured the father again, saying, "I am talking about the chump. I know how to deal with these niggas. . . . This is my job, this is my job." The father was concerned, however, that, putting money aside, the witness would still cooperate with the District Attorney's Office if he was fearing deportation. Gallman suggested that they could use threats too: "Yeah, well we can do the same shit."

Gallman also suggested that the daughter could lie on the stand and say, he offered, that she was acting in self-defense to stop the victim from raping her. "I am dead serious. I would have them kids saying all kinds of stories. Yo, you got it, look by any means necessary is all I know, [father]. By any means necessary man, you know. She's not going to jail bro, she is not going to jail."

4. Brettschneider

Gallman was also intercepted in December 2014 discussing with Brettschneider selling a false witness recantation to a prospective client. The conversation about this topic began with Gallman describing to Brettschneider the sentence that a certain defendant received for a murder (hereinafter the "State Defendant-4")—someone they did not formally represent and or had even met;[7] Gallman told Brettschneider, "Scott we gotta get this guy as a client."

---

[7] In one conversation with another person Gallman asked about State Defendant-4, "What's this guy's name again?" Gallman then returned to Brettschneider, and reported the name.

10

Gallman previewed the statement that they could offer from a witness who testified at State Defendant-4's trial, identifying State Defendant-4 as the shooter. The statement would go something like this, Gallman previewed: "[T]he police told him to lie, he better say it's this guy else they're gonna lock him up." Brettschneider agreed with Gallman that they had to convince State Defendant-4 to retain them: "Oh, absolutely." The plan was for Gallman and Brettschneider to represent State Defendant-4 post-conviction in the criminal case and in a subsequent civil law suit. (Gallman: "You got to let us do the civil suit and not only are we gonna do the civil but we're gonna be the one to argue criminal side for you.").

The purported recantation from the witness was key to getting the client. Gallman suggested to Brettschneider that they remind State Defendant-4 that they had all the power because they owned the recantation, and that if State Defendant-4 did not retain them, they would not give him the statement: "tell this guy . . . we in control of this, he gotta retain us. . . . . We got the statement he don't want us to do the shit then I am keeping the statement." Brettschneider again agreed: "Oh, absolutely." Brettschneider opined that the case would be a "slam dunk" and a "home run." He suggested using a particular investigator to take the statement because this investigator had "done thousands of these wrongful conviction cases as an investigator, he knows exactly what he needs you know for the guy to say."

Gallman was elated at the possibility of scaring the QCDA's Office about opening a "flood gate" of "actual innocence" cases. The two men started dreaming about how many millions of dollars the civil case would bring. Brettschneider thought they could get a third of $22,000,000, agreeing with Gallman that it could be their "retirement money." As for the witness whose recantation Gallman and Brettschneider believed was their ticket to riches, Gallman promised Brettschneider that "the kid is going to do whatever it is we need him to do."

In the ensuing days, detectives working with the QCDA's Office observed Brettshneider drive to get Gallman, and the two men then pick up this witness (whom they had identified by name in the calls). On the same day, December 16, 2014, Gallman talked to another individual, telling him that the witness "just gave the statement up, man" and that they now had to pay him: "we gotta give the kid a $150." Gallman left no doubt that the payment was for the statement, explaining that he told the witness, "He'll have it [the $150] today, you know no problem you know the lawyer got the statement so we good. . . ."

About two hours later, Gallman spoke with another individual, telling him that "we are not finished" with the witness yet, but "he wanted $150." Gallman said he promised that he would give the money because it was "the best recantation I ever heard. . . . I don't know if he telling the truth, if he practicing or whatever, this is in [the State Defendant-4's] favor man." Gallman was excited. He said the "the lawyer just went to the bathroom" but there "ain't no doubt in my mind that we going to get on top of this man that I probably start the 440 [motion for post-conviction relief in state court] this week man."

11

Three days later, on December 19, 2014, Gallman spoke with the witness again. The witness emphasized that if he does not get paid, he would not offer his recantation, "I don't see no change [i.e., money] ain't nothing happening." Gallman promised the money ("I got a hot twenty, man") but the witness was growing impatient: "I am not really talking about me waiting waiting waiting you know ah til after this and after that give me a fuck, I need now." Gallman explained that there would a contingency fee in the civil lawsuit but that the witness could get paid up front: "[T]he money don't come till the lawsuit but we trying to get some upfront money."

