**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**

                                              **18 CR 123 (S-1) (CBA)**

        -against-


**SCOTT BRETTSCHNEIDER, et al.,**

                         *Defendants.*

-------------------------------------------------------X




## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT SCOTT BRETTSCHNEIDER'S MOTIONS</u>




Sarita Kedia Law Office, P.C.
East 22nd Street, Suite 7B
New York, New York 10010
(212) 681-0202
skedia@kedialaw.com

*Attorney for Scott Brettschneider*

# TABLE OF CONTENTS

STATEMENT ........................................................................................................... 1

BACKGROUND ..................................................................................................... 1

   A. THE *FREEMAN* BRIBERY INVESTIGATION ......................................... 1

   B. THE WIRETAP INVESTIGATION ............................................................... 3

ARGUMENT .......................................................................................................... 5

I. THE COURT SHOULD SUPPRESS EVIDENCE GATHERED FROM THE
WIRETAP OF GALLMAN'S CELLULAR TELEPHONE ................................. 5

   A. THE GALLMAN WIRETAP WAS UNNECESSARY AT ITS INCEPTION
......................................................................................................................... 6

   B. INVESTIGATORS FAILED TO ESTABLISH PROBABLE CAUSE TO
INTERCEPT COMMUNICATIONS CONCERNING "FALSE BUSINESS
RECORDS" ................................................................................................... 11

   C. THE NOVEMBER 2014 AMENDMENT APPLICATION CONCEALED A
VIOLATION OF NEW YORK'S 10-DAY RULE ......................................... 14

II. THE COURT SHOULD GRANT BRETTSCHNEIDER'S MOTION FOR
SEVERANCE FROM CO-DEFENDANT JOHN SCARPA JR. ......................... 17

CONCLUSION ..................................................................................................... 18

## STATEMENT

Defendant Scott Brettschneider submits this memorandum and the accompanying declaration in support of his motions for an order (1) suppressing unlawfully intercepted oral and electronic communications and the evidence derived from them and (2) severing his case from that of defendant John Scarpa Jr.

## BACKGROUND

The circuitous chain of events that led to Brettschneider's prosecution began with a botched holdup in a Queens housing project. On January 30, 2013, Frederick Freeman and Raneisha Williams appeared at the door of the Baisley Park Houses apartment of Williams' brother Roshown. After Roshown refused to admit the couple, they attempted to force their way into the apartment with a loaded handgun. Roshown rebuffed the intruders and called the police. Freeman and Williams were, in due course, arrested, indicted on weapons charges and remanded to Rikers Island in anticipation of trial. *See* Eavesdropping Warrant dated 10/15/14 (Ex. A), Bates 87.

## A.     THE *FREEMAN* BRIBERY INVESTIGATION

Williams pled guilty and began cooperating with the Queens County District Attorney's (DA) Office in May 2014. During her debriefings, prosecutors learned that Freeman's father, Frederick Hutcherson, had paid a visit to Williams at Rikers in September 2013. According to Williams, Hutcherson had urged her to claim ownership of the handgun used in the Baisley Park holdup. Ex. A, Bates 91. Although the

prosecutors viewed the meeting as an "attempt[] to falsely exonerate" Freeman, no charges were filed against Hutcherson. *Id.*

In the weeks leading up to Freeman's October 14, 2018, trial date, the DA's Office learned that another *Freeman* witness had been approached. Raneisha's brother/victim Roshown reported that he had received several phone calls and one in-person visit from a man named "T.A." Ex. A, Bates 106-09. T.A., it appeared, was attempting to cajole Roshown into meeting with a "lawyer[]" who would prepare a "writing" that absolved Freeman in the January 2013 holdup. Ex. A, Bates 108. T.A. had allegedly promised to "pay Roshown" for his cooperation. Ex. A, Bates 108-09.

The DA's investigators had little trouble ascertaining the nature of T.A.'s interest in *Freeman*. For months, Rikers' inmate telephone system had been recording Freeman and Hutcherson as they discussed hiring a "private investigator" named "T.A." who would "visit[]" potential witnesses." Ex. A, Bates 95-97. The Freeman-Hutcherson jail calls had informed investigators of T.A.'s business address – a Queens Boulevard law office – and the fee – $300 – T.A. had quoted for his services. Ex. A, Bates 92, 99.

