MEG:AS/LKG
F. #2015R01691

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

- against -                                           Docket No. 18-CR-123 (S-1) (CBA)

SCOTT BRETTSCHNEIDER, et al.,

                Defendants.

– – – – – – – – – – – – – – – – – – X

THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS THE WIRETAP

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrey Spektor
Lindsay K Gerdes
Assistant U.S. Attorneys
      (Of Counsel)

1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS .............................................................................................2

I.      Charges Against Brettschneider ......................................................................2

        A.      Brettschneider Is Indicted for Working With Others to Write a False Letter to the
                Bureau of Prisons. ...................................................................................2

        B.      Brettschneider Is Caught Discussing the Letter with an Incarcerated Client on the
                Client's Smuggled Cell Phone ..................................................................2

        C.      Brettschneider Recruited His Legal Assistant to Write the Letter ..........................3

        D.      Wiretap Evidence Supporting the Charges Against Brettschneider .......................5

                1.      The QCDA Wiretap Uncovered Evidence of the False Letter Scheme .......5

                2.      The Inception of the QCDA Wiretap ..........................................6

ARGUMENT ........................................................................................................8

I.      Applicable Law .............................................................................................9

        A.      Deference to Decision of the Issuing Judge ...........................................9

        B.      Necessity Requirement ..................................................................10

        C.      Probable Cause Requirement ............................................................11

II.     The QCDA's Initial Wiretap Application Was More Than Adequate to Show That Other
        Investigative Techniques Would Likely Be Unsuccessful ...............................................12

        A.      The Goal of the Investigation Was to Identify All of Gallman's Co-Conspirators,
                Not Just One ...........................................................................12

        B.      Even the More Limited Investigation Suggested by Brettschneider Could Not
                Have Been Completed Without a Wiretap .........................................15

III.    The QCDA Properly Notified the Issuing Judge That It Intercepted Communication of an
        Offense Not Specified in the Initial Application..............................................18

        A.      Criminal Communication Need Not Always Relate to a Designated Offense ......19

B.       The QCDA's Wiretap Based on Witness-Bribery and the Extension Application Were Not Subterfuge Searches ..............................................................................23

C.       In Any Event, There Was Probable Cause to Believe the Incidentally-Captured Communication Constituted a Designated Offense ...............................................24

IV.      The November Application Contained No Violation ........................................26

          A.       The Wiretap Order Is Valid Under Federal Law .......................................26

          B.       Federal Law Governs in Federal Court.......................................................27

          C.       State Notification Requirement Does Not Safeguard a Privacy Right ......29

          D.       The QCDA Complied With State Law .......................................................29

V.       The Government Does Not Oppose Severance Even Though the Defendants Were Properly Joined .............................................................................................................31

CONCLUSION....................................................................................................................32

## PRELIMINARY STATEMENT

Defendant Scott Brettschneider—a criminal defense attorney—is charged with conspiring to commit fraud with his assistants, five-time felon Charles Gallman and Reginald Shabazz-Muhammad.  He did it to help a convicted drug dealer, Richard Marshall, reduce his sentence.  Gallman, Shabazz-Muhammad and Marshall have all pleaded guilty, while Brettschneider's trial is scheduled to begin on March 18, 2019.   He hopes the Court will suppress the wiretap (obtained by state authorities) and effectively end the case against him.

Brettschneider argues that (1) the wiretap was unnecessary, (2) state authorities intercepted discussion of a crime not specifically proscribed by Title III, and (3) disclosure of the newly-intercepted crime violated state law.  All three arguments share one trait—they fail for many reasons.  Brettschneider cites bad law, omits facts and ignores the governing framework.  His first argument twists the wiretap affidavit; his second ignores binding authority—dispositive and fatal to his claim; and his third argument relies on a case the Second Circuit has abrogated, for a proposition the Circuit has, in its own words, "rejected."

The liberties that Brettschneider takes with the facts and the law are revealing.  They show that the wiretap applications are impervious to fair attack; even a cursory review shows the care and detail that went into them.  The state authorities had ample reason to investigate Gallman and his co-conspirators in wide-ranging bribery schemes—an investigation that uncovered widespread unethical and criminal conduct by Brettschneider and other defense attorneys.

## STATEMENT OF FACTS

I.   Charges Against Brettschneider

   A.   Brettschneider Is Indicted for Working With Others to Write a False Letter to the Bureau of Prisons

   This case stems from Brettschneider's relationship with Gallman and his representation of Marshall in a federal case, United States v. Wright et al., 12-CR-014 (N.D.N.Y) (FJS).   At sentencing in Wright, Brettschneider submitted a report (publicly-available) from a psychologist who evaluated Marshall.  The report stated that after recovering from depression earlier in his life, Marshall had been "clean and sober for over 20 years."  Id. Docket Entry No. 338 at 6.

   Soon after Marshall began his term of incarceration, he and his co-conspirators (Brettschneider, Gallman and Shabazz-Muhammad) began discussing how they could get Marshall admitted into the Residential Drug Abuse Program ("RDAP") through fraud.  They decided to hold out Shabazz-Muhammad—Brettschneider's legal assistant—as the director of a treatment program and to suggest that Marshall attended that program due to his substance and alcohol dependence.  The four defendants were charged in the instant case with making and conspiring to make false statements to the Bureau of Prisons ("BOP"), in violation of 18 U.S.C. §§ 1001(a)(2) and 371, respectively.

   B.   Brettschneider Is Caught Discussing the Letter with an Incarcerated Client on the Client's Smuggled Cell Phone

   Brettschneider is moving to suppress a wiretap on Gallman's cell phone obtained by the Queens County District Attorney's Office ("QCDA") because intercepted communication narrated how he and his co-conspirators planned and executed the fraud.   The calls were initiated by Marshall on his "burner" phone, which had been smuggled into a United States

penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg").  In two calls in October 2014,

Marshall and Gallman discussed the idea of a false letter that would detail Marshall's purported

history of substance abuse.  In one of those calls, on October 24, 2014, the two men added

Brettschneider and asked him about such a letter, with Marshall detailing exactly what the letter

should say for him to get admitted into RDAP.  Brettschneider—acknowledging Marshall's

difficulty in talking from a smuggled cell phone in prison—promised to get back to him: "I know

who to talk to."

It was not until November 1, 2014, however, that obtaining a fraudulent letter

became a real possibility.  When Marshall called Gallman that day, Gallman reported that he had

good news: "I just got someone [from Virginia] to put the letter together" for "$350, $400," a

price Marshall hoped Brettschneider would "maybe . . . put that shit up."  The two men discussed

whether the Virginia origin would set off red flags, given that Marshall was from New York.

Gallman was not worried: "I doubt they going to be scrutinizing it that much."  Gallman once

again added Brettschneider to the call to discuss the letter.  Gallman confirmed with

Brettschneider, as Marshall was listening, that Brettschneider had someone prepared to write it.

"I think I do," Brettschneider said, "I just have to ask the person."  After listening to Marshall's

instructions about the contents of the letter, Brettschneider promised: "I'll take care of it when I

get off the phone with you."

