FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JAN 30 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

SCOTT BRETTSCHNEIDER et al.,

                       Defendants.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
18-CR-123-1 (CBA)

**AMON, United States District Judge:**

Defendant Scott Brettschneider has been indicted for fraud and conspiracy to commit fraud related to false statements made to the United States Bureau of Prisons ("BOP"). (D.E. # 74 ("Indictment").) A significant portion of the government's evidence was secured through a wiretap obtained by the Queens County District Attorney's Office ("QCDA") on co-conspirator Charles Gallman's cell phone. Brettschneider has moved to suppress the wiretap evidence derived from that interception. For the reasons stated below, Brettschneider's motion is denied.

## BACKGROUND

### I. Proposed Trial Evidence

The government proffers that it will prove the following facts at trial. From 2012 until 2014, Brettschneider represented Richard Marshall in a criminal proceeding in <u>United States v. Wright, et al.</u>, No. 12-CR-014 (FJS) (N.D.N.Y.). During the sentencing proceedings, Brettschneider submitted a psychological evaluation that stated that Marshall had been "clean and sober for over 20 years." (<u>Id.</u> D.E. # 338 at 2–3.) Marshall was sentenced and incarcerated at a federal penitentiary in Lewisburg, Pennsylvania. In October 2014, Brettschneider began working with co-conspirators Gallman and Reginald Shabazz-Muhammed to get Marshall admitted into the Residential Drug Abuse Program ("RDAP"), which they believed would help reduce Marshall's

1

prison sentence. Brettschneider, Marshall, and Gallman had several phone conversations where they discussed creating a false letter to send to the BOP that would detail Marshall's purported history of substance abuse. These conversations began in October 2014 and were intercepted by the QCDA due to a wiretap previously initiated on Gallman's cell phone.

Of note are two conversations that took place on November 1, 2014. In the first conversation, prior to Brettschneider joining a three-way call, Gallman and Marshall had an extensive discussion about the contents of the letter, ensuring that there was no "conflict" with Marshall's pre-sentence report, and determining that as long as "it's from a counselor who [is] board certified," there would not be any issues with admission into RDAP. (Santangelo Nov. Aff. ¶ 27.) The two also agreed that Marshall would be sent a copy of the letter "through legal mails" so the BOP would not detect it. (Id.) When Brettschneider joined the call, he stated that he had someone to write the letter, and just needed to "ask the person." (Id.) Brettschneider then received details from Marshall as to the requested contents of the letter. Marshall told Brettschneider that he "always" was in a program for drug treatment, that "I can be an outpatient or I can be an inpatient," and that he had a "drinking problem . . . or if you want to put drugs too, then whatever . . . ." (Id.) Brettschneider then stated that he would "take care of it as soon as I get off the phone with you." (Id.) Thirty minutes later, Brettschneider joined a second three-way call with Gallman and Marshall. In that conversation, Brettschneider stated "he is gonna be able to do it," in an apparent reference to the individual he recruited to write the letter. (Id. ¶ 29.) Brettschneider was temporarily disconnected from the phone call, but upon rejoining, asked Marshall "when do you need this thing by?" and if the letter was "to get [Marshall] into the program." (Id.) Brettschneider stated on the call that the letter would be from "Shabazz's program." (Id.)

2

In November 2014, the federal penitentiary in Lewisburg received a letter signed by "Reginald Shabazz-Muhammad, CASAC CLA, Director of Program Services," detailing Marshall's purported treatment at the "Muhammed Mosque No. 7." The letter was dated November 6, 2014, was postmarked November 20, 2014, and stated that Marshall was involved in an outpatient program, was "suffering from active drug dependence, namely alcohol and marijuana," and had been "making progress gradually reducing his active substance dependence." Despite this letter, Marshall was not admitted into RDAP. When the BOP asked Shabazz-Muhammed for progress reports from Marshall's treatment, Shabazz-Muhammed stopped returning their calls. (D.E. # 118 ("Mem. in Opposition") at 4–5.)

