

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MEG/AS
F. #2015R01691

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 25, 2019

By ECF

The Honorable Carol B. Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

>   Re:   United States v. Scott Brettschneider,
>           Criminal Docket No. 18-123 (S-1) (CBA)

Dear Judge Amon:

   The government respectfully submits this letter in response to the defendant Scott Brettschneider's March 20 and March 22 submissions.  The defendant has moved to preclude certain government exhibits and to introduce his own.  For the reasons set forth below, the government does not object to the introduction of most of the defendant's proposed exhibits, except the most inflammatory.  The defendant's attempt to limit the government's case, however, fails because it misconstrues rules of hearsay, the critical issue in this case, and binding law.

I.   The Defense Coming Into Focus: Hiding Inconvenient Facts From the Jury

   The defendant worked with two co-conspirators to submit a false letter (the "Letter") to the Bureau of Prisons ("BOP") on behalf of a federal inmate, Richard Marshall, in an effort to get him admitted into the Residential Drug Abuse Program ("RDAP").  The government's primary proof against the defendant are (1) intercepted calls—some of which include the defendant—in which the co-conspirators discussed the contents of the Letter, and (2) court documents that the defendant reviewed or submitted that put him on notice that the Letter was false.

   The defendant will apparently argue at trial that he did not know the Letter was false, and that Gallman and Marshall plotted to lie to the BOP behind his back.  But there are two obstacles the defendant must overcome.  *First*, the defendant represented Marshall in court just months earlier, and during those proceedings both the Presentence Investigation Report ("PSR") and the defendant's own submission stated that Marshall had no recent substance abuse problem—contradicting the Letter.  *Second*, the intercepted communications demonstrate that the defendant and Gallman worked closely together on criminal cases, casting doubt on the idea that

Gallman concocted this fraudulent scheme—which required action by the defendant—without the defendant's knowledge.

Instead of trying to clear these two hurdles at trial, the defendant hopes to remove them altogether. He wants the jury to assess his argument in a vacuum—an alternate reality in which the defendant had no information about Marshall's substance abuse history, and where his professional relationship with Gallman might have only extended to this RDAP fraud. In this world, one divorced from facts, the defendant is betting the jury could well believe the defendant was in the dark about his client's drug history and Gallman's reasons for working with Marshall.

The defendant can still—and almost certainly will—make these arguments at trial. But for the reasons set forth below, the Court should not allow him to hide facts to which the government will point in rebutting his assertions.

II. The Court Should Not Preclude the PSR, BOP Documents or the Expert Report Submitted by the Defendant

In his March 22, 2019 submission, the defendant argues that Marshall's PSR and a report he submitted to the federal judge prior to Marshall's sentencing are not admissible, even as non-hearsay. March 22 Submission at 4-5. In a footnote, he adds that the portions of the BOP's Screening Report—completed by the BOP to assess Marshall's eligibility for RDAP— that reference the PSR are also inadmissible "for the same reasons." Id. at n. 2.[1] He is wrong.

The expert report is admissible for its truth, and all three documents are admissible non-hearsay. It is settled (and the defendant does not dispute) that a statement can be admitted as non-hearsay if it is probative of a defendant's knowledge or intent. See, e.g., United States v. Oguns, 921 F.2d 442, 448 (2d Cir. 1990) (affirming admission of a co-conspirator's statement not for its truth but "as non-hearsay circumstantial evidence of [the defendant's] knowledge and intent"); United States v. Salameh, 152 F.3d 88, 112 (2d Cir. 1998) ("Where, as here, the statement is offered as circumstantial evidence of [a defendant's] state of mind, it does not fall within the definition given by Rule 801(c); because it was not offered to prove the truth of the matter asserted." (internal quotation marks omitted)); United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988) (same, where the statement was admitted to show what a defendant had been previously told).

