# PATRICK J. JOYCE, ESQ.
Attorney at Law
70 Lafayette Street - 2nd Floor
New York, New York 10013
(212) 285-2299
FAX (212) 513-1989

New Jersey Office:
658 Ridgewood Road
Maplewood, NJ 07040
(973) 324-9417

June 28, 2019

Hon. Carol B. Amon, D.C.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201
Telephone: (718) 613-2410

*VIA CM/ECF*

    **Re:**    **United States v. Scott Brettschneider**
    **Docket #**    **1:18-CR-00123**

Dear Judge Amon:

I write to respectfully request permission to supplement Scott Brettschneider's pending Rule 29 and Rule 33 motion, and to respectfully request oral argument on this application and the underlying Rule 29/Rule 33 motions as well.

On June 14, 2019, I called AUSA Andrey Spektor and informed him that I was entering this case as counsel for Scott Brettschneider. During that conversation, I informed Mr. Spektor that it was my intention to request this Court's permission to supplement previous counsel's Rule 29/Rule 33 motion with an additional argument pertaining to Count # 1, Conspiracy to Make False Statements, in violation of 18 U.S.C. § 371, 18 U.S.C. § 3551, and 18 U.S.C. § 1001. This was because my predecessor's Rule 29/Rule 33 motions did not address this particular count, despite the fact that Mr. Brettschneider specifically asked his prior counsel to make this argument concerning Count # 1. Mr. Spektor advised me that the Government would be opposing this request.

On June 14, 2019, I filed my request to be substituted as counsel of record for Scott Brettschneider. The Government filed a response to previous counsel's Rule 29/Rule 33 motions on June 17, 2019, before I was permitted to appear as counsel, and before any supplement could be filed.

On June 25, 2019, Your Honor approved a substitution of counsel, permitting me to enter this case as counsel.

I respectfully submit that the Government will suffer no prejudice from supplementing the pending Rule 29/Rule 33 motions, as the motion has not yet been decided, and the arguments made herein were previously made at trial. The Government has thus been aware of the defense position. In the alternative, I ask that this Court consider this as a Reply in support of the Rule 29/Rule 33 motions, and permit the Government to file a sur-reply address the arguments made herein concerning Count # 1.

As Your Honor will recall, at the close of the Government's case-in-chief and again at the close of all evidence, the defense moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. After the verdict was rendered, Your Honor granted the defense extra time to file post-verdict motions. The defense now respectfully renews the motion for a judgment of acquittal pursuant to Rule 29, and respectfully requests that both counts of the Superseding Indictment be dismissed for the reasons set forth herein. In the alternative, the defense respectfully moves for a new trial pursuant to Rule 33.

Scott Brettschneider was charged in the Indictment with Count # 1, Conspiracy to Make False Statements, in violation of 18 U.S.C. § 371, 18 U.S.C. § 3551, and 18 U.S.C. § 1001, and Count # 2, Making False Statements, in violation of 18 U.S.C. § 1001. As the Court will recall, Mr. Brettschneider was charged with conspiring with his former client, Richard Marshall, Reginald Shabazz-Muhammad, and Charles Gallman in connection with the submission of a letter authored and signed by Mr. Shabazz-Muhammad and received by the United States Bureau of Prisons, United States Penitentiary – Lewisburg.

Richard Marshall was arrested in February 2012 by Federal authorities in the Northern District of New York and prosecuted in Docket # 12-CR-00014 for Federal drug offenses. He pled guilty and was ultimately sentenced to a period of 3 years imprisonment. Upon entry into the United States Penitentiary – Lewisburg, Mr. Marshall sought assistance in gaining admission into the Residential Drug Abuse Program (RDAP) from Mr. Brettschneider. According to the Government's theory of prosecution, Mr. Brettschneider then conspired with the co-defendants to submit a false letter to the Bureau of Prisons in order for Mr. Marshall to be admitted into RDAP.

At the close of the Government's evidence, the defense moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (T:680-683). The Court reserved decision on the motion. (T:683). Therefore, the provisions of Rule 29(b) apply to this motion:

> (b) Reserving Decision. The court may reserve decision on the
> motion, proceed with the trial (where the motion is made before
> the close of all the evidence), submit the case to the jury, and
> decide the motion either before the jury returns a verdict or after it
> returns a verdict of guilty or is discharged without having returned

a verdict. **If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved**.

