U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KDE:MEG/AS/LKG

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 19, 2019

By Hand and ECF

The Honorable Carol B. Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Scott Brettschneider
                Criminal Docket No. 18-123 (S-1) (CBA)

Dear Judge Amon:

      The government respectfully submits this letter in advance of defendant Scott Brettschneider's sentencing, scheduled for July 26, 2019. Brettschneider admits that he was charged with serious offenses but still refuses to take full responsibility for his role, blaming his co-defendants, including the paralegal whom he tasked with the fraud. The lack of remorse and Brettschneider's grossly unethical and illegal conduct involving case-fixer Charles Gallman warrants a term of incarceration.

    I.    Background

      Brettschneider was convicted following a jury trial with making and conspiring to make a false statement to the Bureau of Prisons ("BOP"), in violation of 18 U.S.C. §§ 1001(a)(2) and 371. Presentence Investigation Report ("PSR"), ¶ 1. The evidence at trial showed that he worked with two co-conspirators, Gallman and Reginald Shabazz-Muhammad to submit a false letter to the ("BOP") on behalf of a federal inmate, Richard Marshall, in an effort to get him admitted into the Residential Drug Abuse Program ("RDAP") and reduce his sentence.

      RDAP is a treatment program sponsored by the BOP that is available to sentenced inmates who receive a verifiable diagnosis of a substance use disorder within the year preceding their arrest. Id. ¶ 5. An inmate who successfully completes the RDAP program is eligible for early release, receiving as much as a year off his sentence. Id. ¶ 5, n.1. That was the benefit that Brettschneider and the co-conspirators were after. See, e.g., GX 23 (Marshall remarking that "they might be giving nig\*\*s the whole year off"); GX 21 (Marshall telling Brettschneider that getting into RDAP would "push me out next year" and Brettschneider responding, "I know who to talk to").

At the time, Marshall was in custody following his conviction in United States v. Wright et al., 12-CR-014 (FJS) (N.D.N.Y), a 16-defendant drug conspiracy case. In Wright, Marshall pled guilty to distributing at least 280 grams of crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A). Brettschneider represented Marshall.

In his sentencing submission in Wright, Brettschneider asked that Marshall be sentenced to home or community confinement, which could include an alcohol or drug rehabilitation center. Id. ECF No. 336 at 6; GX 16 at 6. Brettschneider also submitted a report (publicly available) from a psychologist who evaluated Marshall. The report twice stated that while Marshall had used drugs decades earlier: "Mr. Marshall has been clean and sober for over 20 years." Id. ECF No. 338 at 2 & 6; GX 17 at 2 & 6. Dr. Marc Janoson prepared the report and addressed it to Brettschneider, who in turn filed it on the docket and dedicated an entire section to it in his primary sentencing submission. See GX 16, at 7. The defendant wrote, "It is apparent from Dr. Janoson's report that Mr. Marshall is not a danger to the community nor is there a likelihood that Mr. Marshall would resume criminal conduct." Id. At sentencing, Brettschneider told the court he had known Marshall for 20 years and in that time, Marshall had led a "clean life," free of crimes save for a marijuana arrest. Marshall was sentenced in August 2014 to 36 months' imprisonment.

Marshall had been Brettschneider's long-time client and a source of referrals for his law practice. Trial Transcript ("Trial Tr."), at 691:14-16; 703:2-8 (testimony of Brettschneider's witness, Jason Russo, explaining that Marshall was not only a "long-time client" but would also refer business to Brettschneider). Marshall was important to Brettschneider in part because he did not appear to have a lucrative law firm practice. See Government Exhibit ("GX") 48 (Brettschneider and Charles Gallman discussing how badly they needed money because it's "rent time again"); GX 31 (Marshall complaining about Brettschneider's lack of responsiveness, stating that, "He wasn't tired when I was burning that mother fucking bread though."); but see Trial Tr. 710:23-711:14 (Russo claiming that he and Brettschneider had such a "thriving" law practice that "Scott Brettschneider had his own judge assigned to all his cases," i.e., the "thousands" of criminal cases he had at one point).