Gallman also promised the witness money in the future, saying that defendants who are "coming home from doing them 20-30 years" sue for "six seven eight million dollars," and the lawyer would give Gallman "10-15 thousand dollars up front. . . hopefully [next month] in January." The bottom line, Gallman told the witness, is "I plan all of us having six seven hundred thousand dollars out this shit man." Gallman offered the witness assurance and encouragement: "I already know what I am doing here" and it was the "best fucking recantation I ever in my life man did you see the emotion he had yo . . . kid I was laughing like a motherfucker. . . . . [W]e got this money man we got this." The witness admitted that "right now I am lying through my teeth." By offering his recantation, the witness explained, he was doing Gallman a favor because "I didn't lie [at trial]," to which Gallman responded, "we already know that homie, we already know you didn't lie you done told me that."

In February 2015, Brettschneider and Gallman discussed the unease they felt with State Defendant-4's attorney. Brettschneider stated that "I don't trust this guy . . . . I think this is too good not [to] do it the right way and make sure everybody's protected in the end when this happens," referring to a formal agreement that he wanted to enter with the other attorney to share proceeds from State Defendant-4's anticipated civil lawsuit.

II.     Legal Standard

The Bail Reform Act directs courts to order a defendant detained pending trial if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

The Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

12

III.     Discussion

   The government respectfully requests that the Court enter permanent orders of detention as to all of the defendants unless they present—and the government can fully vet—strong bail packages.  Strict conditions and financially responsible sureties are necessary to account for the risk that all four defendants flee from prosecution, as well as to reflect the seriousness of the offense, the strength of the evidence, the nature and characteristics of the offenders, and, in the case of Gallman and Marshall, the danger posed by their release.

   First, the crimes charged in the indictment are serious and sophisticated, carrying significant consequences for all four defendants.  They stem from a fraud perpetrated by three men with significant criminal history records and a criminal defense attorney whose practice includes cases in state and federal court (including in this district).  If convicted, the defendants face prison time in a federal penitentiary—the very place that Marshall was desperately attempting to leave by committing this fraud, and where Gallman has vowed to never return ("If money can keep me out of jail, I ain't never going to jail.").  The defense attorney, Brettschneider, will almost certainly be disbarred.  See N.Y. Jud. Law § 90(4)(a) (providing that conviction of a felony results in immediate disbarment).  And neither Shabazz nor Gallman, if convicted of a federal offense, could continue working in their capacities as pseudo legal assistants.  As a result, all four defendants have significant incentives to flee.

   Second, Gallman and Marshall present serious dangers to the community.  Gallman has a criminal history spanning decades, is a five-time convicted felon, and has participated in two murders.  In 1992, Gallman pled guilty to Manslaughter in the First Degree and was sentenced to four to eight years' imprisonment.  That conviction stems from a shooting that occurred in June 1987 in which Gallman shot one victim dead and a second one, who luckily survived.  Approximately one month later, in July 1987, Gallman killed again.  After being convicted by a jury of murder for the July 1987 shooting, Gallman prevailed on an appeal stemming from a discovery violation.  Instead of facing the prospect of a retrial, Gallman plea-bargained the case to Criminal Possession of a Weapon in the Second Degree and was sentenced to four to eight years' imprisonment.  In 1988, Gallman was convicted of Criminal Possession of a Weapon in the Third Degree and was sentenced to 30 months' to five years imprisonment.  In 1983, Gallman was convicted of Robbery in the Second Degree and sentenced to 32 months' to 8 years' imprisonment.  And in 1983, Gallman was convicted of Criminal Sale of a Controlled Substance and sentenced to two to six years' imprisonment.  Gallman also has a series of more recent misdemeanor drug-related convictions.

   Shabazz has had nine arrests, most of which resulted in convictions, including for Criminal Sale of a Controlled Substance in the Fifth Degree in 1995, Bail Jumping in the First Degree in 1992, and Possession of Stolen Property in the Second Degree in 1978.