Records for the cellphone number T.A. had used to contact Roshown were equally revealing. The records, which the DA's Office obtained early in the investigation, proved that Gallman had been in frequent contact with Hutcherson. Ex. A, Bates 109 n.14. They also disclosed TA's legal name, Charles Gallman, and his home address in Jamaica, Queens. *See* Eavesdropping Warrant dated 11/10/14 (Ex. B), Bates 167 n.1.

The investigators confirmed Gallman's "physical identity" at a calendar call in *Freeman*. Ex. A, Bates 117. The ADA assigned to that case had for some time suspected that "a [] man who attended [] Freeman['s] court appearances was," in fact, "T.A." Ex. A, Bates 117-18. On October 2, 2014, after establishing physical surveillance of the man at one such appearance, investigators called Gallman's cellphone number and watched as he answered. *Id.*

On September 11, 2014, the DA's investigators arranged a telephone call between Roshown and Gallman. As the investigators listened and recorded, Gallman chastised Roshown for breaking an earlier appointment and urged him to "talk to the lawyer" in advance of Freeman's upcoming "court date." Ex. A, Bates 110-13. Roshown's response, presumably at the direction of his handlers, was noncommittal; he did not ask Gallman to name "the lawyer."

## B.  **THE WIRETAP INVESTIGATION**

On October 15, 2014, the DA's Office applied to a justice of the Queens County Supreme Court for permission to "intercept and record . . . [Gallman's] communications . . . concerning the crime[] of Bribing a Witness" for a period of 30 days. Ex. A, Bates 73. An Eavesdropping Warrant issued later that day. Ex. A, Bates 59-60.

Twenty-seven days later, on November 10, the DA's Office returned with the first of its several applications to "extend[] and amend[]" the wiretap. Ex. B, Bates 137. The application disclosed that the wiretap had recorded several communications that

related to crimes other than witness bribery. The DA's Office requested that the court: (a) "preserve" the incidentally intercepted communications for use in future proceedings; (b) add 30 days to the surveillance period; and (c) authorize the ongoing interception of conversations related to several newly discovered "offenses." Ex. B, Bates 138-40.

One of the "recently uncovered" offenses prefigured the Superseding Indictment's false statement charges. According to the supporting affidavit of Detective Richard Santangelo, a series of calls and text messages intercepted between November 1-3 had revealed that Gallman, Brettschneider and a federal inmate named Richard Marshall were scheming to submit "a forged drug treatment letter" to BOP officials at Marshall's prison. Ex. B, Bates 228-60. The November 10 application styled the plot as a "conspiracy" to "Falsify[] Business Records in the First Degree" in violation of Section 175.10 of the Penal Law.

As requested, the November 10 warrant "retrospectively amended" the previous authorization "to include the contents of the communications specified in Detective Santangelo's" affidavit. Ex. B, Bates 126.

# ARGUMENT

## POINT I

### THE COURT SHOULD SUPPRESS EVIDENCE GATHERED FROM THE WIRETAP OF GALLMAN'S CELLULAR TELEPHONE

Brettschneider advances three distinct objections to the evidence gathered from the Gallman wiretap. *See* 18 U.S.C. § 2518(10)(a) (empowering "[a]ny aggrieved person" to "move to suppress the contents of any [unlawfully intercepted] wire or oral communication"). First, the initial October 2014 eavesdropping application fell short of establishing that "investigative procedures less intrusive than a wiretap" were "tried" or meaningfully "considered." *United States v. Lilla*, 699 F.2d 99, 102 (2d Cir. 1983). Second, the November 2014 application to amend the wiretap failed to establish probable cause to suspect the commission of a "'designated offense.'" *United States v. Manfredi*, 488 F.2d 588, 597 n.6 (2d Cir. 1973). Third, the DA's Office misrepresented the date on which investigators learned of the treatment letter "conspiracy" in order to conceal the untimeliness of its November 2014 amendment application. Ex. B, Bates 150; *see* CPL § 700.65(4).