C.      Brettschneider Recruited His Legal Assistant to Write the Letter

Brettschneider delivered.  About thirty minutes later, he told Marshall on another

three-way call that a letter from a program would be written.  "He's gonna do it," Brettschneider

said, referring to the person he apparently recruited on short notice.  The person who would

ultimately write about Marshall's alleged prior drug treatment was Brettschneider's own legal

assistant, Shabazz-Muhammad.[1]  With Brettschneider temporarily off the phone, Marshall and

Gallman discussed the logistics.  Gallman said that Marshall had to get a copy of the letter before

it was submitted so that he would know all about his purported substance abuse history, in case

he was "questioned about what's in the letter.  So this way you already know what's in the letter,

and you'll be able to answer whatever is asked."  Marshall worried that the prison authorities

would discover the letter and know it is "bullshit," but Gallman was not concerned because they

would send it through legal mail, presumably from Marshall's attorney, Brettschneider.  Upon

rejoining the call—still on November 1, 2014—Brettschneider caught up on the details of the

plan and confirmed that the author of the letter would be Shabazz-Muhammad.

       That same month, November 2014, USP Lewisburg received a letter signed by

"Reginald Shabazz-Muhammad, CASAC CLA, Director of Program Services," detailing

Marshall's purported treatment at the "Muhammad Mosque No. 7."  The letter was dated

November 6, 2014 and postmarked November 20, 2014, though incriminating calls continued

into early 2015.  It stated that Marshall was involved in an outpatient program and was

"suffering from active drug dependence, namely alcohol and marijuana."  According to the letter,

Marshall had been "making progress gradually reducing his active substance dependence."

       Nevertheless, Marshall failed to get into RDAP.  The BOP asked his treatment

provider—i.e., Brettschneider's legal assistant—for progress reports[2] from when Marshall was

treated.  Brettschneider thought he could get those too, but by that point Shabazz-Muhammad

---

[1] Brettschneider described Shabazz-Muhammad as a dependable worker, willing to do hours of grunt work: "He's a guy that he'll stand there copy 500 pages for me and put together a loose leaf, you know, for trial."

[2] Progress reports, also referred to as session notes, are contemporaneous notations made by the treatment provider documenting that the service provider delivered certain diagnostic and/or treatment services to an individual.

apparently stopped returning calls.  On a December 11, 2014 call, Gallman and Brettschneider

described how odd it was that the usually-dependable Shabazz-Muhammad had gone missing,

though Brettschneider also recognized that what Marshall was "looking for . . . that's not really

that easy to—."

          D.     <u>Wiretap Evidence Supporting the Charges Against Brettschneider</u>

          1.     <u>The QCDA Wiretap Uncovered Evidence of the False Letter Scheme</u>

The government obtained evidence of the RDAP fraud because the QCDA had a

court-authorized wiretap on Gallman's cell phone.  And the QCDA only had a wiretap on

Gallman's cell phone because a cooperating witness and recorded jail calls suggested that

Gallman worked with criminal defense attorneys to bribe witnesses.  Those early suspicions were

ultimately substantiated.

This year, Gallman pleaded guilty in Queens County Supreme Court to bribing a

witness and, more recently, in the instant case, to bribing another witness in an unrelated case.

One of the attorneys with whom Gallman worked (referred to as Attorney-A in the government's

initial detention memorandum, <u>see</u> ECF Docket Entry No. 23) was convicted of participating in

an unrelated bribery scheme.  Another attorney, John Scarpa, Jr. (referred to as Attorney-B, <u>see</u>

<u>id.</u>), was charged in the instant indictment for bribing a witness in a double-homicide case.

Brettschneider, for his part, schemed with Gallman on how they could sell a false recantation to a

prospective client.  And another attorney (referred to as Attorney-C, <u>see</u> <u>id.</u>) dispatched Gallman

to intercept a victim on the way to a lineup.  The unethical and criminal conduct by criminal

defense attorneys with no apparent relationship to each other (but all working with Gallman) was

uncovered only because of the wiretap on Gallman's phone.

2.    <u>The Inception of the QCDA Wiretap</u>

The QCDA wiretap began with a state criminal case against Frederick Freeman, who ordered the complaining witness (the "Victim"), at gunpoint, to "back the fuck up" and open the door to the Victim's apartment.  October 15, 2014 Affidavit of Detective Richard Santangelo ("Det.'s Oct. Aff.") ¶ 5.[3]  After his arrest, Freeman demanded a trial, while his father worked behind the scenes to bribe the star prosecution witness, the Victim, so that he would not testify.  Det.'s Oct. Aff. ¶ 6.  Recorded jail calls between Freeman and his father led the QCDA to Gallman.  Det.'s Oct. Aff. ¶¶ 12-19.

The QCDA also received information from the Victim, who began cooperating with the QCDA after he received a nighttime home visit from Gallman.  Det.'s Oct. Aff. ¶ 20. According to the Victim, Gallman told him to "come with me to one of my lawyers and put stuff in writing.  I'll pay you."  Det.'s Oct. Aff. ¶ 20.

Gallman continued pressuring the Victim, including in a recorded call, to accept money and not testify.  Det.'s Oct. Aff. ¶¶ 21-22.  During that call Gallman again told the Victim that for the Victim to get paid and agree not to testify he just had to meet with Gallman and see a lawyer: "All we gotta do is go talk to the lawyer."  Det.'s Oct. Aff. ¶ 22.  Describing his job, Gallman told the Victim that, "I'm a n**** who gone and had a life in jail.  I work with a lot of lawyers.  I work with a lot of lawyers.  I had had life in jail, I'm a motherfucking homie."  <u>Id.</u> Gallman added that he is a "n**** who helps n****s speak their cases."  <u>Id.</u>  When the Victim pressed Gallman on why he had held himself out as a lawyer, Gallman responded, "I said I

---

[3] For ease of reference and to comply with the Court's rules, <u>see</u> Court's Individual Rule 1F, the government has enclosed, in hard copy and as sealed exhibits to this memorandum, the QCDA's October and November 2014 wiretap orders and supporting documents.  These documents—which are subject to the Court's protective order dated April 6, 2018, <u>see</u> ECF Docket Entry No. 41—were also submitted (initially unsealed) by Brettschneider as Exhibits A and B to his memorandum of law.

worked with lawyers.  That's what I said to you.  I told you, you could ask anybody in the street about me."  Id.

Based on these conversations and additional investigation, the QCDA had the following information: (1) Gallman was working with an attorney who could help Freeman fix his case by bribing a witness; (2) Gallman, by his own repeated admissions "work[ed] with a lot of lawyers" to help defendants "speak their cases"; and (3) Gallman was talking in circumspect terms with other inmates about helping them with their cases.   The QCDA submitted a wiretap application on October 15, 2014 to the Honorable Robert McDonald, New York State Supreme Court Justice.  Based on these and other facts, the QCDA argued that there was reason to believe Gallman was "being paid by other criminal defendants, possibly with the knowledge and assistance of criminal defense attorneys, to fix their cases as well."  October 15, 2014 Affidavit of Assistant District Attorney Jennifer Hagan ("ADA's Oct. Aff.") ¶ 2.  Justice McDonald authorized the wiretap, agreeing that the wiretap was necessary for the QCDA to obtain information that other investigative tools could not uncover, namely "which lawyers [Gallman] may be working with, or the extent of their knowledge and involvement in the scheme."  ADA's Oct. Aff. ¶ 8.