## II.   Initial Wiretap Application on Gallman's Cell Phone

The QCDA-secured wiretap on Gallman's cell phone was initially obtained to investigate witness bribery in the QCDA's pending criminal case against Fredrick Freeman. Recorded conversations on a prison phone line between Freeman and his father led investigators to conclude that Gallman was hired to bribe Roshwon Williams, the critical witness in the case against Freeman. (Santangelo Oct. Aff. ¶¶ 6–7, 13–19.) In support of the QCDA's application to secure a wiretap on Gallman's cell phone, Detective Richard Santangelo stated that he learned that Gallman had approached Williams and stated to Williams, in sum and substance, "I need you to speak to a lawyer because we don't testify. We are black. We don't testify against one of our own black brothers. Come with me to one of my lawyers and put stuff in writing. I'll pay you." (Id. ¶ 20.) Williams rebuffed Gallman and then began cooperating with the QCDA. (Id.) Santangelo stated that Williams received three additional calls from Gallman's cell phone in the next several days. With Williams' consent, the QCDA then recorded a phone conversation between Williams and Gallman, a transcript of which was included in the wiretap application. (Id. ¶¶ 21–22.) In that

3

phone call, Gallman repeatedly stated that he "work[s] with a lot of lawyers," that he is a "n**** who helps n**** speak their cases," and that although he was "not a lawyer," he "worked for lawyers." (Id. ¶ 22.)

Detective Santangelo attested that at the time of the wiretap application, it was "clear that [Gallman] uses the [Gallman] cell phone in his efforts to bribe witnesses." (Id. ¶ 28.) He believed a wiretap was required to determine "what other individuals [Gallman] may be contacting," "the identity of the lawyer that [Gallman] want[ed Williams] to meet with," and "what additional individuals may be involved in this activity, and whether the lawyer and/or others have knowledge of the illegal nature of this activity." (Id.) Detective Santangelo also stated that a wiretap would enable investigators to gain insights into Gallman's activities that they would be unable to derive from physical surveillance: "For example, merely seeing [Gallman] in a lawyer's office, or meeting with people, would not give [investigators] any insights into the nature of those meetings. Even observing the payment of money, without the context of electronic surveillance, would not be helpful in advancing the goals of this investigation." (Id. ¶ 30.) Finally, Detective Santangelo stated that he believed that "it would be unsafe for the cooperating witnesses to accompany [Gallman] anywhere, certainly not to meet with anyone Gallman has thus far refused to even identify." (Id. ¶ 30.) As documented in the wiretap application, Gallman had an extensive criminal history that included guilty pleas for manslaughter in the first degree and criminal possession of a weapon in the second degree. (Id. ¶ 8.)

On October 15, 2014, Justice Robert McDonald of the Queens County Supreme Court signed an eavesdropping warrant authorizing the interception of communications on Gallman's cell phone "relating to the crime of Bribing a Witness." (Oct. Wiretap Order at 3.)   Justice McDonald found that "essential evidence to the commission of [this] offense will be obtained by

intercepting the communications" on Gallman's cell phone, and that "comparable evidence essential for the prosecution" of this crime "could not be obtained by other investigative means." (Id. at 2–3.)

After securing the initial wiretap in October 2014, the QCDA heard the above-mentioned conversations between Gallman, Brettschneider and Marshall while monitoring the wiretap. On November 10, 2014, the QCDA made an application to Justice McDonald seeking continued authorization to intercept communications related to witness bribery, and requesting that he amend the wiretap order to additionally encompass communications related to falsifying business records, noting that there was now "probable cause to believe" that Gallman, Marshall, and Brettschneider "have committed, are committing, or are about to commit the crime of Falsifying Business Records in the First Degree." (Hagan Nov. Aff. ¶ 3.) Detective Santangelo's affidavit for the November 2014 wiretap application provided transcripts of the conversations that took place on November 1, 2014 between Gallman, Marshall, and Brettschneider where they agreed to generate a fraudulent letter to support Marshall's candidacy for RDAP. (Santangelo Nov. Aff. ¶¶ 27, 29.)