A. The PSR Is Admissible Non-Hearsay

The relevance of the PSR for the defendant's knowledge and intent cannot be overstated. It shows the defendant had reason to know the co-conspirators were plotting to submit a letter to the BOP that was not based on Marshall's actual substance abuse history; just months earlier he had reviewed a court document, the PSR, that stated Marshall had no recent history of substance abuse. Notably, at sentencing the defendant confirmed to the judge that he read the PSR and had no objections.

---

[1] This document was submitted to the Court and marked for identification as Government Exhibit 4. It is enclosed again with this letter.

2

The defendant's contention to the contrary rests on a faulty premise. He claims there is "no meaningful distinction between Marshall's statements . . . and admitting the statements to prove Brettschneider's knowledge of that fact." March 22 Submission at 5. But the critical issue at trial is not whether Marshall had a substance abuse history; the issues are whether the Letter is false, and whether the defendant knew it was false. The defendant is well aware that the calls, particularly between Gallman and Marshall, speak for themselves, as the two men brainstorm contents for the Letter, without regard to any actual treatment or drug dependency. They identify different authors for the fake letter before the defendant supplies them with Shabazz-Muhammad. The accuracy of the Letter is therefore unlikely to be heavily (if at all) disputed by the defense.

The parties' arguments will focus on the defendant's knowledge and intent. And since the defendant had reviewed the PSR and offered no objections, he had reason to question the Letter's truth. Indeed, even if the truth was that Marshall lied to the probation officer about his substance abuse, the PSR would still be admissible for the same reason: the PSR's accuracy does not change its probative value with regard the defendant's state of mind at the time he was discussing the Letter. It still put him on notice, and that goes to his knowledge and intent. See, e.g., United States v. Ferguson, 653 F.3d 61, 87 (2d Cir. 2011) ("[T]he statement was not offered for its truth; it was offered solely for the purpose of showing that the statement was made to [the defendant]"). For this reason alone, the PSR is admissible as non-hearsay for the defendant's knowledge and intent.

There is an independent reason the PSR is admissible non-hearsay: as the Court correctly observed at the last conference, the PSR will be admitted not "for the truth of the contents [but] . . . for what's not in there." Transcript of March 12, 2019 Hearing, at 32:7-9. A hearsay statement is defined as an assertion or conduct intended by the declarant as an assertion. Fed. Rule Evid. 801(a). The absence of a statement is by definition not an assertion, let alone an assertion offered for its truth. See, e.g., Columbia Communs. Corp. v. EchoStar Satellite Corp., 2 F. App'x 360, 370 (4th Cir. 2001) (explaining that absence of customer complaints are not statements because absence of a statement is not an assertion or non-verb conduct intended as an assertion); cf. Oguns, 921 F.2d at 449 ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." (internal citation marks omitted)). To the extent the defendant wishes to cross-examine the probation officer about the accuracy of her report, and test whether she neglected to include substance abuse history, he will have an opportunity to do so at trial.

  B. <u>The BOP Screening Report's References to the PSR Are Admissible as Non-Hearsay</u>

The government will elicit at trial that the BOP reviews inmates' court files—and most notably the PSR—to determine their eligibility for the RDAP. The resulting business records, see Government Exhibit ("GX") 4, show that Marshall's problem for gaining admission into RDAP was caused by the absence of necessary information in the PSR. See, e.g., GX 4 at 4 ("There is not enough information in his PSR to indicate that a problematic substance abuse problem occurred in the year prior to his arrest."). That gap—left open by the PSR—was what the co-conspirators tried to plug with the Letter. Put differently, if the PSR provided (accurately

3

or not) that Marshall had a recent or ongoing substance abuse problem, the co-conspirators would not have needed the Letter.

The references to the PSR in the Screening Report are therefore admissible as non-hearsay for two independent reasons. *First*, as set forth above, they are relevant not for any assertion—and certainly not a truthful assertion—but for the lack of statements in the PSR about recent substance abuse. See Fed. R. Evid. 801(a). *Second,* they are necessary to show the context and motive for the co-conspirator's actions, why they needed to submit a false letter. See, e.g., United States v. Slaughter, 386 F.3d 401, 403 (2d Cir. 2004) (admitting out-of-court statement of a civilian who pointed to a discarded weapon to explain how the police officer found it); United States v. Green, 887 F.2d 25, 27 (1st Cir. 1989) (affirming admission of statements as non-hearsay because the government used them to show motive).