The Government's position, as stated in their response, is that the false statements contained in Reginald Shabazz' letter were capable of influencing the Bureau of Prisons' decision whether to admit co-defendant Richard Marshall in the Residential Drug Abuse Program treatment program. (Docket Entry # 225, page 18 of 27). In the Government's view, that "ends the materiality inquiry." (Id.). The actual evidence at trial tells a different story.

At trial, the Government's evidence concerning the materiality of the false statements came chiefly from Dr. Kit Hoffman and Government Exhibit # 4. At the time the Rule 29 motion was made at the close of the Government's case, its case-in-chief consisted of the following:

Dr. Kit Hoffman is the Psychology Treatment Programs Coordinator for the Northeast Region of the United States Bureau of Prisons. (T:29). As such, he oversees the drug treatment programs in the Federal prisons located in Ohio, Pennsylvania, New Jersey, New York, and New England. (T:29). Dr. Hoffman described the procedures for evaluating inmates for substance abuse treatment; once an inmate is assigned to a particular BOP institution, they are screened by a psychologist, and if eligible, will be referred to residential or non-residential substance abuse treatment. (T:30-31).

The BOP facility in Lewisburg, Pennsylvania, which houses a Residential Drug Abuse Program treatment facility, was under Dr. Hoffman's supervision. (T:32). RDAP is an intensive, residential substance abuse treatment program offered by the BOP to qualified inmates. (T:32-33). Successful completion of RDAP can result in a reduction of up to one year off of a prisoner's sentence, provided other conditions are satisfied. (T:33-34). However, successful completion is no guarantee of a reduction of sentence. (T:34).

In order to gain acceptance into RDAP, a drug treatment specialist at the facility must first initially screen an inmate for the criteria of admission. (T:36). The criteria for the initial screening starts with an initial determination whether the inmate is legally eligible to be placed in a halfway house for at least 180 days prior to the completion of the sentence. (T:36). If an inmate has too little time left to serve on their sentence, they are deemed ineligible. (T:36). The inmate must also meet some educational requirements in order to read and comprehend the program material, and the inmate must also have a documented history of substance abuse in the 12 months prior to the arrest for the offense that resulted in the sentence. (T:37).

Dr. Hoffman testified that one of the first documents consulted in a screening of an inmate for RDAP is the Pre-Sentence Report; if there is a positive indication of substance abuse in the 12 months preceding the arrest, that meets the criteria. (T:37-38).

If the Pre-Sentence Report does not reflect a documented substance abuse problem in the 12 months preceding the arrest, the treatment specialist will automatically determine the inmate is currently ineligible. (T:38). In that event, the treatment specialist will then inform the inmate

that they are ineligible for RDAP, and inform them they can have other substance abuse treatment through BOP, and also provide outside documentation of substance abuse for the 12 months preceding their arrest. (T:38).

If the inmate submits outside records of substance abuse diagnosis and treatment, the outside records are taken under advisement only if they meet certain criteria. (T:38). First, they must establish diagnosis and/or treatment in the 12 months preceding the arrest. (T:38, 39, 42). Second, the outside documentation has to have been written contemporaneously with the services provided. (T:65, Defense Exhibit A). Third, the documentation must demonstrate that substance abuse diagnosis was completed at the time that the inmate was treated. (T:65, Defense Exhibit A). Finally, the documentation must contain information that supported such a diagnosis. (T:65, Defense Exhibit A). If the outside documentation does not meet these requirements, it will be dismissed out of hand, and the Drug Abuse Program Coordinator will deny admission into RDAP.

According to Dr. Hoffman, not even a judicial recommendation by the sentencing District Court Judge for substance abuse treatment will qualify an inmate for the second screening by the RDAP coordinator. (T:46).

If the inmate meets the requirements of the initial screening, the RDAP coordinator then interviews them. (T:36). If the RDAP coordinator determines the inmate meets the criteria in this step, then the inmate is placed on a waiting list for admission. (T:36).