Marshall told Brettschneider how to maximize his chances of getting admitted into the RDAP. Describing the fraudulent letter that Brettschneider was to supply, Marshall explained that, "It got to have the letterhead . . . . It got to look real official [be]cause . . . [t]hey don't want some bullshit over here." GX 21. Brettschneider understood what he had to do ("Right, ok"). Id. In the three-way call, Gallman reassured Marshall that "we'll get it to you next week," a belief Brettschneider echoed ("alright, we'll get it" and, later, "I am on it, I am on it, I'll take care of it for Tuesday"). Id.

Later, Brettschneider told Marshall that he found the person who would author this fraudulent letter. "He's gonna do it," Brettschneider said, referring to the person he apparently had recruited on short notice. GX 23. As it turned out, the person who would write about Marshall's prior drug treatment was co-defendant Shabazz-Muhammad—Brettschneider's part-time legal assistant. Brettschneider described him as a dependable worker, willing to do hours of grunt work: "He's a guy that he'll stand there copy 500 pages for me and put together a loose leaf, you know, for trial." GX 35. Brettschneider knew that Shabazz-Muhammad was desperate for work. Id. ("[He's been calling me for work, and I just haven't had a lot for him.").

The co-conspirators brainstormed about the contents of the letter over several telephone calls. See, e.g., GX 21 (Marshall telling Brettschneider the letter should say he had a

long-term problem with drinking and that he would relapse); GX 22 (Marshall telling Brettschneider that the letter could say he was in an "outpatient" program, that he "always" had a "drinking problem," and that Brettschneider could feel free to "put drugs too, whatever"). They even knew the identity of the decision-maker for the RDAP program in Marshall's prison, Dr. Diana Banks, the RDAP coordinator. See GX 23; GX 57.

The letter the BOP received (the "Letter") was addressed to Dr. Banks and was sent from "Reginald Shabazz-Muhammad[,] Dir. of Services[,] Muhammad Mosque No. 7." GX 1a (original envelope); GX 2a (copy). Just as the co-conspirators discussed, the Letter described Marshall's purported alcohol abuse (along with marijuana dependence) and treatment in an outpatient program until he, "without any notice or explanation," stopped attending in 2010. See GX 1B (original) and GX 2B (copy).

Among other things, the Letter provided that: (1) Marshall had been enrolled in Shabazz-Muhammad's program; (2) Marshall was suffering from active substance dependence at the time he enrolled in the program; and (3) while in the program, Marshall gradually reduced this dependence. Id. Each of these three statements was identified in the indictment as materially false and proven as such at trial. See ECF No. 74 (S-1 Indictment), ¶ 3. Brettschneider kept track of the Letter, asking Gallman in one call whether Marshall had received it yet. See GX 27.

After the Letter made its way to the BOP, Marshall told Gallman that, "She [i.e., Dr. Banks] wants progress notes along with that [i.e., the Letter]." GX 28. Gallman said they would "find somebody to make them up" but he was unsure if Shabazz-Muhammad would agree—"that's Scott [Brettschneider's] man . . . like I know the dude, but I don't know what he'll do." Id. Marshall told Brettschneider the Letter was "great[,] [d]on't get me wrong," but could use some improvement: the date of when his purported treatment ended should be pushed to 2011 and not stop in January 2010 as the Letter provided. See GX 30. Just as he had explained to Gallman, Marshall told Brettschneider about the additional false documents he needed to provide Dr. Banks: "She just want, you know, like, you know like, the progress notes, the session notes." Id. Brettschneider responded that he would check with Shabazz-Muhammad the following Tuesday, and that he was optimistic he could deliver session notes too. Id.