   Marshall has convictions dating back to when he was 18.  The most serious of these have included Criminal Possession of a Narcotic Drug in the Fourth Degree in 1983,

13

for which he was sentenced to 60 days in jail, Bribery of a Public Service in the Second Degree, for which he was sentenced to two-to-four years in 1988 and the recent federal drug offense described above, for which he received 36 months, representing a significant discount from the 20-year mandatory minimum sentence he originally faced. Interspersed between these convictions are over a half-dozen drug convictions, including one stemming from an arrest during which officers recovered two loaded guns from the Marshall and his three co-conspirators.

And it is not just their criminal histories. Gallman, in addition to his violent record, has tampered with witnesses, including victims, examples of which conduct are provided above. As the Second Circuit has held, risk of witness tampering can by itself warrant detention. See, e.g., United States v. LaFontaine, 210 F.3d 125, 134 (2d Cir. 2000) (affirming finding of dangerousness based on witness tampering in a white collar case with no allegations of violence or threats aimed at witnesses); United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (reversing district court's rejection of dangerousness because no specific witness had been identified as the object of potential influence or intimidation, because no "such . . . identification is required," where there was evidence that the defendant "threatened to harm any witnesses that might testify against them").[8]

Marshall, for his part, has a long history of dealing drugs. His sentencing judge in Wright was skeptical that, despite an apparent gap in this record, he ever took a break from drug trafficking, especially considering the sophisticated nature of the last conspiracy. Marshall's last sentence—a significant break from his potential exposure—was supposed to be a chance for him to rehabilitate, to show that he was moving on from a life of crime. But by committing fraud to obtain early release, Marshall demonstrated that he is not ready to be a law-abiding citizen. Once released and facing the pressure of yet another federal case and prospect of re-incarceration, Marshall will be incentivized not only to flee, but to resume drug trafficking to quickly earn money. And as the Second Circuit has made clear, the concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" Millan, 4 F.3d at 1048 (quoting legislative history). Significantly, dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." Id.

---

[8] See also United States v. Gotti, 02-CR-743 (RCC), 2004 U.S. Dist. LEXIS 3308, at *12-13 (S.D.N.Y. Mar. 2, 2004) ("[A] threat to witnesses in this case and to the integrity of the trial process weighs in favor of pretrial detention. This threat is especially grave here because the Government proffers that Defendant knows the identity of many of the Government's witnesses."); United States v. Grisanti, No. 91-229A, 1992 WL 265932, at *7 (W.D.N.Y. Apr. 14, 1992) (finding the defendant too dangerous to be released because he lied to the court and because even if his physical movement can be restricted, contact with potential witnesses cannot be); United States v. Rivera, 09-CR-619 (SJF), 2010 U.S. Dist. LEXIS 39641, at *6-8 (E.D.N.Y. Apr. 21, 2010) (affirming Judge Orenstein's order of detention in part because the defendant knew where the victims lived and the defendant was capable of attempting to intimidate witnesses).

14

Third and relatedly, Marshall used a cell phone that had been smuggled into prison in order to communicate with Brettschneider and Gallman, all in the hope of avoiding detection. He would have been successful were it not for the fortuitous timing of the wiretapping of Gallman's phone. Marshall reminded both Brettschneider and Gallman, more than once, that the phone he was using was illegal, and that he had to be careful in using it because "shit be too hot." As a result, the Court should view with skepticism any promises of self-policed bail conditions by any of the defendants.

Finally, in assessing the defendants' incentives to flee, the Court should also account for the overwhelming strength of the government's case. As this letter shows, the defendants' planning and execution of the fraudulent letter scheme are captured in intercepted communications, obtained pursuant to a court order. The fraud was so clearly and completely narrated in these conversations that evidence of the recordings alone, coupled with the letter would likely ensure the defendants' convictions. And even if the government does not seek to supersede the indictment with charges stemming from witness bribery against Gallman and Brettschneider, a sentencing judge will take that conduct into account under 18 U.S.C. § 3553(a). The defendants are therefore facing the prospect of almost certain convictions and significant prison terms.

IV.   Conclusion

For the reasons above, the Court should enter permanent orders of detention unless the defendants present significant bail packages that are fully vetted by the government.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   _____/s/_____
Lindsay K. Gerdes
Andrey Spektor
Assistant U.S. Attorneys
(718) 254-6155/6475

cc:   Defense Counsel, Esq. (by ECF)
      Clerk of the Court (CBA) (by ECF)