The first and second points are grounded in the federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2510 *et seq.*). Title III codifies constitutional limits on the use of "wiretapping" as a law enforcement tool (*United States v. Aloi*, 449 F. Supp. 698, 715 (E.D.N.Y. 1977)), setting "minimum standards" that apply to federal and state officials alike. *United States v. Marion*, 535 F.2d

697, 701 (2d Cir. 1976). Because the investigation at issue here was undertaken by New York State authorities, Brettschneider cites the State's Title III analogue, CPL § 700.00, *et seq.*, where appropriate. *Cf. United States v. Principie*, 531 F.2d 1132, 1137-40 (2d Cir. 1976) (citing both Title III and New York State law).

The final assertion, set out below in Subpoint C, arises under a provision of the New York State law that accords greater "protect[ion to] the individual right of privacy" than its counterpart in Title III. *United States v. Sotomayor*, 592 F.2d 1219, 1225 (2d Cir. 1979); *see id.* at 1225 n.13 (distinguishing "wiretap regulations" concerning the "issuance and execution of an eavesdropping warrant" from those that establish "post-interception evidentiary procedures such as sealing" on the grounds that only the former implicate "privacy [rights]"). The application of New York State law under these circumstances is consistent with Title III, which explicitly requires that state wiretap investigations "conform[]" to "any applicable [s]tate statute." 18 U.S.C. § 2516(2).

## A. THE GALLMAN WIRETAP WAS UNNECESSARY AT ITS INCEPTION

The DA's initial wiretap application asserted "probable cause" to suspect Gallman, Hutcherson and Freeman of "attempting to bribe witnesses in a [pending] criminal matter." Ex. A, Bates 74. Detective Santangelo's affidavit supported that assertion, and then some. Traditional methods of investigation had supplied the Detective and his team with a "cooperating witness[]" (Roshown Williams) whose testimony at a criminal trial would provide a firsthand account of Gallman's effort to

falsely exonerate Freeman in the Baisley Park holdup.[1] As for Gallman's coconspirators, Freeman and Hutcherson, their role in the conspiracy was evidenced through (a) admissible jail calls in which the two men discussed hiring Gallman to "visit" potential witnesses against Freeman; (b) cellphone records establishing frequent contact between Gallman and Hutcherson; and (c) the *Freeman* ADA's observation that Gallman had regularly attended Freeman's court appearances. These successes had, by mid-October 2014, depleted the investigation's supply of unattained objectives.

Grasping for loose ends, Detective Santangelo's affidavit in support of the initial wiretap application focused on the possibility that Gallman split his $300 fee with another party. "[A]t this point," Detective Santangelo wrote, "we do not know the identity of *the lawyer* [with whom Gallman] wants Roshown to meet [] . . . and whether th[at] lawyer and/or others have knowledge of the illegal nature of [Gallman's] activity." Ex. A, Bates 119. Santangelo went on to assert that "only . . . electronic surveillance" could unmask the potentially corrupt attorney. *Id.*; *see also* Ex. A, Bates 76 (Assistant District Attorney supervising the investigation of Gallman identifies electronic surveillance as the "only" means of ascertaining "definitively which lawyers" were participating in Gallman's "scheme").

---

[1]    Roshown's testimony to this effect could be corroborated through (a) the cellphone records demonstrating that the cellphone number T.A. had used to contact Roshown was registered to Gallman and (b) testimony concerning the DA's October 2 operation, which confirmed that Gallman used the cellphone number and that he responded to the name "'T.A.'" Ex. A, Bates 118.

### i.    <u>**Legal Framework**</u>

Federal and state law require the party applying for a wiretap to convincingly "show[] that investigative procedures less intrusive than a wiretap" were "tried and [] failed," appear "unlikely to succeed if tried" or are "too dangerous." *Lilla*, 699 F.2d at 102-03 (internal quotation marks omitted). Title III thus mandates that "[e]ach" wiretap application include

> (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]

18 U.S.C. § 2518(1)(c); *see also* CPL § 700.20(2) (restating the federal statute's necessity requirement in nearly identical language).

Statutory "necessity" requirements ensure "that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crimes." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974); *see Lilla*, 699 F.2d at 103 n.5 (including "standard visual or aural surveillance," "general questioning or interrogation under an immunity grant," "use of regular search warrants" and "infiltration of conspiratorial groups by undercover agent or informants" in the list of traditional investigative techniques) (internal quotation marks omitted).