As recounted above, Gallman's unlawful conduct with defense attorneys was not limited to just one lawyer, or just to witness bribery.   It was during the initial interception period that the QCDA intercepted Gallman, Brettschneider and Marshall discussing the fraudulent letter.  When it was time to seek reauthorization in November 2014 for continued interception, the QCDA notified the authorizing judge about this and other communications.

## ARGUMENT

Brettschneider makes three arguments in an attempt to suppress the wiretap.[4]  He claims that: (1) other investigative techniques were not "tried or meaningfully considered" before a judge authorized the QCDA to obtain a wiretap; (2) the reauthorization for the wiretap "failed to establish probable cause to suspect the commission of a designated offense"; and (3) the QCDA "misrepresented" when exactly it learned about Brettschneider's conspiracy to submit a false letter and "concealed" this knowledge from the issuing judge, all in an effort to satisfy a disclosure requirement under New York law.  Brettschneider's Memorandum of Law in Support of Motions ("Mot.") at 5 (internal quotation marks omitted).  Each of these arguments fails for multiple, independent reasons.

Brettschneider also asks the Court to sever his case from Scarpa's, who, as discussed above, is charged along with Gallman for bribing a witness.  The government does not oppose severance but addresses briefly Brettschneider's assertion that the two defendants were improperly joined.  Mot. at 17.

---

[4] Brettschneider asserts standing by claiming that he is an "aggrieved person" under 18 U.S.C. § 2518(10)(a) because he was intercepted on the wiretap.  He did not, however, submit an affidavit stating that he was intercepted, even though he has the burden to do so.  See United States v. Montoya-Echevarria, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) ("The law is clear that the burden on the defendant to establish standing is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge."), id. (stating with approval the government's position that the "defendant should not be deemed to have standing while retaining the option, if the motion to suppress is denied, of later denying that his voice is on the tapes"); accord United States v. Loera, No. 09-cr-0466 (BMC), 2018 U.S. Dist. LEXIS 155544, at *4 (E.D.N.Y. Aug. 29, 2018); United States v. White, 2018 U.S. Dist. LEXIS 146444, at *23 (S.D.N.Y. Aug. 28, 2018) ("This Circuit has routinely rejected efforts by defendants to establish Fourth Amendment standing based on the Government's allegations or evidence.").  Because Brettschneider's attorney submitted a declaration in which she confirms that Brettschneider was intercepted, the government assumes the defendant will not make an argument to the contrary at trial.  Decl. ¶ 3.  If the government is wrong in its assumption, then it respectfully requests that Brettschneider submit an affidavit attesting that he was intercepted on the wiretap he seeks to suppress.

I.    Applicable Law

        In litigating the admissibility of intercepted communication from a state wiretap,

it is only federal law that applies in federal court.  See United States v. Amanuel, 615 F.3d 117,

122 (2d Cir. 2010) (holding that in a "federal case, federal law governs the use of a state-issued

eavesdropping warrant"; rejecting prior dicta that suggested state-issued warrants were subject to

state statutory requirements in federal court if that law more stringently protected individuals'

privacy rights).

        To obtain a wiretap, the government must provide an explanation about probable

cause and necessity—that is, a "full and complete statement of the facts and circumstances relied

upon by the application to establish probable cause," and a statement "as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear to be unlikely

to succeed if tried or to be too dangerous."  United States v. Rajaratnam, 719 F.3d 139, 144 (2d

Cir. 2013) (quotations marks and internal citations omitted).

    A.    Deference to Decision of the Issuing Judge

        A district judge's review of another judge's determination to authorize a wiretap

must give "considerable deference" to the issuing judge's decision.  United States v. Bourne, No.

08-CR-888 (NGG), 2011 U.S. Dist. LEXIS 107530, at *33 (E.D.N.Y. Sept. 23, 2011); see also

United States v. Concepcion, 579 F.3d 214, 217 (2d Cir. 2009) (reversing suppression of a

wiretap because the reviewing judge failed to accord sufficient deference to the issuing judge's

decision); United States v. Wagner, 989 F.2d 69 (2d Cir. 1993) (same).  The review is also

narrow in scope:

            Where a defendant moves to suppress evidence obtained pursuant
            to a judicially authorized wiretap on the grounds that the wiretap
            application was not supported by facts sufficient to establish
            probable cause, or on the grounds that the Government failed to

> establish that traditional investigative techniques were reasonably
> likely to be unsuccessful, the trial court reviews the wiretap
> application only to determine whether the facts set forth by the
> Government were "minimally adequate" to support the issuing
> court's order.

Bourne, 2011 U.S. Dist. LEXIS 107530, at *33 (quoting Concepcion, 573 F.3d at 217).

B.    Necessity Requirement

The necessity requirement of 18 U.S.C. §§ 2518(1)(c) and (3)(c)—that other investigative measures must reasonably appear to be unlikely to succeed, to be too dangerous or to have been tried and failed—is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).  A wiretap application must provide a practical basis for concluding that other investigative techniques are not feasible.  See United States v. Lilla, 699 F.2d 99, 103 (2d Cir. 1983) (citing S. Rep. No. 1097, 90th Cong., 2d Sess. 101 (1968)).

The necessity requirement, as the Second Circuit has explained, does not mean that the wiretap must be a tool of last resort; law enforcement need only inform the issuing court "of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement techniques."  United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990) ("[T]he purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents." (internal quotation marks omitted)), abrogated on other grounds, see United States v. Marcus, 628 F.3d 36, 41-43 (2d Cir. 2010).  "The issue of whether a normal investigative method has been exhausted must be tested in a practical and common sense manner."  United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999).

C.    Probable Cause Requirement

"A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists. . . .  The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause."  Wagner, 989 F.2d at 72 (internal citations omitted) (reversing suppression order); United States v. Snape, 116 F. App'x 317, 319 (2d Cir. 2004) ("Courts conducting an after the fact review of a judicial officer's decision to issue a warrant based on probable cause pay great deference to the issuing judge's determination of probable cause.").

"The test for determining probable cause under 18 U.S.C. § 2518 is the same as that for a search warrant."  Wagner, 989 F.2d at 71.  "A judge's probable cause determination is not overly strict.  Presented with a warrant application, the judge must simply . . . make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability" that evidence of a crime will be uncovered.  United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) (internal quotation marks omitted).

"The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity . . . .'"  Wagner, 989 F.2d at 72 (quoting Illinois v. Gates, 462 U.S. 213, 235 (1983)).  Moreover, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  Martin, 426 F.3d at 74.  Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'"  Walczyk v. Rio, 496 F.3d 139, 156-57 (2d Cir. 2007) (quoting Gates, 462 U.S. at 231).

II.     The QCDA's Initial Wiretap Application Was More Than Adequate to Show That Other
        Investigative Techniques Would Likely Be Unsuccessful

        Brettschneider argues that traditional methods of investigation had "supplied" the

QCDA team with all the evidence it needed to show Gallman, Freeman and Freeman's father

conspiring to bribe a witness. Mot. at 6-7. Brettschneider lists all the evidence the team had to

prosecute the three men, see id., and suggests "ready means" by which the investigation could

have achieved what Brettschneider suggests was the objective—to identify the fourth co-

conspirator, the lawyer whom Gallman was planning to use to document the Victim's

recantation. Mot. at 9. That objective, Brettschneider offers, could have been realized without a

wiretap, by simply instructing the Victim to call Gallman, "ask for the lawyer's name and then

arrange a meeting with the lawyer at his office." Id. Brettschneider misstates the goal of the

investigation as it was articulated to Justice McDonald and fails to explain how even the limited

investigation could have been completed without a wiretap.