Justice McDonald reauthorized and amended the QCDA's wiretap application on November 10, 2014. The "Extended and Amended Eavesdropping Warrant" continued to authorize the interception of communications related to the crime of "Bribing a Witness," but also authorized the interception of communications related to the crime of "Falsifying Business Records in the First Degree and Conspiracy to commit [this] offense," (Nov. Wiretap Order at 4), a crime designated by the state of New York as eligible for wiretap investigation. See N.Y. C.P.L. § 700.05(8)(b); 18 U.S.C. § 2516(2). Conversations related to the RDAP fraud continued to be intercepted after the wiretap order was reauthorized and amended.

## DISCUSSION

Brettschneider rests his motion to suppress the wiretap evidence obtained by the QCDA on three separate grounds: (1) that other less intrusive investigative procedures were not "tried or meaningfully considered" before seeking a wiretap; (2) that the November 2014 application to extend and renew the wiretap failed to establish probable cause for the commission of the "designated offense" of Falsifying Business Records in the First Degree, which requires the suppression of conversations related to the RDAP scheme; and (3) that the QCDA "misrepresented" when it learned about Brettschneider's conspiracy to submit a fraudulent letter to the BOP in order to appear compliant with New York State's statutory requirement that investigators make an application to amend an eavesdropping warrant within ten days of discovering communications that give rise to probable cause to believe that a crime not listed in the eavesdropping warrant is being committed. The Court addresses each in turn.

I.    The October 2014 Wiretap Application met Title III's Necessity Requirement

Brettschneider argues that all of the wiretap evidence obtained by the QCDA should be suppressed because the QCDA's October 2014 wiretap application failed to make a sufficient necessity showing as is required by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2518(1)(c).

In a federal case, "federal law governs the use of a state-issued eavesdropping warrant." United States v. Amanuel, 615 F.3d 117, 122 (2d Cir. 2010). Title III requires that wiretap applications provide a full and complete statement of the facts and circumstances relied upon by the applicant to establish probable cause, and a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C § 2518(1)(b), (c); United States v.

Rajaratnam, 719 F.3d 139, 144 (2d Cir. 2013). To satisfy the latter "necessity" requirement, the government must show that "investigative procedures less intrusive than a wiretap have been tried or are unlikely to succeed if tried." United States v. Lilla, 699 F.2d 99, 102 (2d Cir. 1983). The purpose of the necessity requirement "is not to preclude resort to electronic surveillance until all other possible means of investigation have been exhausted by investigative agents." United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990) (quoting United States v. Vazquez, 605 F.2d 1269, 1282 (2d Cir. 1979)). Instead, agents are only required to "inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." Id. The sufficiency of an applicant's necessity showing "is to be tested in a practical and commonsense fashion." Lilla, 699 F.3d at 103–04.

Brettschneider contends that the QCDA failed to sufficiently make a necessity showing because the less intrusive means of a more aggressive use of the informant coupled with surveillance was available to investigators. (D.E. # 106-2 ("Mem. in Support") at 6–7.) He argues that because Williams, who was cooperating with the QCDA at the time of the wiretap application, was invited to accompany Gallman to meet the lawyer working with Gallman, the QCDA had "a ready means of ascertaining both the attorney's identity and the extent of his criminal knowledge: they could have simply instructed [Williams] to call Gallman, ask for the lawyer's name, and then arrange a meeting with the lawyer at his office." (Mem. in Support at 9.)

When a defendant moves to suppress evidence obtained from a judicially authorized wiretap on the grounds that the Government failed to establish that ordinary investigative techniques were reasonably likely to be unsuccessful, the district court should grant "considerable deference" to the issuing court and review the wiretap application "only to determine whether the facts set forth by the Government were 'minimally adequate' to support the issuing court's order."