Just as with the PSR, the government will not use the Screening Report to argue that they show Marshall did not have a recent history of substance abuse.[2]  Even if the BOP Screening Report had incorrectly reported Marshall's drug history, the documents' relevance to explain the co-conspirators' actions is not diminished.  The co-conspirators would still need to show Marshall's substance abuse history through other documentation.

### C. The Expert Report the Defendant Submitted to the Judge is Admissible for Its Truth and as Non-Hearsay

#### 1. The Expert Report Is Admissible for Its Truth

The defendant attempts to distance himself from an expert report (the "Report") he submitted at sentencing, which is reattached (and highlighted for purposes of this letter) with this letter and marked GX 17.  He claims that his "office" filed it on ECF on the "eve of Marshall's sentencing," and that the defendant "made no reference to the psychologist's report" at sentencing.  March 22 Submission at 2.

These assertions are misleading.  The Report twice stated that while Marshall had used decades earlier, "Mr. Marshall has been clean and sober for over 20 years." GX 17 at 2 & 6 (highlighted for purposes of this letter).  The Report, prepared by Dr. Marc Janoson, is addressed to the defendant, not to the sentencing judge.  The defendant filed it on ECF under the caption, "Sentencing Memorandum."  See United States v. Marshall et al., 12-CR-14, ECF No. 338 (FJS) (N.D.N.Y.).  And in his primary sentencing submission (which was not submitted on the "eve" of sentencing), the defendant dedicated part of an entire section, about recidivism, to the Report. See GX 16, at 7.  The defendant wrote, "It is apparent from Dr. Janoson's report that Mr. Marshall is not a danger to the community nor is there a likelihood that Mr. Marshall would resume criminal conduct."  Id.

---

[2] Although the statements are likely admissible for their truth under Rules 801(d)(2), 803(3), 803(4), and 807 as reliable admissions about Marshall's then-existing condition of not being addicted to drugs, that were pertinent for potential treatment (on supervision and in prison), and were arguably adopted by the defendant at sentencing, the government is no longer seeking to introduce them for their truth.

4

At sentencing (a transcript of which is also attached), the defendant tracked this 20-year period, by claiming to "know[] Richard Marshall for 20 years." Transcript of Marshall's August 8, 2014 Sentencing Hearing, at 3:14-15. See also Id. at 6:10. The defendant did not request drug treatment at sentencing, referenced Marshall's "unblemished" period of pretrial supervision (during which, as the court knew, he tested negative for drugs), id. at 4:6, and finished his argument by stating that Marshall had "basically led a clean life," id. at 6:17-18. Though the defendant appeared to be referring to Marshall's criminal history, the thrust of the defendant's argument at sentencing about Marshall's "clean" 20 years, and the explicit incorporation of the Report into his sentencing submission, leave no doubt that the defendant had adopted it within the meaning of Rule 801(d)(2). See, e.g., Kreppel v. Guttman Breast Diagnostic Inst., Inc., 95 Civ. 10830 (SWK) (MHD), 1999 U.S. Dist. LEXIS 19602, at *2-4 (S.D.N.Y. Dec. 17, 1999) (holding that an expert's report prepared in litigation "cannot reasonably be viewed as anything but adoption of or acquiescence in those opinions").

The defendant's only argument to the contrary once again misstates the defendant's connection to the Report. March 22 Submission at 4. He equates the defendant's role with someone who simply forwards a document and acts as a "mere messenger." Id. (citing Transbay Auto Serv., Inc. v. Chevron USA Inc., 807 F.3d 1113, 1118 (9th Cir. 2015)). He conveniently omits the defendant's reliance on the Report to advance his arguments on Marshall's behalf. The defendant also vacillates between arguing about Dr. Janoson's adoption of statements and his own. March 22 Submission at 4. That is the wrong analysis. The source of information for the Report's statements does not change the defendant's adoption of it. It only allows the defendant to argue to the jury why less weight should be placed on it. See, e.g., United States v. Qunbar, 335 F. App'x 133, 135 (2d Cir. 2009) (argument that a defendant did not adopt a statement went to weight rather than admissibility).