According to Dr. Hoffman, the most common reason for rejection of admission into RDAP is a lack of documented substance abuse. (T:42).

Upon Richard Marshall's entry into FCI Lewisburg, Dianna Banks, a mental health professional on October 1, 2014, gave him an initial psychological assessment. (T:49, Government's Exhibit # 4). During that initial assessment, he disclosed that he had a history of substance abuse involving alcohol, marijuana, and cocaine or crack. (T:50). Based upon this disclosure, Dianna Banks recommended drug treatment, either RDAP or non-residential drug treatment. (T:50).

Simultaneously, Marshall was screened to determine if he met the initial requirements of RDAP. (T:52). However, based upon the Pre-Sentence Report, which did not establish substance abuse in the 12 months preceding his arrest, it was determined that he did not meet the requirements for RDAP, and he was not referred to the Drug Abuse Program Coordinator for the second step in the RDAP screening process. (T:52). This decision was made on October 3, 2014. (Government's Exhibit # 4).

In a letter dated November 16, 2014, Reginald Shabazz-Muhammad, a Credentialed Alcohol and Substance Abuse Counselor, sent Dianna Banks a letter falsely detailing Richard Marshall's participation in a substance abuse counseling program through "Muhammad Mosque No. 7" in Manhattan. (Government's Exhibit # 4). The letter was written in Reginald Shabazz-Muhammad's letterhead as "Ministry of Health and Human Services, Muhammad Mosque No. 7. Id. The letter claimed that Marshall was enrolled in the program from October 2003 through January 2010 when he suddenly stopped attending. Id. No supporting documentation that was

written contemporaneously with the alleged treatment was attached to the letter. The letter did not contain any information that supported a diagnosis of substance abuse disorder; rather, the letter (and apparently any diagnosis) was based upon self-reporting of substance abuse by Richard Marshall. (Government's Exhibit # 4). The letter did not request reconsideration of RDAP admission, did not make any treatment recommendations, or request any action be taken. Id.

On December 10, 2014, Dianna Banks noted the following in Marshall's BOP records regarding the November 16, 2014 letter:

> Documentation received that did not meet criteria of one year before his arrest, 2/12. Documentation not acceptable. See attached.

(T:67, Government's Exhibit # 4).

The letter provided a phone number if further information was requested, but no one from BOP ever called Shabazz-Muhammad for verification or further information. (T:54). No further documentation was ever submitted to the BOP by Marshall, Shabazz-Muhammad, or anyone else. (T:67).

On cross-examination, Dr. Hoffman further testified that the November 16, 2014 letter did not meet the criteria for outside documentation sufficient to warrant a second screening for RDAP. (T:72-73).

During his direct testimony, this Court inquired of Dr. Hoffman as follows:

> THE COURT: So am I correct that the information in the letter that we just looked at was not sufficient to qualify him for the program?
> THE WITNESS: That's correct, Your Honor.

(T:55).

Marshall was never admitted into RDAP, or apparently even considered. (T:55). However, he was required to complete a non-residential substance abuse program, and successfully completed the 13-session program with a 92.9 attendance rate. (T:59-60).

Based upon this evidence, this Court should find that the evidence was legally insufficient to establish the element of materiality.

In order to secure a conviction under 18 U.S.C. § 1001(a)(2), the Government must prove that a defendant (1) knowingly and willfully, (2) made a materially false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent. United States v.

Litvak, 808 F.3d 160, 170 (2d Cir. 2015); United States v. Coplan, 703 F.3d 46, 78 (2d Cir. 2012).

Materiality is an indispensable element of 18 U.S.C. § 1001 that must be proven by the Government beyond a reasonable doubt. United States v. Gaudin, 515 U.S. 506 (1995). The question whether the defendant's statement was material to the Federal agency's decision is the sort of mixed question of law and fact. Id.

The Supreme Court has defined "materiality" under 18 U.S.C. § 1001 to require that a statement have "a natural tendency to influence, or [be] **capable** of influencing, the decision of the decision making body to which it was addressed." Gaudin at 509 (emphasis added), quoting Kungys v. United States, 485 U.S. 759, 770 (1988). "Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made?" and (b) "what decision was the agency trying to make?" Gaudin at 512.