When Shabazz-Muhammad learned about the request, however, he disappeared, ignoring all three of his co-conspirators, despite their attempts to reach him. See GX 31 (during the telephone call, stating he would get a "notebook" to write down what Marshall needed; Shabazz-Muhammad never returned to the call); GX 33 (one of Gallman's and Marshall's attempts to reach Shabazz-Muhammad); GX 12b (Shabazz's toll records, showing furious activity during the drafting-stage of the letter between Brettschneider and Shabazz, but no communications between December 6, 2014 and December 30, 2014). After learning about Shabazz-Muhammad's disappearance, Brettschneider told Gallman they should, perhaps, stop pursuing the matter too. See GX 33 (Brettschneider telling Gallman that what Marshall was looking for is "not really that easy to uh—" and "I don't think we should [laughing]—I think we just, you know what, I don't know").

Marshall did not get admitted into RDAP. Trial Tr. 56:1-3. Before the BOP received the Letter, detective Richard Santangelo, the lead investigator with the Queens County District Attorney's Office ("QCDA"), who was in charge of the wiretap that allowed the QCDA to intercept Marshall's conversations, notified the BOP about the co-conspirators' plan to submit a fraudulent letter. Trial Tr. 419:9-21. When the BOP finally received the letter, a BOP

investigator, Suzanne Heath, forwarded a copy to Santangelo and provided the original to the Federal Bureau of Investigation.[1]

II.     Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted); see also United States v. Booker, 125 S. Ct. 738, 743 (2005) (although the Guidelines are advisory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence).

Next, courts should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Gall, 552 U.S. at 50 (citation and footnote omitted). Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [18 U.S.C. § 3553(a)(2)]." The factors courts shall consider in imposing sentence include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as the need for the sentence imposed:

>   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B)   to afford adequate deterrence to criminal conduct;
>
>   (C)   to protect the public from further crimes of the defendant; and
>
>   (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In addition, 18 U.S.C. § 3661 provides that, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

---

[1] The co-conspirators decided to simultaneously send a copy of the Letter to Marshall, so that he could be prepared to answer questions about his purported treatment. See GX 23 ("Like if she [i.e., Dr. Banks] get a letter and she get to question you about shit, and you give different answers than what's in the letter, then you fucked."). The BOP allowed that copy to pass through to Marshall, who in turn discussed its contents in intercepted communications.

III. Guidelines Calculations

The government agrees with Probation and the defense, see Defendant's Sentencing Letter ("Ltr."), Dkt. No. 235, at 2-3 (stating "no objection to the Guidelines analysis"); PSR ¶¶ 29-37, that the applicable Guidelines range is 0 to 6 months, based on Criminal History Category I and the following calculation:

| | | |
|---|---|---:|
| Base Offense Level (§§ 2X1.1(a), 2B1.1(a)(2)) | | 6 |
| Plus: | Aggravating Role (§ 3B1.1(c)) | +2 |
| Total: | | 8 |

IV. Discussion

   A. The Section 3553(a) Factors Require a Term of Incarceration

Brettschneider was convicted of charges that he admits are "quite serious." Ltr. at 15. He is right, and the Court has agreed too. See, e.g., January 25, 2019 Transcript of Reginald Shabazz-Muhammad's Sentencing ("Shabazz-Muhammad's Tr."), at 18:23-24. Dr. Hoffman described at trial and in his victim-impact statement how false applications and unwarranted admissions affect this important and effective program. See PSR ¶ 12; Trial Tr. 45:7-18. The BOP has no meaningful way to fully vet the thousands of annual applications that it fields from inmates, and, as a result, must rely on inmates and their counselors to distinguish between inmates who desperately need treatment and those, like Marshall, who just want a shorter sentence. See, e.g., United States v. McDonough, 233 F. Supp. 3d 231, 236, 239 (D. Mass. 2017) (quoting testimony of BOP doctor recognizing that inmates have an "incentive to lie to get into the program and obtain a reduction in their sentence," and noting that the defendant had been improperly admitted into the RDAP program).