The sufficiency of an applicant's necessity showing "is to be tested in a practical and commonsense fashion." *Id.* at 103 (internal quotation marks omitted).

## ii.    **Application**

During the "controlled telephone" conversation recorded on September 11, 2014, Gallman invited Roshown to "go talk to the lawyer" the following morning. Ex. A, Bates 110-11. There is no indication that Gallman's invitation expired at some point before the court received the initial wiretap application on October 15. To the contrary, Detective Santangelo's affidavit in support of that application referred to Gallman's offer in the present tense – writing, for instance, that Gallman "*wants* Roshown to meet with [the lawyer]." Ex. A, Bates 119 (emphasis supplied). It thus appears that the Detective and his team had a ready means of ascertaining both the attorney's identity and the extent of his criminal knowledge: they could have simply instructed Roshown to call Gallman, ask for the lawyer's name and then arrange a meeting with the lawyer at his office.

Detective Santangelo's objection to this approach is buried in his affidavit's "boilerplate" discourse on the "inherent limitations of normal investigative procedures." *United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001). It consists of an unelaborated assertion that it was "*unsafe* for cooperating witnesses to accompany [Gallman] anywhere, certainly not to meet with anyone that [Gallman] has thus far refused to even identify."[2] Ex. A, Bates 120 (emphasis supplied).

---

[2]    Puzzlingly, Detective Santangelo fails to cite an instance in which Gallman actually "refused to [] identify" the lawyer. Ex. A, Bates 120. Certainly, there was no such refusal during Gallman's September 11 conversation with Roshown. *See* Ex. A,

A bald assertion of danger, needless to say, does not constitute a "full and complete statement." 18 U.S.C. § 2518(1)(c); *see Lilla*, 699 F.2d at 104 (invalidating wiretap because the applicant "failed to specify the facts upon which [he] based []his conclusion that other investigative procedures were [] unlikely to succeed or [] too dangerous to use"). As a technical matter, then, Detective Santangelo's affidavit falls short of the statutory standard.

Technical considerations aside, the Detective's vague assertion of peril "simply does not square with common sense." *Lilla*, 699 F.2d at 105. Gallman was, after all, under investigation for witness bribery, not witness intimidation. He had not threatened Roshown. Nor were there signs of violence on the horizon. Detective Santangelo himself had concluded that Gallman had been hired to "bribe[]" Roshown, "as opposed to [] subject[ing him] to physical intimidation or harm." Ex. A, Bates 107. Gallman's proposal – inviting Roshown to make a daytime visit to a lawyer's office – is wholly consistent with this surmise.

Under these circumstances, the Detective was obligated to "specify the facts upon which" his ostensible fears were based. *Lilla*, 699 F.2d at 104. The failure to do so invalidates the initial October 2014 eavesdropping warrant, triggering a chain

---

Bates 110-14. The transcript of that call shows that the witness never inquired about the lawyer's identity. *Id.*

reaction that ends in the suppression of the entire body of wiretap evidence in this case.

*Id.* at 102.

## B. INVESTIGATORS FAILED TO ESTABLISH PROBABLE CAUSE TO INTERCEPT COMMUNICATIONS CONCERNING "FALSE BUSINESS RECORDS"

Detective Santangelo's November 10 supporting affidavit offered no plausible basis to suspect Gallman, Brettschneider and Marshall in a conspiracy to falsify business records in the first degree. The proffered facts simply did not fit the crime, which requires, among other things, an intent to commit or conceal "*another*" offense. P.L. § 175.10 (emphasis supplied). Ignoring the elements of P.L. § 175.10, the investigation achieved an end run around Title III's central mandate: "that [] wiretap[s] [] issue only upon a showing of probable cause to believe that communications pertaining to [a] *designated* offense will be obtained." *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977) (emphasis supplied). The November 10 Warrant sinks under the weight of this subterfuge.

### i. Legal Framework

Title III permits state legislatures to "'designate[]'" certain "major [state-law] offenses" for investigation by wiretap. *People v. Shapiro*, 50 N.Y.2d 747, 764 (1980) (quoting 18 U.S.C. § 2516(2)); *see* CPL § 700.05(8) (designating Penal Law offenses). New York's list of designated offenses includes "falsifying business records in the first degree as defined in [P.L. §] 175.10." CPL § 700.05(8). Falsifying business records in the second degree (P.L. § 175.05) is not a designated offense.