        A.      The Goal of the Investigation Was to Identify All of Gallman's Co-Conspirators,
                Not Just One

        The goal of the investigation was not simply to identify the lawyer whom

Gallman had in mind to fix Freeman's case; nor was that the reason Justice McDonald

authorized the wiretap. The goal was to "identify *all* of the participants in, and beneficiaries of,

the[] attempts to bribe witnesses." ADA's Oct. Aff. ¶ 5(a) (emphasis added). Those participants

were other defendants and lawyers who worked with Gallman. The QCDA's application

repeatedly echoed this overarching objective when referring to Gallman's statements and

conduct. See, e.g., ADA's Oct. Aff. ¶ 2 (noting that there is reason to believe Gallman was

"being paid by other criminal defendants, possibly with the knowledge and assistance of criminal

defense attorneys, to fix their cases as well"); Det.'s Oct. Aff. ¶ 4 (explaining that the QCDA

"discovered that Gallman's services are not limited to a single case, but are part of paid services that he provides to multiple criminal defendants[]"); Det.'s Oct. Aff. ¶ 9 ("[T]here is evidence that [Gallman] is using [his cell phone] to plan and carry out [a] witness bribery scheme[] with other criminal defendants, and possibly the criminal defense attorneys themselves."); Det.'s Oct. Aff. ¶ 25 (noting that Gallman had made it "clear that he works with multiple criminal defense attorneys[,]" and that information in the affidavit shows the "attorneys may be knowledgeable participants in the witness bribery schemes[]").

There were two primary reasons for QCDA's suspicions that underpinned its goal to identify all of Gallman's co-conspirators, beyond just Freeman's case. *First*, the QCDA drew on Gallman's own remarks about working with other lawyers. <u>See, e.g.</u>, Det.'s Oct. Aff. ¶ 20 (Gallman's inviting the Victim to see "one of my lawyers"); Det.'s Oct. Aff. ¶ 23 (Gallman telling the Victim that he works with "a lot of lawyers"). The authoring detective even interpreted these statements for Justice McDonald, opining that Gallman was likely "employed by more than one attorney as a case fixer," Det.'s Oct. Aff. ¶ 20, and provided "his services for multiple defendants." Det.'s Oct. Aff. ¶ 23.

*Second*, to substantiate the detective's interpretation of the calls supporting the probable cause finding and to preempt any suggestion that Gallman's statements were mere puffery, the affidavit cited examples of prison calls in which Gallman was recorded talking to other inmates about "work[ing]" their cases, which included trying to "beat" a case by meeting with an eyewitness. Det.'s Oct. Aff. ¶ 24. The QCDA informed Justice McDonald that it did not know which "lawyers" Gallman "may be working with, or the lawyers' knowledge and involvement in the scheme." ADA's Oct. Aff. ¶ 8. The QCDA informed Justice McDonald that it "also [did] not know how many other cases [Gallman] may be involved in [or] the identity of

his accomplices[.]"  Id.  And other investigative means would not reveal all of Gallman's co-conspirators, including criminal defense attorneys.  See Det.'s Oct. Aff. ¶¶ 28-30.

Brettschneider does not argue that the "lot of lawyers" with whom Gallman worked to fix cases could have been identified through investigative means other than a wiretap. More precisely, he does not argue that Justice McDonald had an insufficient basis to find "difficulties inherent in the use of normal law enforcement techniques" to compile a list of all of Gallman's co-conspirators and to gather evidence against them.  Torres, 901 F.2d at 231.

Nor could he.  As the QCDA team explained to the justice, there was no reason to believe Gallman would offer the Victim (or an undercover officer) the names of his co-conspirators.  See Det.'s Oct. Aff. ¶ 30 (noting that Gallman had not volunteered the name of even one attorney with whom he fixed cases).  And while surveillance could show Gallman meeting with lawyers and witnesses, it would give no "insight into the nature of these meetings." Det.'s Oct. Aff. ¶ 29.   Indeed, it is difficult to conceive of an investigation where the need for a wiretap is more obvious.  The targeted crime itself—not just discussions about it—was being conducted (or at least initiated) predominantly on a cell phone.  See Det.'s Oct. Aff. ¶ 28 (noting that Gallman uses his "cell phone in his efforts to bribe witnesses"); United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975) ("[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation[.]").

That's why Brettschneider attempts to rewrite the application submitted to Justice McDonald.  If the goal of the investigation was more modest—to identify a single lawyer that Gallman had in mind for Freeman's case—then the toolkit for that investigation could be more limited too.  But Brettschneider does not get to reframe the objectives of an investigation.  He

does not get to redraft the QCDA's application. And he does not get to delete portions of the application that are unhelpful to his argument.

The QCDA used traditional investigative tools to learn that Gallman was trying to fix one case; the task for the investigators was to uncover other cases Gallman was jeopardizing, as well as the knowledge, intent and identity of his possible co-conspirators. See, e.g., United States v. Scala, 388 F. Supp. 2d 396, 404 (S.D.N.Y. 2005) ("[Defendant] incorrectly assumes that the purpose of the wiretaps was only to obtain evidence of the sort that the government already had succeeded in obtaining through its confidential informants, physical surveillance and other measures. The wiretaps, in contrast, were sought and authorized in order to allow law enforcement officers to intercept conversations thought necessary to explore matters that the government had not succeeded in investigating through available means.").

For these reasons alone, his necessity argument fails—a wiretap was necessary to "identify all of the participants," ADA's Oct. Aff. ¶ 5(a), in Gallman's bribery schemes, not just his co-conspirator in a single case.

B. Even the More Limited Investigation Suggested by Brettschneider Could Not Have Been Completed Without a Wiretap

In any event, even if Brettschneider could retroactively recast the goal of the investigation as the pursuit of a single criminal defense attorney, his argument would still fail. Brettschneider offers his advice on how the goals of this narrower investigation could have been achieved: the Victim should have been told to "ask for the lawyer's name and then arrange a meeting with the lawyer at his office." Mot. at 9.

But there is one problem. Knowing the identity of the lawyer and meeting with that lawyer would have done little to reveal whether the lawyer had "knowledge of the illegal nature of this activity." Det.'s Oct. Aff. ¶ 28. Gallman proposed to pay the Victim and go to one

of his attorneys to "put stuff in writing."  Det.'s Oct. Aff. ¶ 20.  An attorney who welcomes the

Victim and Gallman into her office to document a recantation—which she might have no reason

to think is purchased or even false—would not necessarily be a co-conspirator.  An attorney's

knowledge and intent, as the application correctly noted to Justice McDonald, could realistically

be gleaned only through the attorney's conversations with Gallman.  Given this reality and

Gallman's testy conversation with the Victim in which he was ready to stop talking to the Victim

altogether, see Det.'s Oct. Aff. ¶ 22 ("[Y]ou want me to lose your number? Cause I'll take it out

my phone."), there was no reason for the QCDA to risk the investigation by asking Gallman for

the identity of one of his co-conspirators.  See Det.'s Oct. Aff. ¶ 30 (noting, inter alia, limitation

of informants in this investigation).  See, e.g., United States v. Trippe, 171 F. Supp. 2d 230, 236

(S.D.N.Y. 2001) (noting the targets' discovery of informant's cooperation as one intolerable risk

of traditional investigative techniques).