7

United States v. Bourne, No. 08-CR-888 (NGG), 2011 WL 4458856, at *11 (E.D.N.Y. Sept. 23, 2011) (quoting United States v. Concepcion, 579 F.3d 214, 217 (2d Cir. 2009)). Employing this standard, the Court determines that the facts set forth in the October wiretap application were sufficient for Justice McDonald to conclude that a wiretap was necessary to successfully prosecute the Freeman case.

The primary tools available to the QCDA at the time of the wiretap application were to employ physical surveillance of Gallman, to utilize Williams as an informant, and to monitor jailhouse communications. The application articulated that, "while productive at times," physical surveillance was a technique of "limited value," especially when Gallman was "conducting a meeting when the nature of the meeting is unknown." (Santangelo Oct. Aff. ¶ 29.) Employing Williams as a cooperator also provided "limited use," because to that point Gallman had been unwilling to "share with [Williams] the names of his co-conspirators," and would not discuss with Williams "his other clients or assignments," or even how Gallman had received Williams' contact information. (Id. ¶ 30.) And while Brettschneider contends that Williams simply could have been sent to a meeting with Gallman to determine the identity of the attorney, Detective Santangelo had determined that it would "be unsafe for the cooperating witnesses to accompany [Gallman] anywhere, certainly not to meet with anyone that [Gallman] has thus far refused to even identify." (Id.) And while "monitoring the jailhouse communications of Freeman ha[d] been helpful," Gallman was "very careful" about what was discussed during those calls, because he "kn[ew] the calls [we]re being monitored and recorded." (Id. ¶ 31.) Detective Santangelo's affidavit also articulated that there was "no reason to expect that [Gallman] would share any additional information with . . . an undercover officer," (id. ¶ 32), and that the use of a "search warrant for a location [was] not possible because no location ha[d] been identified to be searched," (id. ¶ 33).

8

Even if the QCDA had, as Brettschneider suggests, directed Williams to "ask for the lawyer's name and then arrange a meeting with the lawyer at his office," (Mem. in Support at 9), the investigation in the Freeman case would have remained incomplete. Learning the identity of the lawyer would have done little to reveal whether the lawyer had "knowledge of the illegal nature of th[e] activity." (Santangelo Oct. Aff. ¶ 28.) After imploring Williams not to testify, Gallman had offered to pay Williams to accompany him to a lawyer's office to "put stuff in writing." (Id. ¶ 20.) An attorney who conducted a meeting with Williams and Gallman and documented an affidavit or recantation might not have had reason to suspect that that the sworn statement was false or paid off. To determine if the attorney had criminal intent and was complicit in Gallman's witness bribery scheme, it would be important to monitor the conversations between the two parties. It is therefore clear to the Court that Justice McDonald was not wrong in his conclusion that a wiretap was necessary to fully investigate the Freeman case.

Moreover, Brettschneider's argument is premised on an overly myopic view of the investigation. The stated goal of the QCDA's investigation at the time of the October 2014 wiretap application was not limited to the Freeman case. Instead, it was to "identify all of the participants in, and beneficiaries of" the attempts to bribe witnesses. (Hagan Oct. Aff. ¶ 5.) There was a reasonable basis to believe that, beyond the Freeman case, Gallman was being paid "by other criminal defendants, possibly with the knowledge and assistance of criminal defense attorneys, to fix their cases as well." (Id. ¶ 2.) At the time of the wiretap application, the QCDA was not only seeking the "identity of the lawyer that [Gallman] want[ed] [Williams] to meet with," but also "what additional individuals may be involved in this activity, and whether the lawyer and/or others ha[d] knowledge of the illegal nature of [the] activity." (Santangelo Oct. Aff. ¶ 28.) Brettschneider

9

provides no argument as to how the QCDA could have uncovered the full scope of the scheme to bribe other witnesses without a wiretap.