2. The Report Is Also Admissible As Non-Hearsay

Just like the PSR, the Report stated that Marshall only used drugs in his distant past. The defendant's attempt to mislead the Court about his reliance and awareness of the Report is a preview of his argument to the jury—a claim that the defendant was in the dark about his client's substance abuse history. His attempt to preclude this evidence therefore also fails for the same reason that the PSR is admissible: to show his knowledge and intent. The PSR and the Report are circumstantial evidence of the defendant's knowledge of the falsity of the Letter. Even if Gallman and Marshall plotted the Letter behind his back, as he apparently will argue, the two documents would have given the defendant reason to question the statements made in the Letter. That he did not do so, but instead facilitated the submission of the Letter, is circumstantial evidence of his intent to participate in the lie to the BOP.

D. Rule 403 Does Not Bar the Documents' Admission Under Rule 403 as Non-Hearsay

The defendant's analysis of Rule 403 conflates the issue of knowledge with the Letter's falsity. See March 22 Submission at 5. To exclude probative non-hearsay under Rule 403, the defendant must show that the non-hearsay value of the documents is substantially outweighed by the risk that the jury would ignore the Court's limiting instruction and consider

them for their truth.  See generally United States v. Reyes, 18 F.3d 65, 70 (2d Cir. 1994) (setting forth the governing framework); accord United States v. Roy, 444 F. App'x 480, 482 (2d Cir. 2011) (finding non-hearsay value of a statement to provide background not outweighed by risk of the jury considering it for its truth).  He cannot make that showing.

As explained above, the critical issue at trial is whether the defendant knew the Letter was false—that Marshall was not really treated by Shabazz-Muhammad—not whether Marshall had any recent substance abuse history.  Marshall could have been an active cocaine or heroin addict, and the defendant would still be just as guilty of submitting the Letter, knowing full well that Shabazz-Muhammad did not treat the defendant.  As a result, the defendant focuses on the wrong question when he writes that, "Given the paucity of evidence on the issue of Marshall's substance abuse, it is virtually inconceivable that a jury would not consider Marshall's assertions for their truth."  March 22 Submission at 5 (emphasis in original).

Indeed, there is an easy solution to what the defendant identifies as the problem: in addition to the usual limiting instruction accompanying non-hearsay evidence, the Court could also instruct the jury that whether or not Marshall in fact had a substance abuse problem is not the determinative issue in this trial, and that the jury must ask whether the defendant believed the Letter was false when he helped to submit it.

In short, the defendant's knowledge and intent will be the central and mostly hotly contested issue at trial.  As a result, evidence that goes directly to the defendant's state of mind cannot be substantially outweighed by the risk that the jury will consider this evidence for a question that will likely not even be disputed.  See, e.g., Slaughter, 386 F.3d at 403; United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992) (holding that Rule 403 did not bar admission of potentially prejudicial evidence because the "defendant's intent or knowledge [was] clearly at issue").

III.   The Court Should Not Preclude the Government's Evidence Showing the Defendant's Relationship With Gallman

After obtaining a second adjournment of trial to purportedly review evidence of the defendant's relationship with Gallman, the defendant now moves, in his March 20 submission, to exclude it altogether.  And if the evidence is admitted, the defendant asks that he be allowed to rebut it with his own recordings—most of which do not even include the defendant.

As the government explained at the last conference, it is seeking to introduce clips of 17 calls, totaling less than 20 minutes.[3]  The conversations are innocuous discussions between the defendant and Gallman about their cases, all showing that the two men have continuously worked together.  See, e.g., GX 55 (the defendant referring to "our case"); GX 53 (discussion

---

[3] Transcripts of these clips have been provided to the Court and are marked for identification as GX 39 through 55.