The Second Circuit has refined the definition of "materiality." According to several recent cases, the Government must prove that the allegedly false statement had the **capacity** to impair the functioning of a governmental agency. United States v. Coplan, 703 F.3d 46, 79 (2d Cir. 2012) (emphasis mine); see also United States v. Boffil-Rivera, 607 F.3d 736, 741 (11th Cir. 2010) (holding in order to be material, a false statement must "have the capacity to impair or pervert the functioning of a governmental agency.")

"The purpose of this 'judge-made limitation of materiality' is to insure that the reach of § 1001 is confined to reasonable bounds and not allowed to embrace trivial falsehoods." United States v. Smith, 519 Fed.Appx. 853 (5th Cir. 2013); quoting United States v. Elashyi, 554 F.3d 480, 497 (5th Cir. 2008), see also United States v. Gafyczk, 847 F.2d 685, 691 (11th Cir. 1988) (internal citations omitted).

In United States v. Litvak, 808 F.3d 160 (2d Cir. 2015), the defendant was charged with various securities fraud offenses and four counts of making false statements pursuant to 18 U.S.C. § 1001 to the United States Department of the Treasury. The false statements were allegedly made to the chief investment officer for the Treasury's Office of Financial Stability, which had purchased troubled assets and securities traded by Litvak, and upon certain representations made by Litvak. According to the Government, the false statements came in the form of monthly balance sheets that reflected marginally higher or lower aggregate balances. The Government's theory that the false balances impeded the Treasury Department's ability to realize the maximum return on a Government investment of a purchase of the securities Litvak traded, and affected the prices of the securities.

The Second Circuit reversed the convictions for violations of 18 U.S.C. § 1001, finding that

> …even if a rational jury could accept the underlying assertion - that Litvak's misstatements ultimately, though indirectly, frustrated the Treasury's achievement of its investment goals—it may not then infer solely therefrom that those misstatements were capable of influencing a decision of the Treasury. **Such speculation is not**

> **permitted; rather, for a jury to so conclude, the government must have adduced evidence of an actual decision** of the Treasury that was reasonably capable of being influenced by Litvak's misstatements. See United States v. Gaudin, 515 U.S. 506, 512, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)

Id. at 172. (emphasis added).

Quoting Gaudin, the Second Circuit went on to hold:

> To form the basis of a jury's conclusion, **evidence of such a decision cannot be purely theoretical and evidence of such a capability to influence must exceed mere metaphysical possibility**.

Id.

Finding that the Department of the Treasury had already made a decision to invest in the securities traded by Litvak, and his allegedly false statements regarding the balances on the monthly balance reports came subsequent to the Treasury's decision making process, the Second Circuit found that the Government failed to prove that the false statements were material. Accordingly, the four convictions for violations of 18 U.S.C. § 1001 were reversed and dismissed as legally insufficient.

The Government argues these two cases are inapposite. However, those two cases dealt exactly with the same type of theory of prosecution found in the instant case. An application of the principles of law set forth in Gaudin and Litvak require the same conclusion herein.

In the instant case, the Government's evidence concerning the materiality element of Counts # 1 and # 2 was legally insufficient. The Government's theory at trial was that false letters like the November 16, 2014 letter have the potential to consume valuable time and resources in reading and reviewing them, and therefore, the false latter was material. There are several problems with this theory.

First, there was no evidence in the record that Dianna Banks gave the letter anything other than a cursory examination; there certainly was no evidence that she expended valuable time and resources reading the letter or that her reading the letter actually did affect any decision making.

Second, the potential is exactly the type of "mere metaphysical possibility" the Second Circuit rejected as legally sufficient evidence to convict a person of 18 U.S.C. § 1001.

Third, on the facts, the letter never had the ability to affect any decision making process for Marshall's admission into RDAP. The testimony of Dr. Hoffman and the Government's documentary evidence conclusively established that the decision to deny Richard Marshall admission into RDAP was made before the November 16, 2014 letter was submitted. The basis of that decision was the lack of documented substance abuse in the year preceding Marshall's

arrest in the Pre-Sentence Report. This decision was made regardless of the recommendation of the District Court Judge who sentenced Marshall and recommended drug treatment and regardless of Marshall's self-reporting of substance abuse upon entry into USP Lewisburg.