In this instance, the BOP was alerted by law enforcement because the QCDA happened to have been intercepting Gallman's cell phone based on a different scheme. Without the wiretap, this case would never have been prosecuted, and Marshall might well have been admitted into the RDAP. There is therefore a significant need for general deterrence and to promote respect for the law that counsels in favor of meaningful punishment. See 18 U.S.C. § 3553(a)(2)(A).

Brettschneider's role in this crime is particularly reprehensible, as he recognizes, because he is an attorney. See Ltr. at 13, 19   When Marshall (with Gallman on the line) presented Brettschneider with the idea of committing fraud to cut his sentence, Brettschneider, despite being sworn to uphold the law, failed to advise Marshall to even consider abstaining from committing a crime while already serving a prison term. Nor did Brettschneider remind Marshall that just two months earlier, Brettschneider had promised a federal judge that Marshall was ready to turn his life around, proclaiming in court that "[t]he chance of a new crime being committed [by Marshall] is non-existent." GX 16, at 9. Brettschneider's violation of his duties as an attorney represents a significant breach of trust vested in him by the courts, the bar and the community at large. This militates in favor of a significant sentence, both to justly punish Brettschneider and to deter other attorneys from violating the law. See 18 U.S.C. § 3553(a)(2)(A), (B).

But what is particularly reprehensible is that Brettschneider did not merely go along with the crime; he enabled it. He told Marshall that he had someone in mind for the job, and then persuaded Shabazz-Muhammad to write the false letter. Gallman's repeated failed efforts to find an author for this false letter show that but for Brettschneider, this crime likely would not have been committed. See, e.g., GX 21 (trying to recruit "Greg X" and "Prince Rasheen"); GX 22 (suggesting someone from Virginia could write the letter).

There is one more factor that sets Brettschneider apart from his co-defendants. Brettschneider pulled Shabazz-Muhammad into the conspiracy—a person who had a distant criminal history but had turned his life around, earning drug-counselor certifications and otherwise living a law-abiding life. Shabazz-Muhammad depended on Brettschneider for work, and, by his own account, viewed Brettschneider as a friend. At Shabazz-Muhammad's sentencing, this Court observed:

> It is unfortunate that [Shabazz-Muhammad] became involved in this matter at the request of someone who was supposed to be an officer of the Court. Mr. Shabazz-Muhammad, as he recognized today, was clearly a grown man who knew that this was wrong. He was put in, I'm sure, a difficult position because he was financially dependent on this person, as well as they apparently shared a personal relationship as well.

Shabazz-Muhammad Tr. 19:10-17. During the proceeding, Shabazz-Muhammad explained that Brettschneider pitched the task to him as "correct[ing] the wrong . . . that Mr. Marshall was experiencing." Id. 17:4-6. Shabazz-Muhammad felt "loyal[]" to Brettschneider: "For many years Scott Brettschneider was not only my employer, but I believed him to be a friend." Tr. 16:21-24. See also Tr. 12:15-21. Brettschneider abused his relationship with Shabazz-Muhammad and led him astray. The exploitation of this relationship, by an officer of the court no less, also counsels in favor of a significant sentence.

In short, Brettschneider committed a serious offense and, as the Guidelines only partially capture, played a significant role in enabling the crime and encouraging a reformed criminal to engage in fraud.

    B.  Brettschneider's Submissions

The government does not dispute the significant mitigating factors presented in Brettschneider's submission, notably his own health and that of his daughter. There are, however, statements in the letter to which the government must respond.