Every eavesdropping application – whether it seeks authority to install, extend or amend a wiretap – must specify which designated offense is the subject of the investigation. *United States v. Giordano*, 416 U.S. 505, 532-33 (1974); *Marion*, 535 F.2d at 700; *Shapiro*, 50 N.Y.2d at 763-64. The court must then "determine" whether or not "probable cause exists for believing that 'communications concerning that offense' will be obtained." *Marion*, 535 F.2d at 700 (quoting 18 U.S.C. § 2518(3)(b)); *see* CPL § 700.15(4).

ii.    **Discussion**

Detective Santangelo's supporting affidavit centered on a pair of conference calls that were intercepted on November 1, 2014. According to Santangelo, in the first of the two conversations, Marshall "solicit[ed]" Gallman and Brettschneider "to obtain a forged letter containing false information" to the effect that Marshall had received treatment for "a substance abuse problem before he entered prison." Ex. B, Bates 241. Brettschneider responded that he would ask a "contact" to oblige Marshall's request. Ex. B, Bates 242. In a second conversation that occurred a short time later, Brettschneider informed Gallman and Marshall that the contact had agreed to prepare a letter. Ex. B, Bates 257. Marshall then identified a "doctor" at his prison as the intended recipient of the missive. Ex. B, Bates 257-58.

After he had listened to the calls, Detective Santangelo consulted with a BOP "investigator" at Marshall's facility. Ex. B, Bates 259. The official "confirmed" that the doctor named in the November 1 call was the prison's "point person for drug

treatment." Ex. B, Bates 259-60. The Detective was also informed that federal inmates "often submitted" "false drug histories" in order to gain admittance to a "drug program" that could potentially "shorten[]" their sentences. Ex. B, Bates 260.

A glance at the Penal Law's text suffices to show that this conduct could not "be reasonably interpreted" as a conspiracy to falsify business records in the first degree under P.L. § 175.10. *Fury*, 554 F.2d at 530-31. That offense, an E felony, borrows its conduct element from P.L. § 175.05, which punishes "a person" with a misdemeanor if, "with intent to defraud," he or she:

> 1. Makes or causes a false entry in the business records of an enterprise; or
>
> 2. Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or
>
> 3. Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or
>
> 4. Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

P.L. § 175.05. Section 175.10 increases the person's liability if his or her "intent to defraud includes *an intent to commit another crime* or to aid or conceal the commission thereof." P.L. § 175.10 (emphasis supplied); *see People v. Reyes*, 69 A.D.3d 537, 538 (1st Dep't 2010) (explaining that "second-degree falsifying business records is a lesser included offense of the first-degree crime, with the sole difference between the two being that the higher crime requires a specific intent to commit or conceal another crime").

There was no "[]other crime" in this case. *Id.* Instead, Detective Santangelo surmised that the "purpose" of "procuring [the] forged drug treatment letter" was to qualify Marshall for the BOP "drug program." Ex. B, Bates 228, 260. At best, then, Detective Santangelo and his team had "uncovered a conspiracy" to commit an *undesignated* misdemeanor violation of P.L. § 175.05.

This defect invalidates the November 10 eavesdropping warrant insofar as it authorized interception of communications "relate[d]" to the Marshall letter. It follows that all such communications must be suppressed.

## C. THE NOVEMBER 2014 AMENDMENT APPLICATION CONCEALED A VIOLATION OF NEW YORK STATE'S 10-DAY RULE

In his affidavit in support of the November 2014 application to amend the wiretap, Detective Santangelo claimed that the first interceptions concerning the drug treatment letter "conspiracy" occurred on November 1. Ex. B, Bates 228. This account supported the DA's Office's assertion that its application, submitted on November 10, came "within ten (10) days after" the investigation established "probable cause" to suspect Gallman and his compatriots of falsifying business records. Ex. B, Bates 147. The Detective's account, however, was false.