 And it is not only the risk of compromising the investigation that Brettschneider

ignores; he also dismisses valid concerns the QCDA articulated about the danger posed by

Gallman.  Mot. at 9-10.   According to Brettschneider, the Victim's safety did not warrant

serious consideration because the witness-bribing Gallman was not tampering with witnesses,

just buying them.  Id. at 10.  He adds that there was no "violence on the horizon," id., from this

two-time killer and five-time felon, Det.'s Oct. Aff ¶ 8,[5] who described himself to the Victim as

---

[5] In 1992, Gallman pled guilty to manslaughter in the first degree and was sentenced to four to eight years' imprisonment. That conviction stems from a shooting that occurred in June 1987 in which Gallman shot one victim dead and a second one, who survived. Approximately one month later, in July 1987, Gallman killed again. After being convicted by a jury of murder for the July 1987 shooting, Gallman prevailed on an appeal stemming from a discovery violation.  Instead of facing the prospect of a retrial, Gallman plea-bargained the case to criminal possession of a weapon in the second degree and was sentenced to four to eight years' imprisonment. In 1988, Gallman was convicted of criminal possession of a weapon in the third degree and was sentenced to 30 months' to five years' imprisonment. In 1983, Gallman was convicted of robbery in the second degree and sentenced to 32 months' to 8 years' imprisonment. And in 1983, Gallman was convicted of criminal sale of a controlled substance and

a "motherfucking homie" who "had a life in jail" and whose reputation was apparently known to "anybody in the street," Det. Oct. Aff. ¶ 22. So, Brettschneider concludes, the Victim should have just been let loose on the excursion with Gallman to go see his lawyer. Brettschneider's proposal ends there, but the logical conclusion of the strategy would have led the Victim inside a law office where investigators could not follow. There, the Victim would have likely been presented with the choice of committing perjury by signing a false affidavit or refusing—and hoping that the violent felon drew the line at paying witnesses, not hurting them. These suggestions would have the Court cast aside the common sense with which it is required to approach the motion to suppress. It is an invitation the Court should decline. See, e.g. Concepcion, 579 F.3d at 218; Torres, 901 F.2d at 231; Diaz, 176 F.3d at 111.

Title III only required the QCDA to inform Justice McDonald about the progress of the investigation and the "difficulties inherent in the use of normal law enforcement methods," Concepcion, 579 F.3d at 218; "[t]here is no requirement that any particular investigative procedures be exhausted before a wiretap may be authorized," United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation marks omitted). For the reasons set forth above, the QCDA's application was, at the very least, "minimally adequate" to support Justice McDonald's determination that a wiretap was necessary. Concepcion, 579 F.3d at 217. See also Det.'s Oct. Aff. ¶¶ 28-34 (explaining the limitation of several investigative techniques).

Accordingly, Brettschneider's necessity argument fails because the goals of the investigation he envisioned were not the ones presented to Justice McDonald. Even that narrower investigation, however, could not reasonably have been completed, as Brettschneider suggests, by simply asking a co-conspirator to identify his accomplice.

---

sentenced to two to six years' imprisonment. Gallman also has a series of more recent misdemeanor drug-related convictions.

III.  The QCDA Properly Notified the Issuing Judge That It Intercepted Communication of an Offense Not Specified in the Initial Application

Moving beyond the initial application, Brettschneider argues that in its subsequent application submitted on November 10, 2014 to extend the wiretap, the QCDA "offered no plausible basis to suspect Gallman, Brettschneider and Marshall in a conspiracy to falsify business records in the first degree" under New York Penal Law § 175.10.  Mot. at 11. Brettschneider virtually concedes that the communication revealed violations of falsifying business records in the *second* degree, but definitely not in the *first* degree (so he argues) because the latter additionally requires an intent to commit another crime.  Mot. at 13-14.  This distinction is critical, he asserts, because only the latter offense is enumerated—that is, an offense that Title III proscribes (by reference to state law), as one that can be investigated through a wiretap.  Mot. at 11-12.  And so, Brettschneider submits to the Court, "the investigation achieved an end run around Title III's central mandate" that communication only about a *"designated"* offense be obtained.  Mot. at 11 (emphasis in original).

Brettschneider does not distinguish between RDAP-related conversations the QCDA captured before it obtained the November 2014 wiretap extension—when the QCDA informed Justice McDonald about this new crime—and communication that occurred after.[6] Regardless of the timing of these conversations, however, as set forth below, they were intercepted pursuant to valid wiretap orders, and can be used in federal prosecution.

---

[6] As discussed above, the co-conspirators kept talking about the RDAP fraud well into 2015. Brettschneider appears to challenge only the November 10 application.

A.      Criminal Communication Need Not Always Relate to a Designated Offense

Brettschneider's argument is built on the premise that the government may not use communications relating to a crime not designated in Title III even if the wiretap order (or an extension thereof) was obtained because an enumerated offense was being committed.  Mot. at 11-12.  In his view, if the crime intercepted is not one listed in Title III then, as a practical matter, the crime must be ignored.  He cites no law for this proposition and withholds binding authority that says just the opposite.

The governing statute is 18 U.S.C. § 2516, which limits the offenses that can be investigated through eavesdropping.  The provision balances privacy interests against "effective control of crime[s]" deemed serious enough by federal and state legislatures.  United States v. United States Dist. Court, 407 U.S. 297, 302 (1972).  Section 2516(2) allows states to designate such crimes, which New York has done by, for example, proscribing witness-bribery in New York Crim. Proc. Law § 700.05(8)(f).  There is no requirement in § 2516 that post-authorization, incidentally-captured communication fit within a "designated offense"; nor is there a requirement that only the predicate offenses be the topics of anticipated interception.

Incidental interception of criminal activity triggers § 2517(5).  That provision allows the government to use incidentally-captured communication so long as the original application was made in good faith and the judicial officer supervising the wiretap was timely notified.  There is no additional requirement in the statute, despite the argument advanced by Brettschneider, that the incidentally-captured communication itself must fit within a predicate offense enumerated in § 2516.  Nor is there a requirement—either in § 2516 or § 2517(5)—that *all* the anticipated pertinent communication correspond to a designated offense.  If a wiretap

investigation is authorized because a Title III predicate offense is being committed, the authorities are under no obligation to ignore talk of other crimes.

The Second Circuit has made that clear in United States v. Goffer, 721 F.3d 113 (2d Cir. 2013). "When the government investigates insider trading for the bona fide purpose of prosecuting wire fraud, it can thereby collect evidence of securities fraud, *despite the fact that securities fraud is not itself a Title III predicate offense*." Id. at 123 (emphasis added, quotation marks omitted). If a "subsequent application" discloses this interception and shows that it was not the result of a "subterfuge search . . . but was in fact incidentally intercepted," then there is no violation of Title III. Id. Precluding evidence obtained from a wiretap just because it captures discussions of other (non-designated crimes) would, the Second Circuit observed, lead to the absurd result of immunizing a defendant because he has a "diversified criminal portfolio." Id.[7] See also In re Grand Jury Subpoena Served on John Doe, 889 F.2d 384, 388 (2d Cir.1989) ("We believe . . . that Congress intended that amended orders under Section 2517(5) could encompass federal crimes not listed in Section 2516.").