He instead makes the unconvincing claim that the wiretap application failed to establish probable cause that Gallman was bribing witnesses in instances other than the Freeman case. The October 2014 wiretap application sufficiently demonstrated that there was probable cause to believe that Gallman's attempts to bribe witnesses extended beyond the Freeman case. Detective Santangelo's affidavit provided transcripts of conversations in which Gallman stated several times that he "work[s] with a lot of lawyers," and that he helps criminal defendants "speak their cases." (Santangelo Oct. Aff. ¶ 22.) Gallman also requested Williams come with him to meet with "one of my attorneys," which would suggest that Gallman works with more than one attorney in these types of transactions. (Id. ¶ 20.) Detective Santangelo also uncovered evidence that Gallman's "criminal activities [were] not solely limited to" the Freeman case. (Id. ¶ 24.) Specifically, a review of the prison telephone system at Rikers Island indicated that Gallman spoke to "many inmates" who were "hiring [Gallman] to perform 'work' on their cases." (Id.)  In one conversation, Gallman stated that he was not going to "beat this case" without an inmate sending him additional money. (Id.)  Finally, a detective in the QCDA anonymously called Gallman's cell phone while he was conducting physical surveillance of Gallman in the Queens County Criminal Courthouse during one of Freeman's court proceedings. (Id. ¶ 26.) The purpose of the detective's call was to ensure that the cell phone that had been making calls to the Rikers Island prison phone line in fact belonged to Gallman. When Gallman answered the call, the agent stated, "I was told to call you because I have a problem." Gallman replied, "You have the right person, I can help fix things." (Id. ¶ 26.) Considering this evidence, the Court concludes there was probable cause to believe that Gallman's witness bribery activities were not limited to the Freeman case.

In sum, on the information provided in the wiretap application, Justice McDonald had a sufficient basis to conclude that comparable evidence could not be obtained by other investigative means both with regard to the investigation of the Freeman case itself and the investigation into other similar schemes.

### II. The November 2014 Application Did Not Need to Separately Establish a Designated Offense

Under Title III, a court may authorize a wiretap only to investigate an offense that is enumerated in 18 U.S.C. § 2516. 18 U.S.C. § 2518(3)(a). Section 2516(2) allows States to designate "major" state-law felonies that are "dangerous to life, limb, or property" to be investigated via a wiretap. People v. Shapiro, 50 N.Y.2d 747, 764 (N.Y. 1980) (citing 18 U.S.C. § 2516). New York has designated "falsifying business records in the first degree as defined in section 175.10 of the penal law," as an offense eligible for wiretap investigation, but has not listed falsifying business records in the second degree, N.Y.P.L. § 175.05, as a designated offense. N.Y. C.P.L. § 700.05(8)(b).

Brettschneider argues that the QCDA's application on November 10, 2014 to amend and extend the October 2014 wiretap to cover the RDAP-related conversations presented "no plausible basis to suspect Gallman, Brettschneider and Marshall [were] in a conspiracy to falsify business records in the first degree" under New York Penal Law § 175.10. (Mem. in Support at 11.) Instead, he asserts that "at best," Detective Santangelo's November 2014 application described a conspiracy to falsify business records in the second degree. (Id. at 14.) Because only the former is a designated offense under § 2516, Brettschneider contends that "the investigation achieved an end run around Title III's central mandate" that only "communications of designated offenses be obtained," and thus the RDAP-related conversations uncovered by the wiretap should be suppressed. (Id. at 11.) (citations omitted).