6

about collecting fees from a client). The government omitted potentially prejudicial calls even though they would be probative of their relationship.[4]

The defendant recognizes the settled law in the Second Circuit, that evidence about the nature of the relationship between co-conspirators is generally admissible at trial. See March 20 Submission, at 1-2. He claims, however, that there is a bright-line rule: if this evidence postdates the conspiracy, as charged in the indictment, then it is "irrelevant." Id. at 2. There is no such rule. In fact, the Second Circuit has stated just the opposite: "Relevancy cannot be reduced to mere chronology; whether the similar act evidence occurred prior or subsequent to the crime in question is not necessarily determinative to its admissibility." United States v. Ramirez, 894 F.2d 565, 569 (2d Cir. 1990). Thus, even in cases involving other bad acts—where the potential for prejudice is higher—the Second Circuit has held that, "The fact that the evidence involved a subsequent rather than prior act is of no moment." United States v. Germosen, 139 F.3d 120, 128 (2d Cir. 1998).[5]

It would make little sense to draw distinctions based solely on timing, particularly in cases like this one. The only reason that most of the calls selected by the government post-date the charged conspiracy is that the RDAP discussions were intercepted immediately after the Queens County District Attorney's office obtained a wiretap in October 2014. Those discussions fizzled out in January 2015, as it became clear that the co-conspirators' efforts to get Marshall admitted into RDAP would fail. But throughout the six-month period of the wiretap (which extended through April 2015), the defendant and Gallman routinely discussed their cases. Those discussions did not change, whether they occurred in November 2014 (see, e.g., GX 53T), February 2015 (see, e.g., GX 55T), or March 2015 (see, e.g., GX 51T).

According to the defendant, even calls that fall on the "correct" side of this imagined line —that is, calls between October 2014 and January 2015—should be excluded, as "wholly irrelevant" and unduly prejudicial. March 20 Submission at 2. But these calls are just as relevant to show the defendant's connection to his co-conspirator. And their probative value is amplified by the anticipated defense that will lay blame with Gallman and attempt to shield the defendant from knowledge of Gallman's activities—a much more difficult task if the jury knows the true relationship between the two men. Indeed, the calls in which the defendant and Gallman switch seamlessly from discussing the Letter to other cases (which the defendant seeks to preclude as well) are particularly telling of this relationship, and how the RDAP fraud was just

---

[4] For example, as the Court is aware from Gallman's sentencing, the defendant worked with Gallman to sell a false recantation by a witness who testified in a murder trial. See ECF No. 13 (Gallman telling the defendant, "Scott, we gotta get this guy as a client.").

[5] The only case the defendant cites in support of his proposition, see March 20 Submission, at 2 (citing United States v. Dupree, No. 10 CR 627, 2011 WL 2006295, at *4 (E.D.N.Y. May 23, 2011)), is inapposite. Ruling on a motion to quash a subpoena, Judge Matsumoto in Dupree held that a defendant's attempt to obtain information about his co-defendants' dealings, in an effort to incriminate them in transactions in which he was not charged, was a fishing expedition because he could not show it would result in admissible evidence. Nowhere did the court state that evidence post-dating a conspiracy is, as a matter of law, irrelevant. Such an observation would contradict Second Circuit precedent.

7

another business dealing between the two men. See GX 25, 2:17-end; GX 27, 2:28-end; GX 35, 6:1-end.

The only risks of prejudice the defendant can identify are "juror confusion" and information about other criminal cases. March 20 Submission at 2. Neither concern warrants exclusion of admissible evidence. The government will make clear in its presentation what is already clear from the face of the calls—that the subject of one set of intercepted calls is not the Letter. It will also explain in its summation that those calls were introduced only to show the defendant's and Gallman's business relationship. As for the passing mention of the nature of the criminal cases the two men discussed, it is unlikely that the jury will hold it against a criminal defense attorney that he represents defendants accused of crimes.