Additionally, Dr. Hoffman testified conclusively that the November 16, 2014 letter would have made no difference in any decision making process because on its face, it did not satisfy several requirements for consideration. The brief and perfunctory entry into Marshall's BOP records bears this out – that BOP officials never even considered the letter in making a determination whether Marshall should be admitted into RDAP. In short, Dr. Hoffman's testimony and Government Exhibit # 4 conclusively establish that the letter, and its contents, was meaningless, and never relied upon in making any determination.

Alternatively, the Government argues, the Shabazz letter was material because it "distracted the BOP from critical matters." (Docket Entry # 225, page 20 of 27). In support of that argument, the Government points to Dr. Hoffman's testimony that false letters, in general, can consume time in distracting BOP personnel from other duties.

The problem with the Government's argument is that Dr. Hoffman never tied his testimony about false statements in general to this particular case. To be clear, the defense does not concede that the Shabazz letter was capable of distracting the BOP from other duties.

Rather, Dr. Hoffman's testimony established a clear timeline of events that leads to the conclusion that the decision to reject Marshall from the RDAP program was made before the letter was received. The Court itself honed in on this issue when Dr. Hoffman testified directly in response to your Honor's question, that this letter meant nothing and had no capability of accomplishing anything other being used as scrap paper.

Every day in FBI field offices around the country, people walk in with wild stories of conspiracy theories, requests to take action against former boyfriends, girlfriends, and spouses, extra-terrestrial encounters, and all other sorts of insane stories with the intent to get the FBI to act. It is safe to say that the FBI will never act on the vast majority of those false reports, immediately disregard them and relegate them to the circular file. That is exactly what happened here.

Because the Government's evidence was legally insufficient to establish the element of materiality, this Court should grant the instant motion in its entirety as to both counts of the Indictment.

Additionally, with respect to Count # 1 of the Indictment charging Mr. Brettschneider with Conspiracy to Make False Statement, this Court should find that the evidence was legally insufficient to establish that Mr. Brettschneider had a "stake in the venture or outcome" as to make him an intentionally participant in the conspiracy.

To establish the requirement of intent for the Federal crime of conspiracy, "[t]here must be something more than 'mere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy.'" United States v. Ceballos, 340 F.3d 115, 124 (2d Cir. 2003), quoting United States v. Cianchetti, 315 F.2d 584, 588 (2d Cir. 1963). "There must be proof that [the defendant]

intended to join the conspiracy, that is, that he participated in it, or in some way made an affirmative attempt to further the conspiracy's purposes, or made it his own venture **in the sense of having a stake in its outcome.**" United States v. Ceballos, at 127-128 (emphasis added), see also United States v. Beech-Nut Corp., 871 F.2d 1181, 1191 (2d Cir.1989) ("[A] defendant may be deemed to have agreed to join a conspiracy if there is something more, some indication that the defendant knew of and intended to further the illegal ventures, that he somehow encouraged the illegal use of goods or had a stake in such use." (internal quotation marks omitted)). Accordingly, unless at least two persons have a shared purpose or stake in the promotion of an illegal objective, there is no conspiracy. United States v. Parker, 554 F.3d 230, 234 (2d Cir. 2009).

At trial, the Government presented no evidence that Mr. Brettschneider had any stake in the outcome of submitting a false letter to the Bureau of Prisons. The Government's theory, as expressed during summation, was that Mr. Brettschneider participated in the conspiracy to keep his client, Richard Marshall, happy. However, the Government presented no evidence that Mr. Brettschneider stood to benefit in any way from the object of the conspiracy; rather, it was Marshall that was to realize a benefit. There was simply no evidence that Mr. Brettschneider was paid, or expected to be compensated, for assisting the co-defendants in any fashion. As a consequence, the Government failed to show that Mr. Brettschneider had any shared purpose or stake in the outcome sufficient to establish that he intentionally participated in this conspiracy. Accordingly, this Court should grant the motion for a judgment of acquittal as to Count # 1 on this ground as well.