*First*, Brettschneider compares himself to Shabazz-Muhammad and Marshall, and proposes a sentence that is in line with the terms of probation the Court imposed (on the government's consent). Ltr. at 20.[2] He brushes off Gallman's six-month sentence for the same crime explaining that Gallman was charged with bribery too, conduct for which he says Gallman was not separately punished in Queens County Supreme Court. Id. The latter assertion is

---

[2] Marshall, in his sentencing submission referred to Brettschneider when he wrote that the "Court will likely have further and better opportunity in this case to deliver a stern warning to those considering the falsification of records to the BOP." Dkt. No. 64, 5-6.

wrong—Gallman pleaded guilty in state court for a different bribery offense—and irrelevant. The Court's upward variance was for the bribery count, not for the RDAP fraud. See Dkt. No. 172. In any event, all of Brettschneider's co-conspirators in the RDAP crime accepted responsibility, which he still has yet to do. If anything, the comparison suggests that Brettschneider should be sentenced to a term of imprisonment. See United States v. Johnson, 567 F.3d 40, 54 (2d Cir. 2009) ("[A] a district court may -- but is not required to -- consider sentencing disparity among co-defendants under 18 U.S.C § 3553(a)(6).").

*Second*, Brettschneider claims to "respect . . . the juries [sic] verdict," but accepting the verdict, to him, means that it showed he did not sufficiently "comprehend what his co-defendants were planning on doing." Ltr. at 15. Brettschneider also writes that "he is still not quite sure what he did wrong." Id. at 1. He asks if he "trust[ed] the wrong people?" and answers himself, "sure," adding that he "[s]hould . . . have been more concerned about what others were doing." Id. at 2. These statements are remarkable in light of the evidence presented at trial—and not just the "witness after witness" he remembers testifying. Id. at 1.

Brettschneider heard his own voice during trial. In calls with his co-conspirators it was apparent that Brettschneider learned quickly what Marshall needed: a letter "from a former program," as he repeated to Marshall. GX 21. And it was just as clear he knew why: Marshall said it would "push me out next year." Id. Brettschneider never asked Marshall for contact information for that former program, and instead volunteered, "I know who to talk to" and "We'll get it to you next week." Id. Marshall even dictated to Brettschneider what he wanted this false letter to say—that he had been "drinking forever" and "relapsing and all that kind of, you know," which Brettschneider knew was not true from the Marshall's PSR and Brettschneider's own advocacy before Marshall's sentencing judge. Id. See also GX 22 (Marshall telling Brettschneider to put that he had "always" been in drug treatment, "put drugs too, whatever," and Brettschneider saying he would "take care of it"); GX 23 (Marshall asking what program Brettschneider was going to write Marshall attended, and Brettschneider stating, "it's Shabazz program"). After tasking Shabazz-Muhammad with the fraud, Brettschneider stayed on top of the project, confirming who at the BOP needed to be deceived, see GX 57, and updated Gallman on the status of the letter, see GX 25.

Brettschneider was not duped, and he did not withdraw from the conspiracy, even after the initial attempt to get Marshall admitted failed. When Marshall asked for false progress reports to supplement the letter, it was Brettschneider's paralegal, Shabazz-Muhammad, who declined to perpetuate the fraud despite Brettschneider's apparent insistence. See GX 30 (telling Marshall he would ask Shabazz-Muhammad for progress notes); GX 12b, at 309 (telephone tolls showing Brettschneider and Shabazz-Muhammad speaking on the same day). It was only when his paralegal balked at the idea of continuing to lie to the BOP that Brettschneider told Gallman—a lifelong criminal—that maybe they should stop pursuing this too. See GX 35 ("I gotta tell you, what Love's looking for . . . that's not really that easy to uh. . . . Well you know what, I don't think we should [laughing]—I think we just, you know what, I don't know).

In short, shifting blame to his co-defendants shows that even post-trial, Brettschneider has not accepted any responsibility for the crime or for bringing Shabazz-Muhammad into this conspiracy. That indicates that he should not get the benefit his co-defendants received for acknowledging their wrongdoing, and it casts doubt on the credibility of other assertions in Brettschneider's letter.