As the government's March 29, 2018, bail letter reveals, the DA's surveillance team had, in fact, intercepted conversations concerning the drug treatment letter on October 16 and 24. Bail Ltr., ECF No. 23, at 3-4. The government's letter demonstrates that those interceptions – which contained, among other things, a "sketch[]" of the drug

treatment letter's content, references to more than one potential author and observations concerning the BOP's "crack[] down" on RDAP-related "fraud" (*id.*)[3] – were every bit as incriminating as those that occurred on November 1. If the November conversations established probable cause, "[c]ommon sense [would] dictate[]" that the October conversations did too. *United States v. Main Street Distributing Inc.*, 700 F. Supp. 655, 660 (E.D.N.Y. 1986). Indeed, the DA's surveillance team identified both recordings as "pertinent" when they were intercepted.

The considerations that prompted Detective Santangelo to exclude the October interceptions from his November 10 affidavit were legal, not evidentiary. Like Title III, New York State's wiretap law severely restricts the use of so-called "incidentally intercepted communications" – that is, calls and messages concerning matters unrelated to the crime "specified" in the operative warrant – in subsequent judicial proceedings. *Marion*, 535 F.2d at 700; *see* 18 U.S.C. § 2517(3), (5); CPL § 700.65(3)-(4). Under both statutes, incidentally intercepted communications are inadmissible unless an appropriate court has "retroactively" approved their seizure. *United States v. Masciarelli*, 558 F.2d 1064, 1068 (2d Cir. 1977); *see* 18 U.S.C. § 2517(5); CPL § 700.65(4).

In New York State, investigators may obtain the requisite approval through an "amendment" of the underlying warrant. CPL § 700.65(4). The CPL's amendment

---

[3]      For purposes of this motion alone, Brettschneider adopts and incorporates the government's description of the calls intercepted on October 16 and October 24, 2014.

process contains a caveat that its federal counterpart does not: when intercepted communications give rise to "probable cause [] to believe that a crime not named in the warrant has been, is being, or is about to be committed," investigators must make an application to amend the warrant "*within ten days*" of the existence of such probable cause in order to use such communications and evidence derived therefrom. CPL § 700.65(4).[4]

By omitting the October 2014 interceptions from the November 10 amendment application, Detective Santangelo and his team forestalled questions about their compliance with the CPL's "ten day[]" requirement. *Id.* In other words, the investigators pretended that the supposed business records "conspiracy" had been "uncovered" on November 1 (Ex. B, Bates 228) so that it would "**APPEAR[]**" that their "application [was] made . . . within ten (10) days after probable cause existed to believe that [the] crime [was] about to be committed." Ex. B, Bates 126. In reality, probable cause had arisen at least 17 days before the application's submission.

The DA's failure to comply with CPL § 700.65(4) rendered the November 2014 warrant invalid under New York State law. *See People v. Liberatore*, 79 N.Y.2d 208, 222 (1992) (reviewing wiretap investigations' conduct for "meticulous" and "'strict compliance with the provisions of New York's eavesdropping statute'") (quoting *People v. Schulz*, 67 N.Y.2d 144, 149 (1986)).

---

[4]     Title III requires only that the "subsequent application" be made "as soon as practicable." 18 U.S.C. § 2517(5).

The Court should apply the State law here, holding that the DA's failure to "conform[]" to the requirements of § 700.65(4) results in the suppression of communications related to the Marshall letter. 18 U.S.C. § 2516(2).

## POINT II

### THE COURT SHOULD GRANT BRETTSCHNEIDER'S MOTION FOR SEVERANCE FROM CO-DEFENDANT JOHN SCARPA JR.

Brettschneider respectfully moves this Court, pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure, for a severance from defendant John Scarpa Jr. Severance is required here as these two defendants are improperly joined under Rule 8(b). Severance would also prevent Mr. Brettschneider from suffering undue prejudice at trial and is thus warranted pursuant to Rule 14.

As the government consents to severing these defendants, we do not detail the law on this issue herein.

## CONCLUSION

For the reasons set forth above, we respectfully submit that the Court should

grant Mr. Brettschneider's motions for suppression and severance.

Dated:  New York, New York
        November 16, 2018

                                        Respectfully submitted,

                                              /s/

                                        Sarita Kedia
                                        Sarita Kedia Law Offices, P.C.
                                        5 East 22nd Street, Suite 7B
                                        New York, New York 10010
                                        (212) 681-0202
                                        skedia@kedialaw.com

                                        *Attorney for Scott Brettschneider*

On the brief:

        Sarita Kedia
        Jonathan Savella