The same is true when authorities are aware ahead of time that they would be intercepting discussions of non-designated crimes and disclose as much to the authorizing judge. See Goffer, 721 F.3d at 123 ("In this case, Government investigators indicated in the wiretap applications that, in addition to wire fraud, they expected to uncover evidence of securities fraud

---

[7] In Goffer, 721 F.3d at 118-122, wiretap evidence led to the defendants' convictions for securities fraud. On appeal, the defendants argued that the district court should not have permitted the use of this evidence at trial because (1) securities fraud is not a predicate Title III offense and (2) the evidence was not incidentally intercepted. Id. at 122. The Second Circuit rejected both arguments, finding no reason that intercepted communication about a non-designated offense should be suppressed (or its use precluded at trial) when the government obtains an otherwise lawful wiretap. Id. at 122-23. Because the application set forth, in good faith, probable cause for the interception of a designated offense (wire fraud), it did not matter that evidence of a non-designated offense (securities fraud) was anticipated and in fact captured. Id. at 123.

(which, they expressly noted, is 'not a predicate offense under 18 U.S.C. § 2516.'").  If the unanticipated incidental capture of non-designated offenses is permitted, the court reasoned, then the government should not be punished when it discloses the probability of such interception ahead of time.  <u>Id.</u>  Indeed, such communication is no less incidental to a bona fide investigation of a different crime—"something does not have to be unanticipated in order to be incidental." <u>United States v. McKinnon</u>, 721 F.2d 19, 22-23 (1st Cir. 1983).[8]

These observations are hardly groundbreaking.  They are in accord with the plain reading of the statute, the views of judges around the country and simple logic.  "Federal courts have made it clear that the government may use lawfully obtained wiretap evidence to prove crimes not specified in the wiretap order, and may do so even if those are crimes not specifically targeted by Title III."  <u>United States v. Marcy</u>, 777 F. Supp. 1400, 1403 (N.D. Ill. 1991) (collecting authority).  <u>See also</u> <u>United States v. Pacheco</u>, 489 F.2d 554, 564 (5th Cir. 1974) (holding that non-enumerated offenses can be prosecuted based on incidentally-intercepted communication); <u>United States v. Arellano</u>, 315 F. Supp. 3d 1207, 1213 (D.N.M. 2018) (same, where the "wiretap is properly executed and there is no bad faith or pretext"); <u>United States v. Lanza</u>, 341 F. Supp. 405, 413 (M.D. Fla. 1972) (observing that nothing in Title III's text or

---

[8] <u>See also</u> <u>United States v. Levine</u>, 690 F. Supp. 1165, 1171 (E.D.N.Y. 1988) ("[T]he mere fact that the prosecutors believe that the surveillance will reveal other crimes, and disclose that belief to the issuing judge, does not justify a conclusion of bad faith."); <u>United States v. Smart</u>, 278 F.3d 1168, 1173 (10th Cir. 2002) ("To hold otherwise would create perverse incentives for law enforcement officers to only disclose suspicion of enumerated crimes and for criminals to commit non-enumerated offenses to insulate their communications from interceptions."); <u>McKinnon</u>, 721 F.2d at 22 ("While an interception that is unanticipated is a fortiori incidental, the converse is not true: something does not have to be unanticipated in order to be incidental. Evidence of crimes other than those authorized in a wiretap warrant are intercepted 'incidentally' when they are the by-product of a bona fide investigation of crimes specified in a valid warrant. Congress did not intend that a suspect be insulated from evidence of one of his illegal activities gathered during the course of a bona fide investigation of another of his illegal activities merely because law enforcement agents are aware of his diversified criminal portfolio.").

history suggests that incidentally-captured communication obtained pursuant to a valid wiretap warrant could not be used in prosecution of crimes not enumerated in Title III).

Indeed, "it would be absurd to suppose that the government could not seize evidence allegedly relating to 'non-enumerated' criminality merely because it happened to discover such evidence during the course of otherwise lawful electronic surveillance." Marcy, 777 F. Supp. at 1403. It would be akin to ignoring crimes or leaving evidence found in plain view. Id. (quoting United States v. Johnson, 539 F.2d 181, 188 (D.C. Cir. 1976) ("Officers attending a properly authorized, limited, and supervised wiretap have no obligation to close their ears to unexpected incriminating information on matters unrelated to their immediate investigation. . . . Like an officer who sees contraband in plain view from a vantage point where he has a right to be, one properly overhearing unexpected villainy need not ignore such evidence."). See also United States v. Masciarelli, 558 F.2d 1064, 1067 (2d Cir. 1977) (observing that the rationale of the incidental-interception rule is derived from the "plain view" doctrine, allowing law enforcement "lawfully engaged in a search for evidence of one crime" to seize what is in plain view if it "inadvertently comes upon evidence of another crime."). Nor would it safeguard privacy rights to limit what communication can be used in court, once eavesdropping is already sanctioned based on the commission of a designated offense.

Accordingly, contrary to Brettschneider's argument, there is no requirement that the RDAP-related communication must have fit within a designated offense. See Goffer, 722 F.3d at 123. To suppress this evidence, Brettschneider would have to demonstrate that the QCDA wiretap applications were "subterfuge" searches.

B.    The QCDA's Wiretap Based on Witness-Bribery and the Extension Application Were Not Subterfuge Searches

Brettschneider does not dispute that the QCDA was, in good faith, investigating a designated offense (witness bribery) when it obtained communication about a different crime (falsifying business records). Mot. at 11-14. In its subsequent application, the QCDA properly disclosed interception of the latter offense. To label QCDA's applications "subterfuge" searches as Brettschneider does, see Mot. at 11, one would have to believe the QCDA had its sights set on investigating a business-record-falsification offense related to a federal inmate—about which it had no reason to know prior to the wiretap—and that the witness-tampering scheme painstakingly detailed by the QCDA was just an excuse to get to the bottom of the RDAP fraud. One would have to be untethered to reality to make that claim, not least because the investigation resulted in state and federal indictments for witness bribery. See Goffer, 722 F.3d at 122-23 (juxtaposing incidental interception with a subterfuge search); Masciarelli, 558 F.2d at 1068 (finding no pretext in an investigation of a crime that was ultimately indicted, even where the incidentally-intercepted communication also led to charges); United States v. Smart, 278 F.3d 1168, 1173 (10th Cir. 2002) (in a case involving "poorly drafted" applications that "misrepresent[ed]" that the targeted offenses were Title III predicates, finding no indication that there was false pretext or subterfuge).

Brettschneider's argument fails for this reason alone: the RDAP fraud did not have to correspond to any Title III predicate offense because the QCDA had a valid wiretap, obtained in good faith, to investigate an enumerated offense. The QCDA informed Justice McDonald of the RDAP fraud in the November 2014 wiretap application, which properly anticipated further discussion about this crime.