11

Although it is true that Title III requires that an initial wiretap be authorized to investigate an offense covered by § 2516, "the statute recognizes that 'a law enforcement officer lawfully engaged in a search for evidence of one crime' may happen upon evidence of another crime not specified in the court's authorization order—and perhaps not specified in Section 2516 either." United States v. Rajaratnam, No. 09-CR-1185 (RJH), 2010 WL 4867402, at *3 (S.D.N.Y. Nov. 24, 2010) (quoting United States v. Masciarelli, 558 F.2d 1064, 1067 (2d Cir. 1977)). When this happens, "the public interest militates against [the officer's] being required to ignore what is in plain view." Masciarelli, 558 F.2d at 1067. As such, Title III has a separate portion of its statute, 18 U.S.C. § 2517(5), which "governs the use of evidence obtained on a wiretap 'relating to offenses other than those specified in the order of authorization or approval.'" United States v. Goffer, 721 F.3d 113, 122 (2d Cir. 2013) (quoting 18 U.S.C. § 2517(5)). Under § 2517(5), the government may utilize incidentally intercepted evidence of offenses "not listed in Section 2516," so long as the government makes a subsequent application that demonstrates that the wiretap was pursuant to an "original order [that] was lawfully obtained, that it was sought in good faith and not a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully intercepted order." Id. at 122–23 (quoting United States v. Marion, 535 F.2d 697, 700 (2d Cir. 1976)). A contrary rule would lead to the absurd result that "the government could not seize evidence allegedly related to 'non-enumerated' criminality merely because it happened to discover such evidence during the course of otherwise lawful electronic surveillance." United States v. Marcy, 777 F. Supp. 1400, 1403 (N.D. Ill. 1991).

Brettschneider does not claim that obtaining the October 2014 wiretap order was in bad faith or that the investigation into the Freeman case was a subterfuge search. And there is no plausible claim that the extended and amended order was a subterfuge to secure in bad faith

evidence of the RDAP scheme. The Court understands Brettschneider to be pressing a different and novel argument; namely, that there must be probable cause to support each enumerated designated offense; and if not, any interceptions regarding that unsupported offense must be suppressed. This is true under Brettschneider's theory even if there is admittedly probable cause to support another designated offense. Here the amended wiretap order authorized the continued interceptions for witness bribery, which Brettschneider concedes is a designated offense. Because the facts alleged in the wiretap application do not establish probable cause for the crime of falsifying business records in the first degree, he claims that any interceptions regarding that offense must be suppressed. He provides no authority to support this argument, and the law is to the contrary.

The Second Circuit has made clear that "an amended [wiretap] order can authorize the use of communications revealing evidence of crimes that could not have been investigated under an original order." In re Grand Jury Subpoena Served on Doe, 889 F.2d 384, 387 (2d Cir. 1989); see also United States v. Giordano, 172 F. Appx. 340, 342 (2d Cir. 2006) (holding that the court can "lawfully amend a wiretap authorization under 18 U.S.C. § 2517(5) to allow the use of evidence of crimes not specified at 18 U.S.C. § 2516"). Under § 2517(5), a judge may enter an amended wiretap order that extends to cover offenses "not listed in Section 2516, so long as there is no indication of bad faith or subterfuge by the . . . officials seeking the amended surveillance order." In re Grand Jury, 889 F.2d at 387.

In In re Grand Jury, communications related to violations of the federal tax laws, crimes not enumerated by § 2516, were intercepted during a lawful wiretap investigation of state enumerated offenses. Id. at 386. A state court judge "acting pursuant to . . . § 2517(5)" granted the investigators request to amend the wiretap order to allow the interception of communications

13

related to the federal tax crimes. Id. The Second Circuit upheld the state judge's amended order. After acknowledging that "the federal tax offenses at issue could not properly be investigated in the first instance by a Section 2516 order," it concluded that "Congress intended that amended orders under Section 2517(5) could encompass crimes not listed in Section 2516. The Senate Report accompanying Section 2517(5) states that 'other' offenses under that section 'need not be designated offenses,' an apparent exemption from the requirement that the offense be among those designated in the Section 2516 list." Id. at 387 (citing S. Rep. No. 1097, 90th Cong., 2d Sess.). Moreover, as applicable here, the Circuit has recently noted that wiretap interceptions concerning non-designated offenses should not be suppressed because the "Government forthrightly discloses the probability of intercepting 'communications related to other offenses.'" Goffer, 721 F.3d at 123.