IV. The Government Objects Only to the Most Egregious Calls Proposed by the Defendant

The defendant has identified two categories of calls he seeks to admit at trial. The first category, identified in his March 20 submission and supplemented via email, contain almost three dozen calls he would admit if the government is permitted to introduce GX 39 through GX 55 (which show the defendant's and Gallman's relationship). In the second category of calls, the defendant identified (via email) 11 clips that he believes are directly relevant to the RDAP fraud. The government does not object to most calls that fall in either category.

A. Non-RDAP Calls

With respect to the first category, the defendant has identified one text message and 34 calls that he "may" introduce, some of which he apparently plans to admit in their entirety. Incredibly, only one of the calls includes the defendant, and none have yet come with transcripts.[6] The probative value of the vast majority of these calls is unclear, and likely non-existent, but, with few exceptions, the government does not object to the defendant's introduction of these calls. Because the defendant has yet to provide transcripts, the government will supply to the Court all the calls, and, segregated in a different folder, those four calls to which the government objects.

The government only objects to the introduction of three calls between Gallman and "Mel" (identified as "TPN" 26020, 26057 and 26059 on the disk) and one between Gallman and "Vic" (TPN 26029). All four calls relate to Gallman's apparent plan to steal documents from another lawyer's office. The probative value of these calls is nil—they do not elucidate Gallman's relationship to the defendant. They are, however, highly inflammatory, likely meant for the jury to infer that if Gallman can steal from a law office, then he is capable of somehow tricking the defendant too.

---

[6] At the last conference, the defense team stated that with regard to this category of calls, it may not have "all" the transcripts available by March 25, 2019, but it will prepare them on a "rolling basis." Transcript of the March 12, 2019 Hearing, 42:19-22. As of March 25, 2019, the government has not received a single transcript for the 34 non-RDAP calls.

8

B. RDAP Calls

The defendant has identified 11 clips that he believes are related to the RDAP fraud. The government objects to only two clips—those marked "Excerpt 1" and "Excerpt 2" in the attached transcripts (prepared by the defense)—both of which contain inadmissible hearsay and are unduly prejudicial.

In the first clip, marked "Excerpt 2," (a call from November 1, 2014), Marshall complains to Gallman about the BOP employee he believes is preventing his entry into RDAP. Marshall tells Gallman she is having an affair with a corrections officer: "Bitch is white, but she is messing with one of the C.O.s . . . . What I heard is she outta here the first of the year because she is messing with a C.O. here, and that's a conflict of interest. So they getting her ass outta here." The discussion is rank hearsay—at times double hearsay—as Marshall relays to Gallman what he has heard. And while there is no non-hearsay value in this clip, there is a real risk that the jurors will accept Marshall's derogatory comments about the BOP employee for their truth, holding her purported behavior against the BOP and the government.

Marshall continues this discussion in the clip marked "Excerpt 1," from December 6, 2014. In this portion of the call, Marshall refers to the same BOP employee when he tells Gallman, "[T]his bitch is the worst, man . . . . [S]he fucking with a C.O." Adding another layer of hearsay, Marshall states, "Even my case worker told me, like, he said, 'Yo listen, let me know what she say because I heard she been denying a lotta—I wanna know why.'" There is no doubt the defendant wants the jury to consider these statements for the truth—that the BOP employee is unsavory, and that even another (unidentified) BOP case worker criticized her. But that violates the rules of hearsay and Rule 403. Both calls should be precluded.

V. Conclusion

For these reasons, the government respectfully requests that the Court allow the government to introduce documents from Marshall's underlying criminal case and communication showing the defendant's relationship with Gallman, while precluding the defendant from introducing the four irrelevant and inflammatory calls identified herein.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:       /s/
Lindsay K. Gerdes
Andrey Spektor
Assistant United States Attorneys
(718) 254-6155/6475

cc: Defense Counsel (by ECF)

9