The Government argues throughout their response that this Court should reject the defense arguments because the jury rejected the same arguments. Obviously, that is not the appropriate standard. Gaudin established that the question of materiality is a mixed question of law and fact. Since this Court is deciding whether the evidence was legally sufficient to establish materiality, this Court decides it as a mixed question of law and fact independently from the jury's determination. Simply put, the verdict has no bearing on the Court's analysis. As is made clear before every trial, each participant in a trial has different roles. The Court's role as clearly stated is to be the judge of the law and the jury's role is to be the judge of the facts. In this instance the jury's decision on the facts not only does not but should not influence the Court's role as decider of the law of the case. The law as is clearly outlined by the aforementioned cases most respectfully mandates that this Court set aside the verdict in this matter. The jury's verdict must be irrelevant to this decision, to rule otherwise would usurp the Court's role herein.

Should Your Honor deny the Rule 29 motion, the defense respectfully moves in the alternative for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Upon motion by the defendant, a District Court may consider setting aside the jury verdict and ordering a new trial "if the interests of justice so require." Rule 33, Federal Rules of Criminal Procedure; United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (citing United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)) ("The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.").

In considering a Rule 33 motion, a court must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." Ferguson, 246 F.3d at 134. The court is not required to view the evidence in the light most favorable to the Government, but rather is to weigh the evidence and determine the credibility of witnesses. Id.

A District Court has "broader discretion" to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29. Ferguson, 246 F.3d at 134. "[A]guilty verdict might survive a Rule 29(c) motion - because a rational jury, viewing the evidence through the government's eyes, could convict - but fail to meet the Rule 33 standard because the momentum of the evidence as a whole would make a guilty verdict irrational." Id. at 139 n. 1 (Walker, J., concurring in part and dissenting in part).

Several Circuit Courts have described the power of Rule 33 review as enabling a District Court to "act as a thirteenth juror, assessing credibility of witnesses and weight of the evidence." United States v. Munoz, 605 F.3d 359 (6th Cir. 2010), citing United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998); United States v. Herrera, 559 F.3d 296 (5th Cir. 2009) (holding that a Rule 33 motion permits a District Judge to sit as a thirteenth juror and reweigh evidence); United States v. Borda, 786 F.Supp.2d 25 (Dist. Ct., D.C. 2011) (Kessler, J.) (recognizing that Rule 33 review enables a court to sit as a thirteenth juror); Brodie v. United States, 295 F.2d 157 (D.C. Cir. 1961) (Rule 33 application requires court to sit as a thirteenth juror); see also Tibbs v. Florida, 457 U.S. 31, 42 (1982) (recognizing that weight-of-evidence review enables a court to sit as a thirteenth juror). The Second Circuit has not adopted the "thirteenth juror" standard, nor has it rejected it. However, the Southern District of New York has recognized this as the proper standard to apply on Rule 33 review. United States v. Davidson, 308 F.Supp.2d 461, 465 (S.D.N.Y. 2004) (McMahon, J.) ("When considering a new trial motion under Rule 33 of the Federal Rules of Criminal Procedure, the Court sits as a proverbial thirteenth juror, and may consider the evidence in whatever light seems most persuasive to it—which may or may not be most favorable to the Government.").

By whatever standard this Court decides to use, the verdict should be set aside. The weight of the evidence preponderates against a verdict of guilty for the reasons set forth above in this motion.

Additionally, the evidence at trial established that Reginald Shabazz-Muhammad authored the letter on his own letterhead, sent the letter from a location near his own residence, and then refused to engage Richard Marshall and Charles Gallman when they requested additional false progress notes after the letter had been sent. In short, while there was some evidence that Scott Brettschneider may have had knowledge of the existence of a letter to be written by Mr. Shabazz, there was insufficient evidence that Scott Brettschneider was a knowing and willing participant in the conspiracy.

Accordingly, this Court should grant this motion and set aside the verdict as against the weight of the evidence.

I look forward to seeing Your Honor at the next scheduled appearance.

Respectfully Submitted,

*Patrick Joyce*

Patrick Joyce, Esq.

CC:
AUSA Andrey Spektor
AUSA Margaret Gandy
VIA CM/ECF