*Third,* Brettschneider claims he will "never practice law again," Ltr. at 2, and "will be disbarred," id. at 13.  He asks the Court to consider this as a collateral consequence.  See, e.g. Ltr. at 14.  Brettschneider's counsel confirmed to the government that Brettschneider has decided not to oppose disbarment.  Yet according to the New York State Bar Grievance Committee, Brettschneider asked for an extension to file his opposition to the committee's motion to disbar him, seeking (successfully) to have his deadline extended until after sentencing.  To this day Brettschneider has not submitted anything in that proceeding to indicate that he has conceded disbarment.  The government has no reason to doubt Brettschneider counsel's representation, but Brettschneider has a history of changing attorneys and blaming prior counsel for representations made to this Court.  See Dkt No. 231, at 2 (summarizing how Brettschneider blamed first counsel for not relaying his trial schedule despite sitting at counsel table, how the Court questioned whether he was engaged in delay tactics, and how he is now blaming his second attorney for not making certain arguments).  The government will update the Court at sentencing as to whether Brettschneider has formally agreed that he should be disbarred.

*Fourth*, Brettschneider is far from the "ethical" attorney he claims to be.  Ltr. at 2, 13.  As this Court knows from sentencing Gallman and presiding over two trials, Gallman is a professional case-fixer—a pseudo-paralegal/investigator who worked with a small and self-selected group of deeply unethical lawyers to sabotage criminal cases and bring civil lawsuits based on false recantations.[3]  These lawyers drew on Gallman's well-known community in Queens.  See March 7, 2019 Transcript of Gallman's Sentencing Hearing ("Gallman Sentencing Tr."), at 6:22-7:4, 7:20-24 (Court recognizing Gallman's use of his influence within the Queens criminal community to "subvert" both criminal and civil cases).  Examples of the kind of conduct in which these attorneys have engaged abound.  See Dkt. No. 23, at 6-12; Dkt. No. 147, at 11-13, 153.

When Gallman interacted with lawyers outside of this small group, the conversations were revealing.  In one call the government offered the Court at Gallman's sentencing, the unaffiliated lawyer was confused about Gallman's job because Gallman admitted he was not a licensed investigator.  Gallman explained, that "I'm known in the street for helping guys get out of jail.  Helping guys . . . For helping guys get out and guys who don't want to go to jail.  I help them."  See Gallman Sentencing Tr., 7:4-5 (Court drawing on this call explain Gallman's reputation).

Apart from John Scarpa Jr., no lawyer worked closer with Gallman than Brettschneider—or as he was known to Gallman and Marshall, "Mighty Whitey."  Over the course of a six-month wiretap, Gallman and Brettschneider spoke hundreds of times, see Trial Tr. 329:2-4, and, as the Court will recall from litigation over "non-RDAP calls," see, e.g. Dkt. No. 177, at 6-8, worked closely together on many cases.  One example, which the Court

---

[3] Two of those lawyers (Scarpa and another attorney) have been convicted of bribery.  A third lawyer used Gallman to try to intimidate a witness and showed complete disrespect for the presiding judge.  As the government described in previous submissions, that lawyer sent Gallman to intercept a victim of a knifepoint robbery on the way to a lineup, but when the victim did not show up, and the presiding judge set $150,000 bail in the violent case, the lawyer remarked about the judge, "Oh, you one of those bitches? . . . [D]evil ass bitch."  She told Gallman that "when there's a race war, I'm taking this bitch's head off personally.  I can't wait."  The two resolved not to waive time to indict because, as the lawyer said, "You ain't got him [the victim] now, you ain't going to have by Monday."  Gallman then worked with the defendant's father to try to find and bribe the victim not to cooperate.  See Dkt. No. 23, at 9-10.

considered in sentencing Gallman, shows that Gallman engaged in the same unethical (and perhaps criminal) behavior when collaborating with Brettschneider.