C.     In Any Event, There Was Probable Cause to Believe the Incidentally-Captured
       Communication Constituted a Designated Offense

Even if the law provided—as Brettschneider argues, ignoring <u>Goffer</u>—that incidentally captured communication must itself fit within a designated offense, his argument would still fail.  He admits that falsifying business records in the first degree is a designated offense (by way of 18 U.S.C. § 2516(2) and New York Crim. Proc. Law § 700.05(8)), but claims that the discovered conduct did not amount to conduct violating that provision; it could, he seems to allow, qualify as the lesser included second-degree falsification of business records offense because that offense does not require the commission or concealment of another crime.

This claim suffers from two flaws.  *First*, it is with some irony that Brettschneider, standing accused of committing a federal offense under 18 U.S.C. § 1001, says that the QCDA could not have been investigating another offense in connection with business-records falsification.  There was also at least probable cause to believe the co-conspirators were committing the New York crime of offering a false instrument for filing in the second degree, in violation of New York Penal Law § 175.30 (or the aiding and abetting and conspiracy thereof).  The QCDA explained to Justice McDonald that the purpose of this falsification was for Marshall to get into RDAP under false pretenses, and that the co-conspirators planned (from Queens County) to send the letter to Marshall through legal mail to avoid detection, so that Marshall could study it.  November 10, 2014 Affidavit of Detective Santagelo in Support of an Application for an Extended and Amended Eavesdropping Warrant ¶¶ 30-31 & n. 23.  That was all the information Justice McDonald needed to find probable cause that the crime of falsifying

business records in the first degree was afoot, and to permit the use of that communication in the grand jury or at trial.[9]

Second, the purpose of the application was not to prove beyond a reasonable doubt that Brettschneider and his co-conspirators committed any offense. Even under Brettschneider's faulty framework (one that requires every incidentally-captured criminal discussion to touch on a designated offense), the wiretap application only had to set forth probable cause to believe that communication about designed-only crimes continued on the targeted cell phone. On a motion to suppress, the inquiry is further layered with "substantial deference" to the authorizing judge and asks whether "the issuing judicial officer had a substantial basis for the finding of probable cause." Wagner, 989 F.2d at 72. There is no question that Justice McDonald had reason to find at least a "fair probability" (not even a "prima facie showing") that the captured discussions showed Brettschneider and his co-conspirators engaging in a conspiracy to falsify business records in the first degree.

In sum, the QCDA did not have to specify a statute within which the incidentally-captured communication fit, and that communication did not have to implicate any enumerated offense under Title III. But the QCDA exceeded Title III requirements and, after informing the

---

[9] Notably, while the QCDA specified the statute it believed Brettschneider and his co-conspirators were violating, Title III did not require it to do so. All that is required is to disclose the nature of the communication. See Masciarelli, 558 F.2d at 1068-69 (approving "implicit" authorization, disagreeing with district court that § 2517(5) required the government to identify the statute when informing the court of the incidentally-captured communication); accord United States v. Ardito, 782 F.2d 358, 362 (2d Cir. 1986) ("[A]uthorization under 18 U.S.C. § 2517(5) may be inferred when a judicial officer grants a continuation of the surveillance, even though the offense was not listed in the original order, so long as he was made aware of material facts constituting or clearly related to the other offenses in the application for the continuance" (internal quotation marks omitted)); United States v. Seabrook, No. 16-CR-467 (ALC), 2017 U.S. Dist. LEXIS 146620, at *5 (S.D.N.Y. Sep. 11, 2017) ("It is of no consequence that the affidavits submitted to the courts for approval do not mention honest services fraud in the context of the allegations made here against Huberfeld (and Seabrook), because the interception was nonetheless lawful.").

issuing judge of the communication, did identify a predicate offense, giving Justice McDonald more than enough reason to find probable cause that the statute was violated.

IV.    The November Application Contained No Violation

Continuing his focus on the November application, Brettschneider claims the QCDA hid from Justice McDonald two October calls about Brettschneider's and his co-conspirators' plot to defraud the BOP.  Mot. at 14-17.  He injects a nefarious motive: the QCDA wanted to make it seem like discussions about this new crime occurred within the time period proscribed by New York Criminal Procedure Law § 700.65(4).  Section 700.65(4) states that before communication of a previously unidentified crime can be used, the wiretap-issuing judge must be timely notified.  That notification, state law provides, must occur within 10 days (unless an application for an extension is made sooner), after "probable cause exists to believe that a crime not named in the warrant has been, is being, or is about to be committed."  N.Y. Crim. Proc. Law § 700.35(4).  Once again, Brettschneider overlooks binding authority fatal to his argument, and, again, loses even if that law did not exist.

A.    The Wiretap Order Is Valid Under Federal Law

As Brettschneider explains, his argument is derived exclusively from state law because that law accords "greater 'protection to the individual right of privacy'" than the corresponding Title III provision.  Mot. at 6 (quoting United States v. Sotomayor, 592 F.2d 1219, 1225 (2d Cir. 1979)).  Brettschneider concedes that there is no 10-day requirement under Title III, as it "requires only that the 'subsequent application' be made 'as soon as practicable.'"  Mot. at 16 n. 4 (quoting 18 U.S.C. § 2517(5)).  See also Mot. at 17 ("The Court should apply the State law here. . . .").

Brettschneider does not argue—for good reason—that the wiretap should be suppressed under the as-soon-as-practicable Title III standard. Only 17 days elapsed between the first pertinent conversation about the RDAP fraud and the QCDA's subsequent application for extending the wiretap in which the crime was disclosed to Justice McDonald. The time span is dwarfed by those routinely approved by federal courts, particularly in cases like this one, where the defendant has shown no prejudice. See, e.g., United States v. Vario, 943 F.2d 236, 243 (2d Cir. 1991) (approving a seven-month delay, where the defendant did not "allege any prejudice from the delay or that the state wiretap was a subterfuge to generate evidence" for unauthorized charges); United States v. Arnold, 773 F.2d 823, 830-31 (7th Cir. 1985) (approving a thirty-one month delay "because the original electronic surveillance order was lawfully obtained, in good faith and not as a subterfuge"). So, if federal law governs, Brettschneider loses.

B.    Federal Law Governs in Federal Court

To apply New York's 10-day notification requirement instead of Title III's as-soon-as-practicable standard, Brettschneider relies on abrogated law. He cites Sotomayor, 592 F.2d at 1225 for the proposition that state law controls in federal court (for state wiretap orders) if it accords greater protection to privacy rights than Title III. See Mot. at 6 (accurately quoting Sotomayor). Brettschneider neglects to mention, however, that Sotomayor's observation is no longer good law. "[S]ince Sotomayor, the Second Circuit has clarified that federal law governs the admission of recordings in federal court cases even where state law applies 'more stringent' standards 'designed to protect an individual's right to privacy." United States v. Hurt, No. 14-CR-250 (JBA), 2015 U.S. Dist. LEXIS 118544, at *2 (D. Conn. Sep. 3, 2015).