In re Grand Jury is directly on point. Contrary to his contention, the November 2014 wiretap order did not need to fit the RDAP-related conversations into a designated offense enumerated in § 2516.[1] Justice McDonald properly extended and amended the wiretap. There is no basis for suppression.

### III.    New York State's 10-Day Rule Does Not Apply in Federal Court

Finally, Brettschneider argues that the November 10, 2014 application to extend and amend the wiretap violated New York State's requirement that investigators must make an application to amend an eavesdropping warrant "within ten days" of discovering intercepted communications that give rise to "probable cause [] to believe that a crime not named in the warrant has been, is

---

[1] The Court notes that Justice McDonald did in fact find that the QCDA had demonstrated that there was probable cause that the co-conspirators were engaged in conspiracy to falsify business records in the first degree, an offense New York has deemed eligible for wiretap investigation pursuant to § 2516(2). However, because the RDAP-related conduct was not required to have been a designated offense in order for it to be permissibly utilized by the Government, the Court declines to evaluate Brettschneider's contention that there was only probable cause to substantiate falsifying business records in the second degree, but not in the first degree.

14

being, or is about to be committed." N.Y. C.P.L. § 700.65(4).   Specifically, Brettschneider contends that the November 10, 2014 wiretap application states that the QCDA first received interceptions about the RDAP conspiracy on November 1, 2014, when other documents indicate that the QCDA intercepted conversations related to the plan on October 16, 2014 and October 24, 2014. (Mem. in Support at 14.) In his motion papers, Brettschneider asked the Court to "apply the State law" in this case to find that "the warrant was invalid," and suppress the "communications related to the Marshall letter." (Id. at 16–17.)

It is well settled that in a "federal case, federal law governs the use of a state-issued eavesdropping warrant." Amanuel, 615 F.3d at 122. The federal statute has no ten-day time limit. Section 2517(5) of Title III only requires that notification of incidentally intercepted communications of crimes not mentioned in the authorizing warrant be made "as soon as practicable" in order for the communications to be disclosed at trial. 18 U.S.C. § 2517(5). In light of this settled law, Brettschneider is no longer pressing the claim that the intercepted communications needed to have been reported to Justice McDonald "within ten days."

He now pursues a new theory. Brettschneider contends that the notification provision of § 2516(5) requires that every conversation that was incidentally intercepted be included. Because the QCDA's November 10, 2014 application only included transcripts of conversations that took place on November 1, 2014, he contends that the conversations on October 16, 2014 and October 24, 2014 should be suppressed. This argument finds no support in the language of the statute or the case law interpreting it. Section 2517(5) merely states that the contents of incidentally intercepted communications may be disclosed when authorized by a judge of competent jurisdiction. "There is no requirement in § 2517 that the judge listen to or know about each such conversation," and there is no need for a judge to engage in a "conversation-by-conversation

15

analysis." United States v. Gambale, 610 F. Supp. 1515, 1531 (D. Mass. 1985); see also Fishman & McKenna, Wiretapping and Eavesdropping § 16:20 ("18 U.S.C.A. § 2517(5) does not require the application to particularize and specify each conversation.").

Consistent with § 2517(5), the QCDA appropriately informed Justice McDonald of the RDAP-related fraud in its November 10, 2014 application to amend and extend the wiretap. There was no requirement that each and every conversation related to the RDAP-fraud be detailed in that application. As such, the conversations intercepted on October 16, 2014 and October 24, 2014 will not be suppressed.

## CONCLUSION

For the reasons stated above, Brettschneider's motion to suppress the wiretap evidence is denied.

SO ORDERED.

Dated: January 29, 2019
       Brooklyn, New York

                                                  s/Carol Bagley Amon
                                                  Carol Bagley Amon
                                                  United States District Judge