In one call, Brettschneider and Gallman schemed to sell a recantation of a witness.[4] The beneficiary of this false statement—a convicted criminal defendant—had not even spoken to Gallman or Brettschneider but the two men were excited that he would have to hire them. The witness was apparently ready to say that the police made him lie, which Gallman and Brettschneider thought was enough to bring a civil lawsuit. See Sentencing Exhibit 1T, at 4:108-112. And because they controlled this witness, Gallman and Brettschneider thought the defendant would be forced to hire them—otherwise they would not "give" him the statement, which the two men felt confident they owned. Id. at 2:37-42. As Gallman put it in preparing Brettschneider to meet the prospective client, "[T]ell this guy . . . we in control of this, he gotta retain us . . . . We got the statement he don't want us to do the shit then I am keeping the statement." Id. at 3:37-38. Brettschneider agreed: "Exactly." Id. at 3:40.[5]

Notably, there was no discussion about the defendant's lawyer or whether he had any pending appeals. Brettschneider wanted to make it seem like the defendant was reaching out to him: "[L]et him call me and, and, have him call me and let me see if Ty can get him on the telephone with me tonight, and ask me to come see him." Id. at 3:27-29. The two men were giddy at how long the defendant had spent in jail. Brettschneider told Gallman, that this jail time could mean millions of dollars for them. Id. at 5:142. He asked, "How many years this guy been in jail?" Id. at 4:138. They agreed that this could be their "retirement money." Id. at 4:132-134.

Brettschneider told Gallman that his investigator, "Jay," knew what the witness needed to say: "This is why I wanna be with Jay, because he's done thousands of these wrongful conviction cases as an investigator, *he knows exactly what needs, you know, for the guy to say*." Sentencing Ex. 1T at 4:115-118. (emphasis added). In the same call, Gallman also told Brettschneider—much like he told Scarpa after meeting with Luis Cherry— "[T]he only thing I know, we got a real winner here, we got a real winner here, *the kid is gonna do whatever it is we need him to do*." Id. at 5:147-149 (emphasis added). Brettschneider responded, "Yeah, ok." Id. at 5:151.[6]

---

[4] A transcript of excerpts of this call and the call itself (respectively, Sentencing Ex. 1T and Sentencing Exhibit 1), is enclosed with this letter. The disk with the call will be provided to chambers.

[5] Elsewhere in the call (not in the transcribed portion), Brettschneider responded "absolutely" to confirm that they would allow access to this statement only if the defendant hired him and Gallman.

[6] In the call between Gallman and the witness (but without Brettschneider on the line), it was clear beyond any doubt that the planned recantation would be false. As the witness put it, he would be "lying through [his] teeth." Sentencing Ex. 2T, at 5:156. A transcript of this call and the call itself (respectively, Sentencing Ex. 2T and 2) are also enclosed with this submission. Gallman and the witness explicitly discussed payment for this false statement—what Gallman believed was "the best recantation I ever heard." See Sentencing Ex. 2T at 5:140-142 ("Jay [the investigator] told Scott [Brettschneider] ain't no way in the world this kid lying man that's the best fuckin recantation I ever heard in my life man. Did you see the emotion he had, yo?"). The witness apparently wanted to be paid immediately, and Gallman said it was contingent on Gallman's and Brettschneider's prevailing in the civil lawsuit (on behalf of the criminal defendant who had not even hired them). See id. at 2:22-33. The witness told Gallman that he had not lied at trial and if he were to lie now, he wanted to be paid. See id. at 3:81. Gallman did not care: "We already know that homie, we already know you didn't lie, you done told me that." Id. at 3:83-84. Although years later the witness was unable to pick Brettschneider out of a photo array, just days after the call between Brettschneider and Gallman a QCDA investigator swore in a wiretap affidavit that he