If there was any doubt about the vitality of the notion that state statutory requirements could apply in federal court, the circuit once and for all put it to rest in 2010. In

Amanuel, 615 F.3d at 122, it cited the same line from Sotomayor that Brettschneider recycles in

his brief, and observed that it had been "rejected by this Court."  The Second Circuit concluded,

in no unclear terms, that in federal court, "federal law governs the use of a state-issued

eavesdropping warrant."  Id.[10]

Nor is 18 U.S.C. § 2516(2), cited by Brettschneider, at odds with Amanuel.  Mot.

at 6.  That provision merely permits state authorities to seek wiretaps that conform with state

procedures.  It does not mean that in federal court, state law governs the admissibility of that

intercepted communication.  See, e.g., United States v. Charles, 213 F.3d 10, 19 (1st Cir. 2000)

(interpreting § 2516(2) and holding that "federal law governs the admissibility of evidence in

federal prosecutions . . . . [E]vidence obtained in violation of neither the Constitution nor federal

law is admissible in federal court proceedings *without regard to state law*."  (internal citation and

quotation marks omitted, emphasis in original); id. (citing United States v. Miller, 116 F.3d 641

(2d Cir. 1997) with approval, where the court upheld a wiretap that was suppressed in state

court).

---

[10] The relevant passage provided:

> In United States v. Sotomayor, 592 F.2d 1219 (2d Cir. 1979), this Court
> noted in dicta that a federal court, in determining the admissibility of the
> fruits of state-issued warrants, need "apply only those more stringent
> state statutory requirements or standards that are designed to protect an
> individual's right of privacy." Id. at 1225. That conclusion, however, was
> later rejected by this Court in United States v. Miller, 116 F.3d 641 (2d
> Cir. 1997).  In declining to apply state law to the use made of the wiretap
> warrant at issue in Miller, we found that the "interpretive dicta" in
> Sotomayor "have never been applied to bar the introduction of wiretap
> evidence." Id. at 661. Accordingly, we agree with the district court's
> determination that in this federal case, federal law governs the use of a
> state-issued eavesdropping warrant.

Amanuel, 615 F.3d at 122.

Accordingly, because federal law applies and because Brettschneider does not argue that the QCDA's November application was untimely under Title III, the analysis for this claim could end here.

C.     State Notification Requirement Does Not Safeguard a Privacy Right

Brettschneider would lose even under <u>Sotomayor</u>'s dichotomous framework—had it not been rejected.  Another Second Circuit opinion (again absent in Brettschneider's brief) held that timely notification of newly captured communication does not guard an individual's privacy rights.   In <u>Vario</u>, 943 F.2d at 244—a decision issued when <u>Sotomayor</u>'s dictum was still viable—the Second Circuit refused to apply New York's more stringent notification requirement[11] in federal court.  Citing <u>Sotomayor</u>, the court held that the notification rule is "procedural" and is "'essentially evidentiary in character.'"  <u>Vario</u>, 943 F.2d at 244 (quoting <u>Sotomayor</u>, 592 F.2d at 1225-26).  "Since a government delay in applying to use communications in evidence under these rules does not bear on a defendant's privacy rights, <u>Sotomayor</u> does not require the application of state law to the question of such delay, and we need not consider whether the government's applications complied with New York law."  <u>Id.</u>

In short, Brettschneider invites this Court to rely on an abrogated opinion (dictum in <u>Sotomayor</u>) and misapply even that law (by ignoring <u>Vario</u>).

D.     The QCDA Complied With State Law

Even if Brettschneider were litigating this issue in state court, the wiretap would still be upheld.  The New York statute requires notification ten days after "probable cause exists"

---

[11] At the time, New York Criminal Procedure Law § 700.65(4) did not contain the 10-day requirement but the defendant in <u>Vario</u> argued that state courts had interpreted the "as soon as practicable" standard in its statute more stringently than the Title III counterpart (as interpreted by federal courts).

that communication about another crime has been intercepted; the statute's clock is not triggered by mere discussion of a crime. N.Y. Crim. Proc. L. § 700.65(4).

The first two pertinent calls related to the RDAP program were captured on October 16 and October 24, 2014, when Marshall, Gallman and Brettschneider discussed the idea of procuring a letter for Marshall that would detail his purported substance abuse history. But it was not until November 1, 2014—less than 10 days before the QCDA submitted the November 10 application—that Gallman reported to Marshall he had secured someone who could write the letter. The investigators could have reasonably believed that probable cause for the commission of the new crime (falsification of business records in the first degree) had only formed then—when a false letter was more than an idea; Marshall had taken a step in furtherance of the conspiracy by apparently recruiting a co-conspirator to write the letter.[12] Nor was it unreasonable for the QCDA to be selective in the 102-page affidavit brimming with transcripts of calls and text messages, to focus mostly on the flurry of communication on November 1, calls that were both concrete and incriminating.[13]

Hindsight always brings clarity. The October 16 and 24 calls are significant because we now know that Brettschneider and his co-conspirators ultimately procured a fraudulent letter that was then sent to the BOP. But the investigators were well within their rights to focus on the November 1 call as the probable-cause forming communication. Contrary

---

[12] Under New York state law, an overt act is always required to establish a conspiracy. See New York Penal Law § 105.20.

[13] Notably, the QCDA did not include a damning November 4, 2014 call between Gallman and Marshall's brother, in which Gallman stated that the fraudulent letter would cost $300 to procure. This further refutes Brettschneider's suggestion that the QCDA selectively omitted only earlier relevant calls so as to make its application appear timely under New York law.

to Brettschneider's suggestion, not every pertinent call gives rise to probable cause of a crime. Mot. at 15.

In short, "[t]he basic error in defendant's claim involves a miscalculation of the date from which the delay in seeking the amendment is to be computed. It is not, as defendant claims, the date when the first conversation relating to [the new crime] was intercepted. Instead, the critical date is when 'probable cause' existed for the amendment." United States v. Aloi, 449 F. Supp. 698, 725 (E.D.N.Y. 1977) (citing People v. DiStefano, 38 N.Y.2d 640 (1976)).

Brettschneider's argument is therefore unavailing even under state law, which, in any event, the Second Circuit has held does not apply in federal court.

## V. The Government Does Not Oppose Severance Even Though the Defendants Were Properly Joined

Finally, Brettschneider has moved this Court to sever his case from Scarpa's. As the government noted at the last status conference, in light of Gallman's guilty plea, and the charges on which the government anticipates proceeding to trial, it does not oppose severance under Rule 14(a) of the Federal Rules of Criminal Procedure. It disagrees, however, with Brettschneider's statement that Scarpa's and Brettschneider's joinder was improper under Rule 8. See Mot. at 17; Decl. ¶ 5.

Like Brettschneider, the government does not detail the law but writes to correct the misstatement. Gallman was charged in separate conspiracies with Scarpa and Brettschneider, both stemming from Gallman's dealings with criminal defense lawyers to fix cases.[14] As detailed above, Brettschneider's conduct involving Gallman was not limited to the RDAP fraud, as they, for example, shopped a false recantation to a prospective client. Joinder

---

[14] Rule 8(b) provides that "[a]ll defendants need not be charged in each count."

was appropriate, and the government could have asked for a joint trial. Nevertheless, with Gallman no longer proceeding to trial, the government agrees that the Court's discretion is better exercised to sever the cases.

## CONCLUSION

For the reasons set forth above, the defendant's motion to suppress the wiretap should be denied, and the Court should sever Brettschneider's trial from Scarpa's.

Dated:   Brooklyn, New York
         December 6, 2018

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                              By:    /s/_____
                                        Andrey Spektor
                                        Lindsay K. Gerdes
                                        Assistant U.S. Attorneys
                                        (718) 254-6475/6155

cc: Sarita Kedia, Esq. (by ECF)
     Jonathan Savella, Esq. (by ECF)
     Clerk of the Court (CBA) (by ECF)