This conduct reveals Brettschneider's true "history and characteristics." 18 U.S.C. § 3553(a)(1). At a minimum, Brettschneider tried to coerce a criminal defendant who was potentially wrongfully convicted of murder, into hiring Brettschneider just to release the recantation, so that Brettschneider and Gallman could profit from a civil lawsuit. Compare with Ltr. Ex. D (character letter, stating that, "When Scott got behind a wrongful conviction case, he never faltered and exhausted every remedy available to achieve justice."). See Rule 7.3(a)(2)(iii) of N.Y. Rules of Professional Conduct (forbidding solicitation if, inter alia, it "involves coercion"); id. Rule 8.4(d) (mandating that a lawyer shall not "engage in conduct that is prejudicial to the administration of justice"); id. Rule 5.3(c)(2) (stating that a lawyer "shall be responsible for conduct of [a nonlawyer] . . . associated with the lawyer if," inter alia, the lawyer "should have known of the conduct").

Moreover, while not nearly as egregious, the evidence showed that Brettschneider shared his legal fees with Gallman, see, e.g., GX 48 (Gallman telling Brettschneider how much to demand from a client because "we need that money"); Sentencing Ex. 1T, at 4:132-4:138. (discussing their joint fee from potential civil lawsuit), and relied on Gallman and Marshall for business referrals, see Trial Tr. 702:23-704:4; 705:3-6; see also GX 31 (Marshall complaining to Gallman that Brettschneider was more responsive when Marshall was making him money: "He wasn't tired when I was burning that motherfucking bread"). That's also unethical. See Rule 7.2 of N.Y. Rules of Professional Conduct (generally forbidding payment to a person who recommended a client); id. Rule 5.4 (generally forbidding sharing of legal fees with a nonlawyer).

*Fifth*, the government has no information to dispute Brettschneider's difficult personal circumstances, which he tells the Court in a letter detailing his daily struggles, is "not written in order to garner sympathy." See July 16, 2019 letter from Brettschneider, at 4. But in deciding how much weight to put on these mitigating factors, the Court should note that, for a time, Brettschneider was prepared to serve as trial counsel in a seven-week trial in the Southern District of New York that was scheduled to run into 2019. See Transcript of August 2, 2018 Conference, at 5:14-24.[7] By his own account, Brettschneider has, until his arrest, "tried cases up and down the Eastern Seaboard from north to south," Ltr. at 1, at least some while living in North Carolina, Ltr. at 3. At trial, Brettschneider's primary witness claimed that Brettschneider even had "his own judge assigned to all his cases in Queens County Supreme Court case." Trial Tr. 711. See also Trial Tr. 780:4-11 (counsel in summation repeating this claim). Virtually all of Brettschneider's health issues were diagnosed before or during these busy times for his practice. The government is skeptical that a man who is constantly traveling, and apparently ready to engage in a seven-week federal trial while also fending off his own case, is too feeble to spend even a "short" time in prison. Ltr. at 12.

Nevertheless, Brettschneider's mitigating circumstances have persuaded the government not to ask for a sentence that would normally be appropriate for a similarly situated

---

observed Brettschneider pick up the witness, and also observed the two men, along with Gallman, exit Brettschneider's vehicle. Gallman was arrested months after these calls were intercepted, and the QCDA informed the government that no collateral attack on the judgment in murder case was filed.

[7] As a result of this scheduled trial, about which Brettschneider failed to notify the Court, the Court adjourned trial in this case for five months. The Honorable Lorna G. Schofield ultimately relieved Brettschneider. See United States v. Zhitnik, et al., Criminal Docket No. 16-763, Dkt. No. 537 (S.D.N.Y.).

defendant who has failed to take any responsibility and has shifted blame onto others—a sentence at the top or above the modest Guidelines range. Instead, it respectfully requests that the Court impose a term of incarceration it deems necessary to promote respect of the law and reflect the defendant's history and characteristics.

IV.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of incarceration.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/
Andrey Spektor
Margaret E. Gandy
Lindsay K. Gerdes
Assistant U.S. Attorneys
(718) 254-6475/6213/6155

cc:     Counsel of record (by ECF and email)